Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

NEW PRIME INC., )
)
Plaintiff, )
)
vs. )NO.6:22-cv-03037-S-MDH
)
MCGRIFF INSURANCE SERVICES, )
INC., as successor in )
interest to REGIONS INSURANCE, )
INC., )
and )
)
AMWINS BROKERAGE OF THE )
MIDWEST, LLC, )
)
Defendants. )
_____

DEPOSITION OF GARY GREENFIELD

THURSDAY, SEPTEMBER 21, 2023

11:30 A.M. CST

VIA ZOOM VIDEO CONFERENCE

Page 2

INDEX

WITNESS Page
GARY GREENFIELD
  EXAMINATION BY Ms. Fowler ......................... 4

EXHIBITS

| Exhibit | | Page |
|---|---|---|
| AmWins Exhibit 2 | Plaintiff's Responses to Defendant AmWins Brokerage of the Midwest, LLC's First Interrogatories to New Prime, Inc. | 56 |
| Exhibit 110 | Report of Gary Greenfield | 16 |
| Exhibit 110a | Mock jury results | 73 |
| Exhibit 110b | Deposition attendance by date from Mr. Greenfield's report | 120 |
| Exhibit 113a | 2020 Legal Trends Report | 30 |
| Exhibit 113g(2) | Docket sheet | 90 |
| Exhibit 113j(1) | Deposition of Steve Crawford | 47 |
| Exhibit 113l(1) | Maranga Morgenstern website | 141 |
| Exhibit 113l(2) | Reza Rismani website | 149 |
| Exhibit 116a | Spreadsheet | 163 |
| Exhibit 15a | Time entries by date | 79 |
| Exhibit 44 | Jury instruction | 75 |

Page 3

APPEARANCES:

    FOR THE PLAINTIFF:
    MR. JIM GRIFFIN
    Scharnhorst Ast Kennard Griffin PC
    1100 Walnut Street, Suite 1950
    Kansas City, Missouri 64106-2197
    jgriffin@sakg.com

    FOR THE DEFENDANT MCGRIFF INSURANCE
    SERVICES, INC.:
    MR. ERIC JOHNSON
    Kutak Rock
    2300 Main Street, Suite 800
    Kansas City, Missouri 64108-2432
    eric.johnson@kutakrock.com

    FOR THE DEFENDANT AMWINS BROKERAGE OF THE
    MIDWEST, LLC:

    MS. MEG L. FOWLER
    HeplerBroom, LLC
    701 Market Street, Suite 1400
    St. Louis, Missouri 63101
    mlf@heplerbroom.com

    ALSO PRESENT:
    Joyce D. Lawrence, CSR, RPR
    CSR# 84-1716, CCR# 1329
    Lexitas Legal
    711 N. 11th Street
    St. Louis, Missouri 63101
    Ryan Gray
    Videographer
    Lexitas Legal
    711 N. 11th Street

Page 4

St. Louis, Missouri 63101

IT IS HEREBY STIPULATED AND AGREED by and between Counsel for the Plaintiff and Counsel for the Defendants that this deposition may be taken in shorthand by JOYCE D. LAWRENCE, an Illinois and Missouri Certified Shorthand Reporter, and afterwards transcribed into typewriting, and the signature of the Witness is RESERVED.

*****************

VIDEOGRAPHER: We are on the record. Today's date is September 21, 2023, and the time is 11:39 a.m. Central Standard Time.

Would the court reporter please swear in the witness?

GARY GREENFIELD, called as a witness, being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. FOWLER

Q. Can you please state your name?

A. **Gary Greenfield.**

Q. Mr. Greenfield, we've met before. This

Case 6:22-cv-03037-MDH Document 107-2 Filed 11/10/23 Page 1 of 83

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F

LEXITAS

Exhibit B

is your second deposition. We're going to hopefully be a little bit more organized this time around so that we can get this done.

To start off with, can you walk us through what your professional experience is?

A. Sure. I graduated from law school in 1975. I went to work at a law firm in San Francisco where I stayed from 1976 through -- until 1991. I was a partner there starting in 1980.

The -- in 1991, I left the firm to start this business that I call Litigation Cost Management.

Q. Okay. What -- before you go further, what sort of law did you practice at that law firm in San Francisco?

A. I -- I did some transactional work. But, primarily, I was a commercial litigator doing a whole gambit of commercial litigation of all types. And towards the end of my practice, I was doing a lot of bankruptcy litigation. I was representing accountants in -- in various kinds of situations. Or doing things where accounting issues came up. But, generally, I was a commercial litigator.

Q. Okay. Did you ever do personal injury law?

A. A little bit. Not much.

Q. Tell me -- tell me your experience in personal injury law.

A. My first trial was a personal injury case. I then handled some small insurance coverage cases that personal injuries were involved. There may have been -- there may have been others.

Q. Okay.

A. There may have been some large, more complex litigation involving personal injury coverage.

Q. Did you ever -- your first trial, was that a car accident case?

A. No.

Q. What was it?

A. Someone fell and hurt -- hurt herself.

Q. It was a slip and fall?

A. She fell and hurt herself. I'm not sure if she slipped or --

Q. Did you represent --

A. That was 45 years ago, so --

Q. Was 45 years ago.

When is the last time you think that you practiced personal injury law?

A. I didn't do much personal injury law. As

I said, I was primarily a commercial litigator.

Q. Do you think it was roughly 45 years ago since you did your personal injury lawsuit?

A. I left -- I left my law firm in 1991. So it would have been before that.

Q. Okay. Okay. So at least 32 years ago. Fair?

A. If that's what it subtracts to.

Q. Okay. And when you talk about the insurance coverage, you were litigating the policy and the policy terms, not necessarily litigating what the injuries were. Is that correct?

A. I don't -- I don't recall right now.

Q. Did you utilize any of that personal injury law experience in coming to your opinions today?

A. Well, I'm not sure that I would say that I used that specific personal injury -- those cases in coming to my opinions today.

Q. Okay. And none of those cases -- fair to say, as you sit here today, none of those cases that you recall involved trucking, correct?

A. Not that I recall. Not that I recall.

Q. Okay. What -- and none of those cases, as you sit here today, involved a wrongful death.

Is that fair?

A. I don't recall.

Q. Okay. You don't recall -- is it -- do you think it's not likely that it did, or you have zero memory?

A. I don't recall. I don't recall.

Q. Okay. And so then you started to go into auditing legal bills. Is that correct?

A. No, not exactly. But it's one of the things --

Q. Say it for me in a better way.

A. Pardon?

Q. Say it for me in a better way. What do you do now?

A. What I -- what I -- well, what I started doing in 1991 was consulting with clients, meaning non-law firms and law firms, about how to better manage their litigation in -- in various respects. And among those things was to train companies about how to analyze their legal bills more effectively. Because my experience was that they didn't do a very good job of it. I also consulted with law firms about issues related to billing.

Over time, I was contacted about providing expert witness work about those areas --

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F



Page 9

namely, evaluating the reasonableness of legal fees, billing practices, and other issues related -- all related to legal fees or expert witness fees in one way or the other. And so that became sort of the expert witness side of the practice, which is actually now most -- the great majority of what I do.

Q. When you say, as an expert, you evaluate legal bills for reasonableness, what does that specifically mean? Do they give you a bunch of bills and say, "Are these reasonable"? Or -- or what does that look like?

A. It's evaluating the bills for reasonableness. Yes, it typically will involve getting a number of bills, a bunch of bills; learning about the cases that are involved; analyzing the bills in terms of billing practices and other issues for whether they are reasonable or not. I don't know how to -- I don't know how to explain it better than to say it's evaluating the legal -- the legal fees -- if you would rather say legal fees and expenses, rather than legal bills, that's fine -- for -- for whether or not time and expenses under the circumstances of the case would appear to be reasonable.

Page 10

Q. How often are you retained by a law firm to justify that the legal fees and expenses they incurred were reasonable?

A. I would say that -- the best I can say is that it's very much fifty-fifty in my practice. Half the time I'm retained by law firms -- let's -- let's make sure we understand. But I think you do understand this.

Most of the time I'm contacted by a law firm, even though I'm retained by the client. Typically, I'm paid by the law firm. And I am -- I am retained by the law firm. But it's for the benefit of the client.

Half of those cases it's for the client that's seeking the recovery of fees. Half of the cases it's where the client is opposing someone else's attempt to recover the fees.

Q. In the cases that you work on as an expert, are those cases where attorneys' fees are recoverable in the actual lawsuit?

A. It's both. By that, I assume you mean are they cases where the legal fees may be damages or recoverable in the actual trial as distinct from a post-settlement motion for attorneys' fees.

Q. Correct.

Page 11

A. Again, it's -- it's both. Sometimes it's like this. Sometimes -- I do a lot of motions where one party or the other is seeking the fees that they believe they are entitled to after the settlement, trial, or other resolution of a case.

Q. Often -- in your experience as an expert or as a person just reviewing the legal fees and expenses, how often do you determine that the expenses and fees incurred were not reasonable?

A. Well, it depends on what you mean. It is -- if you're asking me have I ended up rendering opinions in a case where I ultimately determined that the overall fees that were billed were not reasonable, that's not very common. And, typically, if that's where I'm -- if that's my preliminary analysis, the client doesn't hire me to retain the -- to -- to testify in their behalf.

It's very common for me to analyze fees for whether or not the amount being sought is reasonable and that the overall amount is not reasonable until you make certain kinds of adjustments. That's extremely common in -- in -- in what I do.

It's also common for me, in cases where I think that the overall fees are reasonable, to make

Page 12

adjustments to those fees for certain things that get through on bills that I think may have been inappropriate to bill or unreasonable to do under the circumstances or they're in the wrong case or something that makes the actual amount billed inappropriate, even though they are -- they are in the range of reasonableness for that case. And I will make adjustments to the fees in those kinds of cases.

Q. How often have you determined that the hourly rate is reasonable?

A. Frequently.

Q. Frequently. Is that -- the majority of the cases that you work on, that's part of your analysis?

A. It depends. I -- I can't say.

Q. How many lawsuits have you reviewed that involve personal injury defense?

A. You mean, as a -- as a -- in terms of my fee analysis?

Q. Yes.

A. I'm not sure. Probably less than ten.

Q. Less than ten currently or less than ten in your career?

A. Oh, overall. Not currently.

888-893-3767                Lexitas operates in all 50 states and is licensed where required   Nevada Registration #116F
www.lexitaslegal.com

LEXITAS

Q.   How often have you been brought into a lawsuit that involves personal injury, period?

A.   Okay.  Look, when I say "less than," I can't really recall.  I have -- I have done hundreds of cases, you know, since I started.  I'm -- I'm really not certain how many cases involved various kinds of personal injury.  I -- I -- I just really can't say.  So -- and I'm not sure I understand that -- that the question you asked, how it's different than the prior one, or the one -- substantive prior one.  But, basically, I don't remember all of the cases that -- that I've handled that have involved personal injuries.  And sometimes the personal injuries are tangential to some of the issues not involved.

Q.   Have you ever had -- have you ever had a case where you were asked to review a defense firm's work on a personal injury lawsuit to determine whether their fees were reasonable and whether the work they did was reasonable?

A.   Yes.

Q.   How often has that occurred?

A.   I can't say.

Q.   Is it the less than ten that you were speaking of before?

A.   I -- I -- I really can't say.  I don't -- it's -- it could be less than ten.  Might be more.  I'm not sure.

Q.   As you sit here today, do you rely on your experience in working on those other cases to formulate your opinions today?

A.   Well, I rely on my general experience, understanding in general what the nature of litigation is about and including personal injury litigation.  But not -- not the specific facts of those cases, no.

Q.   Have you ever been asked to look at a trucking accident case?

A.   I do not believe so, other than this, of course.

Q.   Have you ever been asked to look at a wrongful death case?

A.   Yes.

Q.   Okay.  How often has that occurred?

A.   I don't -- I -- I really can't say.

Q.   All right.  Is it less than ten or more than ten?

A.   I really don't -- I really can't say.

Q.   All right.

Do you intend to give any opinions with

respect to the insurance coverage in this case?

A.   Legal opinions, no.

Q.   Any opinions that you have been retained to give, any of those include how the policies operated, what was covered, what was not, how they read, how they can be interpreted?

MR. GRIFFIN:  I am not going to ask him any questions -- this is Jim Griffin -- ask him any questions or elicit any opinions along those lines, if that helps.

MS. FOWLER:  Thank you.

BY MS. FOWLER:

Q.   And you would agree with that, sir?

A.   Yes.

Q.   All right.

And you're not going to give any opinions specifically against Regions or AmWins and what role they played.  Is that correct?

MR. GRIFFIN:  And I'm not going to ask him any such opinions.

But, Gary, you can confirm that.

WITNESS:  I'm not providing any kind of opinions regarding the coverage of any insurance policies here or the liability under the insurance policies for any of the parties.

MS. FOWLER:  Okay.

WITNESS:  Is that a fair statement, Jim?

MR. GRIFFIN:  Yes.

WITNESS:  Is that a fair characterization?

MR. GRIFFIN:  Yeah.

BY MS. FOWLER:

Q.   All right.  So let's get to -- let's start with your report.

Do you have that handy?

A.   Sure.

(Exhibit 110, report of Gary Greenfield, was marked for identification.)

BY MS. FOWLER:

Q.   All right.

A.   Excuse me.  I'm going to -- it is warm here.  I'm going to take off my coat.

I just turned on a fan.  If that -- you know, if that creates problems hearing me, let me know.

Q.   Okay.

You charge $600 per hour for the work that you do.  Is that correct?

A.   Not now.  That may be what I charged with this.  Whatever my report says.

Lexitas operates in all 50 states and is licensed where required - Nevada Registration #116F

Page 17

Yes. At that time, yes.

Q. What is it now?

A. 650.

Q. Okay. And you have your invoice, as you produced the billing on this. Do you recall as you sit here today how much you have -- up to this point -- have charged in this case?

A. No.

Q. Okay. Did you prepare an invoice for any prep time that you have done between the last time you produced the invoices to today?

A. No.

Q. How many -- how many hours have you spent preparing for your deposition?

A. I don't know.

Q. Did you keep track of that?

A. Yes.

Q. Okay. Do you have that accessible?

A. I -- I -- I don't -- I haven't created a bill. I have time entries.

Q. We'll probably look at that during a break.

So let's -- tell me -- walk me through what were you asked to do in this case.

A. I was asked to -- as my report

Page 18

indicates -- to discuss the reasonableness of the fees and expenses that were incurred by the Plaintiff and the appropriateness of the decision to retain Gibson Dunn.

Q. Okay. And in order to determine the reasonableness --

A. And I should say, the reasonableness of certain of those fees that were incurred by -- by -- by the Plaintiff.

Q. In order to formulate an opinion to provide in court, you stated that you modeled your approach off of the ABA. Is that correct?

A. Not exactly. But what I do is, I use -- I -- I consider the factors that are set forth in the Model Rules and the rules of professional conduct in the various states involved, typically that are often identical to or similar to the model rules. But there are also other factors in cases that I consider. And then there are other factors. Anything that I consider to be relevant. But I tend to structure my reports around the rules.

Q. Let's go to page 5 of your report. "Factors in Selection of Counsel and Analysis of Reasonableness of Fees." Do you see that?

Page 19

A. Yes.

Q. All right. And you listed in a footnote Rule 1.5 of the ABA's Model Rules setting out the factors to be considered in assessing the reasonableness of fees. Correct?

A. Yes.

Q. And then --

A. Depending on the contents.

Q. -- above the footnote, you have listed eight factors that you are looking at, correct?

A. That -- in this case.

Q. All right. I want to ask you something, sir. If you look to the footnote, Rule 1.5 of the ABA's Model Rules sets forth in paragraph 3 "the fee customarily charged in the locality for similar legal services." Did I read that correctly?

A. Yes.

Q. I did not see anywhere in your report where you made such an analysis.

A. Okay.

Q. Did you make such an analysis?

A. Well, as you can see, it's not one of the eight factors that are listed that I did consider.

Page 20

Now, when -- that particular portion of the rule, the Model Rules, it can be read two ways. It can be read, "Is the overall fee in a case" -- typically, a fixed-fee case -- "customarily charged in a particular area?" Because in some areas, a divorce may cost a certain amount.

Q. Uh-huh.

A. Typically -- a typical divorce. Or there may be a customary fee for filing a Chapter 7. Or there may be a customary fee for representing a defendant in a criminal case. There are all kinds of situations where there are fees that are customarily charged. They don't -- that doesn't -- you don't necessarily have to charge those, but they're the customary charges.

You can also read that position to be -- to actually mean -- and I don't understand why they never changed this. Because I think now it has become mostly "the rates customarily charged." But, you know, it's not what it says.

Q. Did you --

A. And as I said, I don't -- I don't think -- right, I don't think I included that among the factors that I considered to be relevant in this case.

Page 21

Q. And just so that we are clear, you did not consider the fees or the hourly rates customarily charged in the locality for similar legal services. Is that correct?

A. No, that's not correct. I did consider the rates.

Q. Sir, I'm asking for the rates customarily charged.

A. I considered the rates customarily charged.

Q. Where is that in your report?

A. It's -- when I discuss the rates -- when I considered the rates of Gibson, I took into account the fact that their -- the rates of Gibson are significantly higher than the rates that are typically charged in these -- in these locales for certain kinds of personal injury litigation. But it's clear that they were higher. It wasn't -- it wasn't a big issue, as far as I was concerned. I didn't note that there were -- I note that there were other firms that were involved whose rates I considered as well.

Q. Okay. Sir, where is that in the report, where you considered the other rate -- the other law firms' rates?

Page 22

A. I don't think I mentioned that specifically in the report.

Q. I mean, we can walk through your report if you would like. But there's eight factors listed. And you go through them in detail to come to the conclusion that Gibson's Dunn's -- Gibson Dunn's rates were reasonable and the work that they did was reasonable. Correct?

A. Say that again, please. Or read it back.

Q. I'll just ask it again.

A. Sure.

Q. You have -- we can go through your report. There are eight categories that you considered to come to the conclusion that Gibson Dunn's rates -- I'm sorry -- Gibson Dunn's work done was reasonable and the decision to retain them was reasonable. Correct?

A. Yes.

Q. And included in your analysis, nowhere did you just discuss whether or not their hourly rate was reasonable. Correct?

MR. GRIFFIN: Object to the form of the question. That's false.

MS. FOWLER: Well, let me -- let me back

Page 23

up. I think I asked that poorly.

BY MS. FOWLER:

Q. Nowhere did you compare their hourly rate to anybody else, whether they were law firms involved in this lawsuit or whether they were law firms in the locality or whether they were other law firms working on trucking accident cases. Is that correct?

MR. GRIFFIN: Objection. Again, you're -- it's a false -- your question is false.

BY MS. FOWLER:

Q. Go ahead, sir.

A. Say it again.

Q. Okay. So I'm going to ask you the question again.

A. Sure.

Q. Your report does not include any analysis of any other law firm's hourly rate. True?

MR. GRIFFIN: False. Objection.

MS. FOWLER: Well, Jim -- okay. Go ahead.

WITNESS: Yeah. I don't recall specifically in my report discussing Gibson's rates versus the specific rates of other law firms.

BY MS. FOWLER:

Page 24

Q. Okay. So what was wrong with my --

A. I would have to read -- I would have to -- look, I've been trying to do it and it's been getting in the way. I've been trying to look through the report and -- and various --

Q. Okay. I want you to do that.

A. Let me finish. Let me finish.

-- to look at the various areas where rates are discussed. I can do that now if you want me to. We tend to then have to go back and have -- have the question reasked. But I did --

Q. Here is my --

A. -- I did -- I did not compare Gibson's rates to specific other law firms' rates in the report itself.

Q. Okay. And your report contains all of your opinions, correct?

A. Yes. It contains all of my opinions.

Q. All right.

You produced in your file a Clio document that's about two inches thick. Do you recall that? It's in your box. You can look at it.

A. Yes. Yeah. Yes, it's in the box.

Q. What's the significance of that?

A. Well, in general, I collect rate

888-893-3767   Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
www.lexitaslegal.com

LEXITAS

information. In this particular case, Mr. Roper referenced the Clio rates. So I went back and I -- I actually looked at the Clio report.

Q. And how was that helpful --

A. The Clio report I had. I'm not sure -- excuse me.

I'm not sure it's -- I don't think it's the same Clio report he was looking at necessarily. I don't know. But it was -- it was one that I had.

Q. The article that I read -- the Clio report that you had talks about COVID and the influence that has had on rates. Correct?

A. I don't recall that. It could.

Q. So the rates that are in the thing that you looked at are about, what, four years -- four years to five -- or three to four years after the fact?

A. I'm not sure. I would have to go look at the Clio report. I have it here. Do you want me to look at it?

Q. I take it from your testimony, sir, thus far, is that that Clio report that you have in your file had no significance in the opinions that you are rendering. Correct?

A. They don't have any significance in -- I

mean, I didn't look at the Clio report for purposes of my report. I've looked at the Clio report since. Because Mr. Roper relied on it -- or relied on Clio rates or Clio analysis.

Q. We have not received a supplemental report from you, sir, rendering additional or amended opinions since the December 15, 2022, date that you authored your report. Is it fair to say that's because you do not have any additional or new opinions?

A. I don't know. But it's -- I have no additional opinions about the reasonableness of a decision to hire Gibson. The reason I looked at the Clio report was to analyze Mr. Roper's use of the rates.

Q. Okay. And so explain to me how that was helpful in assessing what he -- what he reviewed. Walk me through that.

A. Well, I wasn't really interested in looking at the specific rates in the Clio report. The rates in the Clio report are just one piece of a much larger analysis. You know, I shouldn't call it an analysis. It's a -- it's a report about various trends in the legal industry as they are marketing their services. And I just wanted to confirm my

understanding, which was that, if you go look at the Clio reports, you don't -- they don't identify who the billers are, the areas of expertise. They do talk about the geographic areas. So you can't necessarily know whether the data in a -- in a -- in an analysis like Clio's reflects the same kind of work that's in the cases you're dealing with.

Q. Sir, the Clio report -- go ahead.

A. No. Go on.

Q. The Clio report that Mr. Roper attached to his report actually sets forth the various areas of practice and the localities. Correct?

A. To some degree, yes.

Q. All right. The report that you have in your file does not. Fair?

A. I don't know. Do you want me to go look that up?

Q. Well, I'm just wondering if there's any significance to that document that we need to discuss today.

A. I don't -- I don't know. I didn't look at it for the rates that are in the Clio report. I looked at it to understand where Clio -- how Clio gathered their information.

Q. I'm confused about -- I'm -- can you --

that doesn't make sense to me. I have to be honest with you.

A. Okay.

Q. The -- the thing that you're saying is apples and oranges to what I think I'm saying. The Clio report that you have in your file talks about the trends existing in -- in -- in response to COVID.

The Clio report that Joe Roper attached in determining element 3 of Rule 1.5 of the ABA's Model Rule discusses the specific hourly rates in specific localities and breaking it down by practice area. Am I wrong?

A. I -- I -- I don't know if you're right about what the Clio report that I have says. If it's just limited to COVID. I mean, I'm looking at it now, counsel. And there's rate information in there that looks at levels of lawyers in various states -- at least the page that I'm looking at.

It has different kinds of areas of practice. Rates in those areas. Not by geographic area, however.

So there are rates in the Clio report. What I was -- you know -- basically, as I understand where Clio gets its information, it's gathering

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F

LEXITAS

Page 29

those rates from various law firms that hire Clio for various services, or clients that are hiring Clio, and the rates are harvested from that, and they analyze them. But that doesn't necessarily tell you that the rates that you're looking at are comparable to the kinds of rates in a litigation -- particular piece of litigation you're talking about. And that's what I'm trying to figure out when I'm looking at the Clio report.

I understand that Mr. Roper had rates from the Clio report -- from that -- a Clio report that he was looking at. May have not been the same report. This report, which is a very, very, very long report, you say just deals with COVID. That's -- I don't see that, but that could be. I would have to read the whole report, of course. But I -- Mr. -- Mr. Roper's looked at, in terms of his analysis, what the average rates for, for example, personal injury lawyers, according to Clio, were in New Mexico and a few other states. And I don't think that's the appropriate approach anyway. So -- but I wanted -- nevertheless, I wanted to see what the source was, to confirm my understanding of what the source was for the Clio rates.

Q. Okay. You have -- all right. Well, this

Page 30

is in your file. So let's just go ahead and pull it up. Exhibit 113a.

(Exhibit 113a, 2020 Legal Trends Report, was marked for identification.)

MS. FOWLER: And, Angie, will you pull up the first page of that?

BY MS. FOWLER:

Q. "2020 Legal Trends Report" published by Clio. Do you see that?

A. Yes.

Q. All right. Now, these are 2020 rates. So this is going to be four years -- sorry, three years after the Gibson Dunn involvement ended. Correct?

A. I don't -- I would have to -- counsel, I would have to look at the report to see. I mean, a lot of times, for example -- oh, you're pulling it up on the screen.

Q. I am.

A. For example, a lot of times reports that are dated 2020 are actually earlier rates because, when they published the report in 2020, they don't have 2020 rates. That's a common problem.

Q. This is your document.

A. I -- I -- it's my document in the sense

Page 31

that I collect documents like this. I haven't analyzed it. I was looking at this document for the purpose of understanding how Clio harvested their rates they got. I wasn't looking at it from the standpoint of looking at the specific rates, either by location or by area.

Mr. Roper had certain numbers in his report. I don't doubt that the Clio report that he was using may have said that. I don't agree with what those -- with using those rates in that way, in any event. But what I was looking for was how Clio gathered its rate information, not what the specific rates were.

Q. Do you have any criticisms with how Clio gathers its rates?

A. It's not a matter of criticizing. It's a matter of how useful and reliable they are in analyzing their rates in particular cases.

Q. All right. Well, that's fine.

But do you have any criticism with -- with how they gathered this data?

A. I think I already said. I don't have -- I mean --

Q. Is the answer, "no," sir?

A. I don't -- the answer is I don't know all

Page 32

of the details of how they -- how they gathered the data. If they gathered the data by obtaining rates from law firms, either because they're being billed to their clients or because the -- the law firms are providing bills with those rates, they can gather the rates that way.

Q. If you look at the --

A. I'm not being critical of it. I'm -- I'm not being critical of it. I'm just saying that I don't -- that you have to take that into account when you are considering how useful the rates are in looking at the rates in a specific case.

Q. All right. So if we go to the page that's in front of you on the screen, if you look at the hourly rates, it breaks it down by --

MR. GRIFFIN: What -- what page is that?

BY MS. FOWLER:

Q. It's on the screen.

MS. FOWLER: It is page 81. Page 81.

MR. GRIFFIN: Thank you. Thank you.

BY MS. FOWLER:

Q. The Adjusted Hourly Rates By State. We have the state, the law firm, lawyers, nonlawyers. Do you see that?

A. Yes.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F



Q. If we go to New Mexico, the law firm hourly rate is stated as $227 for law firms. Do you see that?

A. Yes.

Q. Lawyers are $251 hourly rate. Do you see that?

A. Yes.

Q. All right. And so that would be almost five times what the top lawyers at Gibson Dunn charged New Prime on this case. Correct?

MR. GRIFFIN: You mean one-fifth.

MS. FOWLER: Sorry. One-fifth. Yeah. Sorry.

WITNESS: Or -- no, it's actually -- it's -- it's not one-fifth. But it might be --

BY MS. FOWLER:

Q. Do you --

A. -- 25 percent.

Q. Do you want to say --

A. But --

Q. Let me --

A. But -- but --

Q. Let me strike the question. I'm going to strike the question.

A. Okay.

Q. I'm going to strike the question.

A. All right.

Q. I'm going to ask you --

A. All right.

Q. I'll ask you the question differently.

Gibson Dunn charged four times the hourly rate that's listed on this page. Correct?

A. I would have to go look at the rates. But there were lawyers at Gibson that were charging in excess of $900 an hour.

Q. No. They were charging in excess of $1,000 an hour.

A. Oh, could be.

Q. You understood that. Did you know that?

A. That's my -- yes.

Q. All right. Let's go to the next page. "Hourly Rates by Practice Area." Do you see that?

A. No.

Q. It's up top. Page -- it's right here, "Hourly Rates by Practice Area."

A. Not on --

Q. Do you not see it?

A. Oh, I'm sorry. I thought you were --

yeah, I see the title. Yeah. Sorry. Uh-huh.

Q. Okay. And it breaks it down by practice area, law firms, lawyers, and nonlawyers. Do you see that?

A. Yes.

Q. And you would agree that the Herrera lawsuit was a personal injury lawsuit. True?

A. Yes.

Q. All right. If we go to personal injury, the law firms are listed as an average hourly rate to be $211. Do you see that?

A. No. I see 211. I don't know a -- if -- if that's the average. Could be. But I don't know. I also don't know, frankly, what -- what location that is or the complexity of the lawsuits.

Q. Personal injury rate listed for -- for personal injury hourly rate it's listed as $250. Do you see that?

A. I see that. But, again, I don't know if that is the average. I don't know what types of cases they are. I don't know how complex they are. I don't know where they're located. Don't know a lot of factors that go into how reasonable rates are, besides a general category.

Q. What were the hourly --

A. We also -- we also -- excuse me. We also don't know how many people -- how many respondents there are within -- within that category.

Q. Sorry. I'm going to --

A. If you're talking -- if you're -- well, wait a second. I'm trying to explain why that --

Q. Sir, you're not answering my question and you're not -- you're not answering my question.

MR. GRIFFIN: Yes, he is.

WITNESS: I think -- I think I am, counsel. You're --

MS. FOWLER: You're giving speeches. You're giving --

WITNESS: I just think you're not getting the answer you want. I don't think this -- this -- I see what the rates say. I see what the page says.

MS. FOWLER: That was the question. That was all of the question.

WITNESS: That is what the page says.

MS. FOWLER: Let me ask my next question.

WITNESS: It -- it's just not -- it's just not a valid way to --

MS. FLOWER: You have got to --

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F



Page 37

WITNESS: -- analyze the rates.

MS. FOWLER: You have to let me ask my questions. Okay? The purpose of today is that I ask the questions I'm going to ask. You're required by the Court to answer the questions that I ask. Your attorney, Mr. Griffin, is more than welcome to come back around and ask questions. That's how this works. But we're not going to be giving speeches while I'm asking questions. Because we will be here all day.

MR. GRIFFIN: Meg, you have to --

WITNESS: Counsel, I understand that. I'm trying to explain why this information --

MS. FOWLER: I'm not asking that question.

WITNESS: And I didn't --

MS. FOWLER: I'm not asking that question.

MR. GRIFFIN: Okay, let's -- Meg, you also have to let him answer. So why don't -- let's go forward and let's start with a new question and everybody be sure to pause. I'm sure the court reporter needs a break soon because everybody is talking at the same time.

MS. FOWLER: Jim -- and I am trying my

Page 38

hardest to be respectful and allowing him to finish his answer. But if his answer never finishes and he's no longer answering the question, he's interfering in the process. So at a certain point, we need to -- to lay down what the rules are.

And I'll keep coming back to it, sir. If we can't follow the rules, then we can't keep doing this.

Because you're right, Jim. It's not fair to Madam Court Reporter at all.

BY MS. FOWLER:

Q. Okay. So, sir --

MS. FOWLER: We can take that down.

BY MS. FOWLER

Q. Now, let's start with the opinions you do intend to give in this case.

The first one discusses the amount at risk in the underlying action. Do you see that?

A. Yes.

Q. All right. And part of your opinion -- maybe we can read the opinion, how you have it stated. But it's my understanding from your opinion that one factor you looked at in determining the amount at risk in the underlying action was looking at the large verdicts. Correct?

Page 39

A. I took those into account, if that's what you mean, yes.

Q. You specifically refer to two large verdicts. Correct?

A. Yes.

Q. One in 2015, and the other in 2013. Correct?

A. Yes.

Q. And, sir, it's true to say that attorneys' fees were not included in those large verdicts. True?

A. I don't know.

Q. You don't know?

A. No.

Q. Do you know anything about those cases?

A. Not other than what's in my report.

Q. Other than there was --

A. I don't think I know anything other than what's in the report. I may have gotten other little bits of information, but those are the major things.

Q. So you understand your report is not admissible. Your testimony is admissible. And this is what I'm trying to get at.

Do you have any information whatsoever

Page 40

about those two cases that came with big verdicts, other than the amount?

A. Other than what's in my report, I -- I don't recall any other information I had.

Q. You -- you keep qualifying it.

A. But that's --

Q. Do you have any -- do you have any information, other than the amounts, with respect to these two cases that you rely on?

MR. GRIFFIN: Meg, he does. And it's in his report --

WITNESS: It's in my report. Do you want me to read it?

BY MS. FOWLER:

Q. Go ahead. Yes, please. That's what I'm asking you to do.

A. Okay. Then -- then -- oh, I'm sorry. I misunderstood that.

So in 2015, in a neighboring judicial district, a jury returned a verdict of $165 million against FedEx for an accident involving a rear-end collision between a truck and a car resulting in two deaths.

In a verdict in the same neighboring judicial district, a jury had returned a

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 10 of 83   LEXITAS

58.5-million-dollar verdict in 2013 against a trucking company, including $47 million in punitive damages.

Q. All right. Now, do you know whether or not -- what the allegations were specifically against FedEx in the $165 million case?

A. I don't recall. I may have been told at one point what -- a little bit more about what -- what was going in those cases. But I don't recall at the moment.

Q. Where did you get this information?

A. I would have gotten it probably from either Mr. Nau, Mr. Dusseault, or the materials I reviewed in the case.

Q. Well, you reviewed a lot of materials in the case. I'm asking you specifically, sir. Did you research these two lawsuits independently?

A. What -- what do you mean, "research"? You mean did I look up the opinions or something? No.

Q. Did you interview the lawyers involved?

A. In these -- in -- in -- in these -- in this 2015 case and the 2013 case?

Q. Yes, sir.

A. No.

Q. Did you investigate how much was charged in defense of the cases?

A. No.

Q. Did you -- did you investigate what their hourly rate was?

A. Whose hourly rate?

Q. The defense attorneys.

A. No. Those -- those factors weren't relevant to -- to why I think those cases are relevant. But the answer is no.

Q. All right. Are you aware of any other trucking cases with multimillion-dollar verdicts or settlements?

A. I don't recall others right now.

Q. Is it fair to say then, sir, you didn't do any research into other trucking cases involving multimillion-dollar verdicts or settlements?

A. I did not do independent research about trucking cases involving multimillion-dollar verdicts. That's correct.

Q. Did you do any research to determine the proportionality between the amounts of the verdict or settlement versus the defense costs?

A. I don't know what the defense costs were. And I did not do any research regarding that because

that isn't what was relevant to my opinion.

Q. All right. Did you review any trends of defense costs in trucking cases?

A. I did not review any defense costs in trucking cases. I -- I review trends in legal rates all of the time in all kinds of cases. And I suspect that the amount -- that trucking cases are similar, in terms of how rates are going, to other kinds of litigation. But I did not do independent research about the rates in -- in trucking cases. Again, because that wasn't relevant to my opinion --

Q. Okay.

A. -- about these -- that wasn't relevant to why these cases were important to my opinion.

Q. Okay. Did -- tell me why these cases -- these two cases are important to your opinion.

A. Because, in selecting counsel, ultimately, these cases were important in -- to Prime in the potential exposure that they felt the company had in the case -- in that case. Not in these cases.

Q. And it's fair to say you have never tried a trucking case, correct?

A. That's correct.

Q. You have never defended a trucking

company. Correct?

A. As far as I know, that's correct. Not in a personal injury case.

Q. As you sit here today, you have no recollection of auditing bills from a defense firm defending a trucking accident. Correct?

A. Not that I can recall. Other than this.

Q. Okay. Have you, as you sit here -- as you sit here today, have you ever been retained as an expert to examine bills of a defense firm defending a trucking accident?

A. Other than this?

Q. Yes.

A. I'm -- I'm sorry, counsel. I may have misunderstood. I thought that's what you were asking before.

I don't recall ever being retained to review defense bills of a defense firm defending a trucking accident, other than this case.

Q. So as we sit here today, you have no experience as a practicing lawyer or experience as an auditing lawyer or experience as a retained expert in reviewing specifically personal injury trucking cases. Fair?

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

Page 45

A. No. Not specifically just as to whether they're trucking cases or not. But I have a lot of experience in analyzing the fees in complex litigation, of which this is one of them.

Q. Okay. So my question is -- is -- is specific.

You have no professional or personal experience in reviewing fees involving trucking accident cases, besides this case. True?

A. As far as I can recall, that's correct.

Q. All right.

Another basis that -- that you rely on with respect to this first opinion is the fact that a high demand was issued by the Plaintiff. Correct?

A. Well, Prime relied on that in terms of how it went about retaining counsel. That's what I'm relying on. That's why I'm saying it. It was relevant, yes.

Q. All right. I'm just going to read your report. Because I'm not sure -- I think we're missing each other somehow, some way. I'm not sure now.

"Lance Richards, main counsel for Civerolo, indicated in late 2016 that based on recent verdicts and settlements in trucking cases in

Page 46

the venue, he expected a settlement demand from Plaintiffs in the upper eight figures."

Did I read that correctly?

A. I -- I think so.

Q. All right. And you've certainly been involved in settlement negotiations. True?

A. Yes.

Q. And you would agree that just because a person or a plaintiff gives a -- a high settlement demand doesn't necessarily equate to what the value of the case is. Is that fair?

A. Generally. I mean, high settlement demands are relevant. But sometimes you get high settlement demands that are way out of touch with reality of the case.

Q. And, generally speaking, when we're talking about negotiations, typically the beginning, you would expect high demands and perhaps lower offers. True?

A. That's a normal way litigation goes.

Q. And the point is, so that the two sides can somehow find a way to meet in the middle, as best as they can. True?

A. That's typically what happens when cases settle.

Page 47

Q. And the only true -- the only true determination of what a value -- what the value of a case is is when the jury comes back and delivers a verdict. Is that fair?

A. I'm not sure about that. But it's certainly an indication.

Q. All right. And you understand -- you've read Steve Crawford's deposition, didn't you?

A. Yes.

Q. All right. Let's pull that out. Do you have it?

A. Do you want me to take it out from a hard copy, or are you going to put it on the screen?

Q. No, you're -- you're going to pull out your -- your case -- your copy.

A. Okay. I didn't know, because I pulled out the Clio report and then suddenly it was on the screen. So I wasn't sure.

Okay.

(Exhibit 113j(1), deposition of Steve Crawford, was marked for identification.)

BY MS. FOWLER:

Q. Tell me when you're ready.

A. I have it.

Q. All right. Go to page 30.

Page 48

A. Okay.

Q. Starting on line 20. Question. "Well, if somebody demands $10 million from you, that doesn't mean that you pull out the checkbook and start writing a $10 million check, do you?"

And his answer was, "It would depend on the facts, but not -- typically, not off the demand."

And next page, page 31. "Because demands are subjective, are they not?"

Answer. "Demands are subjective, yes."

And you would agree with that, sir, wouldn't you?

A. I'm not sure what being subjective means. I mean, in this context, but --

Q. You don't understand the question?

A. So I'm not sure. I'm not sure what he means by "demands are subjective," other than that's what someone thinks. If that's what it means, sure.

Q. All right.

A. That's what someone thinks. To me, that's what subjective means.

Q. Just to be fair, you -- and I think we've covered this. You didn't do any research to

Page 49

determine the proportionality between what starting demands are versus what the case actually settles for or what the jury awards. True?

A. You mean -- you mean I didn't research demands versus jury awards in particular cases?

Q. Or settlements. Ultimate settlements.

A. Or settlements? No, I didn't.

Q. All right.

All right. And you also talk about -- the third prong of your opinion, or subset of this first opinion, is the mock juries.

You say, "In addition, the mock jury results showed a range of" -- and you give ranges of 9,000,601 to -- so 9.6 to 80.9 for compensatory damages, and you set off the different punitives and things of that sort. Do you see that?

A. I can read it.

Q. Did you -- are you reading it?

A. No. Do you want me to read it? I mean, I can see what it says.

Q. You -- there were three factors in determining that the amount at risk in the underlying action justified how much Gibson Dunn charged and spent on this case.

No. 1. It was the fact that there were

Page 50

two other verdicts in this -- in the nearby counties or districts or whatever in 2013 and 2015.

No. 2. Because they anticipated a high demand.

And No. 3. Because of the mock jury results.

Correct?

A. Those are three indications of the amount of risk in the underlying litigation, yes.

Q. All right. And those three things are what you are relying on to determine that Gibson Dunn's rates and work done were reasonable. True?

A. Among other things, yes.

Q. All right. Now, did you -- for the mock jury, did you look at the background of the jurors?

A. I read the mock jury report. It gave a little tiny bit of background about them.

Q. Can you tell us anything about the manner, method or quality of the assembly of the mock jurors?

A. I did not independently research how the mock jury was put together.

Q. Can you tell us what was reviewed or how it was presented to the mock jury?

Page 51

A. I -- well, I assumed that -- that they had people presenting the case to the mock jury. That's the way it normally happens with mock juries. And then the jurors --

Q. In your career --

A. And the jurors would return their verdicts. And then they're asked about how they reached them.

Q. I'm asking about the work that you've done in this case. Did you do any of that? Did you look at any of that specifically?

A. No. No. I read the mock jury reports. I looked at the mock jury reports.

Q. All right. You looked at the -- at the numbers that they were awarding. Correct?

A. I looked at the mock jury report, yes, which included the numbers that -- that they were -- that they felt would be awarded.

Q. In your career as a practicing lawyer, have you ever participated in a personal injury mock trial?

A. I don't recall. I don't think so.

Q. In your career as a bill auditor, have you ever watched a mock jury presentation?

A. By video I have, I believe.

Page 52

Q. And do you recall what Steve Crawford testified to in his deposition about what he had to say on focus groups?

A. No.

Q. All right.

Go to page 31.

Line 4. "Had you ever had focus groups before the Herrera lawsuit?"

Answer. "Yes."

"All right. And have those focus groups come back with multimillion-dollar verdict potentials?"

And the answer was, "Yes."

Did I read that correctly?

A. Yes.

Q. All right.

Page 32, line 16.

"All right. But certainly if the jury decides we are going to offer 1 zillion dollars, the mock jury, that's not something that -- that sways you to say we need to settle this case for 1 zillion dollars. True?"

Answer. "Correct."

Question. "All right. You try to have a measured response, right?"

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 13 of 83

Page 53

Answer. "Correct."

Did I read that correctly?

A. Yes. You left out some other stuff, though, I would point out.

Q. Well, these are -- these are germane to my questions.

A. Okay. But I'm just saying, there's a -- you're taking it out of context, I think.

Well, let's see what your question is.

Q. Well --

A. Go ahead. If it's not --

Q. The next question is --

All right, sir.

The question is this: Based upon that deposition testimony, you know that New Prime has had mock juries before, correct?

MR. GRIFFIN: Well, no --

WITNESS: I don't know.

MR. GRIFFIN: -- because you said focus groups. You said focus groups. And, Meg, there were two -- there were two separate proceedings.

MS. FOWLER: Fine.

MR. GRIFFIN: There was a focus group and then there was a separate mock trial. So --

MS. FOWLER: I'm using them

Page 54

interchangeably.

MR. GRIFFIN: Well, it wasn't interchangeable in this case.

WITNESS: They're not the same.

BY MS. FOWLER:

Q. Sir, have you ever been in -- have you ever participated in a focus group on personal injury?

A. I don't recall. I mean, in my current work, no.

Q. All right.

And focus groups, you've had -- New Prime testified -- Mr. Crawford testified that focus groups have been used before the Herrera lawsuit and have issued multimillion-dollar awards. Correct?

A. I'm not sure when you said it. I would have to go back and look.

Q. All right. Go back to the testimony we just read.

Question, page 31, line 7.

"All right. And have those focus groups come back with multimillion-dollar verdict potentials?"

Answer. "Yes."

A. Okay.

Page 55

Q. Now, sir, do you know how much New Prime spent in defense of those other cases?

A. Of what? I'm sorry. Is there a question there?

Q. Do you know how much New Prime spent in defense of those other cases?

A. I'm sorry. I didn't hear the question. No.

Q. Did you review the Answers to Interrogatories of New Prime?

A. I -- if I did, I don't recall them.

Q. Were you aware that, in their Answers to Interrogatories, they said under oath that besides the Herrera -- Herrera lawsuit, that was the only claim where the costs exceeded $3 million, including defense costs? Were you aware of that?

A. I don't think I reviewed the Interrogatories. Are they in the materials that I produced?

Q. Do you need -- do you need to review it, sir? Would you like to review it?

Let's go ahead and pull that up.

A. I don't know.

Q. It's marked as AmWins 2.

A. Were these the notes -- do I have them

Page 56

here in my materials?

Q. You can tell me. We're going to pull it up.

A. Well, I don't know. I mean, I have a box here of materials that you sent me.

(AmWins Exhibit 2, Plaintiff's Responses to Defendant AmWins Brokerage of the Midwest, LLC's First Interrogatories to New Prime, Inc., was marked for identification.)

BY MS. FOWLER:

Q. Okay. This is Plaintiff's Responses to Defendant AmWins -- go to the first page. Go up a little bit. Plaintiff's Responses to Defendant AmWins Brokerage of the Midwest, LLC's First Interrogatories to New Prime, Inc.

A. I see the title, yeah.

Q. All right. So these are their answers, okay?

MS. FOWLER: Then go to Interrogatory No. 4.

BY MS. FOWLER:

Q. "Please identify any claims, by name of lawsuit or claimants, dates, and amounts accrued, against New Prime involving commercial automobile liability in which the defense costs exceeded $3 million from 2003 to the present."

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
LEXITAS

Case 6:22-cv-03037-MDH Document 107-2 Filed 11/10/23 Page 14 of 83

Do you see that?

A. Yes.

Q. And in response, they say, "The Herrera claim was the only claim in which the costs alone exceeded $3 million. But there were a number of cases in which total payouts, including defense costs, exceeded $3 million."

Do you see that?

A. Subject to the various objections. And I assume, by the way, the defense costs here includes attorneys' fees, not just expenses and costs.

Q. All right. And do you understand that Dean Hoedl has gone on record to say that -- and Eric Nau -- have gone on record to say that they have -- New Prime has never spent more than $3 million in defending a lawsuit on a trucking liability case? Were you aware of that?

A. I don't remember. I am not aware of that. I -- I know I read Mr. Nau's deposition, so he may have said that. I did not read Mr. Hoedl's deposition.

MS. FOWLER: All right. You can take that down.

BY MS. FOWLER:

Q. Sir, wouldn't that be important to

know?

A. I guess it's not relevant to my opinion in this case. I mean --

Q. Why -- why --

A. I mean, it's not -- it's not anything -- look. It's -- it's not necessarily irrelevant. But it's not really determinative in any way. It's not really relevant. Because they could have one huge case, which is what this was. It was much bigger, apparently, than these other cases. And at least --

Q. How do you know that, sir?

A. At least -- let me finish.

At least they thought it was much bigger than -- than these other cases. And that, to me, is what's the -- is -- is the important factor. It's what -- how they viewed the case at the time and whether their view on how they viewed it was reasonable. And the fact that they had never incurred a case where the fees were over $3 million. Okay. You can have a big case all of a sudden. Doesn't mean that -- that -- that the fees in that big case are unreasonable.

Q. So let's separate --

A. Or that the decision to hire somebody else for that big case was unreasonable.

Q. Let's separate the work that you actually did versus what Eric Nau told you in an interview. Okay?

A. I -- that's part of my work.

Q. The work that -- hold on.

The work that you did, you did not investigate what other lawsuits were filed against New Prime that involved focus groups, multimillion-dollar demands or even verdicts. True?

A. I did not look at -- at -- at other verdicts in other cases --

Q. And the only --

A. -- or focus groups or mock juries.

Q. The only information that you relied upon to make the determination that this case was the biggest case they ever had was based upon your interview with Eric Nau. Is that correct?

A. No. But, I mean, it's one of the things he told me. I'm not sure it's the only thing that I relied on.

Q. Is there any other source of material or information that gave you the indication or impression that this was the biggest case New Prime has ever had?

A. I wouldn't doubt that Mr. Crawford said

that. Mr. Dusseault may have said that when I talked to him.

Q. How would Mr. Dusseault know?

A. They may have told him.

Q. All right. I don't have any --

A. I -- I think -- sorry. Sorry.

Q. I don't have any notes on Steve Crawford. Did you interview him and not produce those notes?

A. No.

Q. You did not interview him?

A. That's correct.

Q. All right. And so you've never spoken to him?

A. Not as far as I know.

Q. All right. The only person from New Prime that you actually spoke to was Eric Nau. Correct?

A. Correct.

Q. And we could look at his notes to glean what he told you in your interview -- in his interview with you. But if it doesn't say this was the biggest case New Prime has ever had, can we assume that that was never said?

A. We can assume I didn't put it in my notes. I don't -- you know, I don't -- I'm not

Page 61

doing things verbatim. I'm trying as hard as I can. But I'm taking notes as someone is talking.

MR. GRIFFIN: Hey, Meg, we probably ought to think about taking a break fairly soon. But for what it's worth, this is the biggest case that Prime has ever had.

MS. FOWLER: Okay.

All right. If you want to take a break, we can take a break.

MR. GRIFFIN: Yeah, let's do.

VIDEOGRAPHER: Off the record. 12:45 p.m.

(Recess taken)

VIDEOGRAPHER: On the record. 12:56 p.m.

BY MS. FOWLER:

Q. Okay. So let's go to the second basis for determining that the work done was reasonable, etcetera.

"The complexity of the factual and legal issues."

Do you see that in your report, page 6?

A. Yes. Yes.

Q. All right. And you say, "The existence of complex factual or legal issues necessarily impacts the fees that are going to be generated in a

Page 62

case."

Did I read that correctly?

A. Yes.

Q. One of the difficult issues you found in this case was sleep apnea. True?

A. Yes.

Q. All right. And -- and it's fair to say -- I think I know the answer to this question, but I want to make sure that I ask it. As a practicing lawyer or as an auditor, have you ever worked on a commercial vehicle accident?

A. Other than this case, not that I can recall.

Q. All right. Do you have any familiarity with the Federal Motor Carrier Safety Act?

A. Other than a little bit that I've read in conjunction with some of the material in this case, no.

Q. Do you know what training, if any, is provided to commercial drivers regarding sleep apnea?

A. I know that there are -- there appear to be some rules and regulations and training involvement. Other than that, I don't know the specifics of it.

Page 63

Q. Do you know what sort of medical requirements exist to address sleep apnea in commercial drivers?

A. Not other than what I've seen in the reports in this case.

Q. Okay. Do you -- and you -- you say the reports that you've seen in these cases. What reports are you --

A. I'm sorry. Go ahead.

Q. What reports are you --

A. I've just seen --

Q. Go ahead.

A. Sorry. You and I are finding a funny rhythm in our -- in our dialogue.

Just -- just that there were references to the -- to the federal agency and that there were regulations and trainings regarding sleep apnea, and I believe other industries as well. But just -- but just references. That's the only information I have about those.

Q. You have no substantive knowledge with respect to those things. Is that correct?

A. Other than -- other than what's in that material, no.

Q. Okay. And I have to be -- this is one

Page 64

chance to talk to you, so I've got to be very -- very precise. When you say "this other material," I'm asking you -- "this other material" that you're -- you're putting the qualifier on, that's not substantive knowledge or substantive information regarding the things I've just asked. Is that true?

A. I have -- the only information I have about those areas are what I've read in the materials in this case, which have been produced to you.

Q. Did you -- as you sit here today, what knowledge do you have with respect to sleep apnea?

A. You mean, outside of the legal world? I mean, I have a little bit of understanding that it's a -- it's a sleep condition that people use devices for and sometimes drugs. Other than that, I don't have any substantive knowledge about sleep apnea.

Q. All right.

Have you ever -- in looking at determining sleep apnea being a complex issue, did you research how common sleep apnea is in commercial drivers?

A. Not other than the context in this case where it appears to be something that was common

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
LEXITAS

enough so that there are regulations and rules about it.

Q. Have you researched how many accidents throughout the United States were caused by sleep apnea?

A. No.

Q. Have you researched how many personal injury lawsuits involve a commercial vehicle having allegations of sleep apnea?

A. No.

Q. And -- and do you know how common such an allegation is in a trucking accident case?

A. Well, I don't know how frequently they're alleged, so --

Q. Can you say or not say whether allegations of sleep apnea are common in trucking accident lawsuits?

A. I can't say.

Q. Okay. We can agree, though, that sleep apnea in these types of cases is not a novel concept. Is that fair?

A. I don't know.

Q. You don't know?

A. Correct.

Q. Do you know what sort of experience

Gibson Dunn had in defending against trucking cases involving sleep apnea allegations before taking on this case -- the Herrera lawsuit?

A. No.

Q. You also in your report, with respect to the complexity of the factual legal issues, you discuss the damages. Specifically, you talk about "There were many pretrial issues raised, including summary judgment motions on some of the damage issues. Gibson was successful in obtaining a summary adjudication that loss of consortium damages could not be recovered under the facts of the case."

Did I read that correctly?

A. I believe so.

Q. All right. And -- okay. Now, you understand that these were -- that the Herreras were two young adults who died. Correct?

A. I believe they were in their mid 20s, yeah.

Q. And family members -- the family members were suing to recover money for their deaths. You understood that, correct?

A. Generally, yes.

Q. And generally speaking, they would be entitled to recover damages for the impact those

deaths have had on them. Correct?

A. General matter of speaking, yes.

Q. And in fact, that's true of all wrongful death cases. True?

A. In a general way, yes.

Q. Can you please tell us what is unique or novel about these types of damages?

A. I'm not sure that they are unique or novel.

Q. What experience did any of the Gibson Dunn attorneys have on working on wrongful death cases before the Herrera lawsuit?

A. Well, I believe that at least Mr. Dusseault and the firm had one case in which they handled after the trial -- they either handled the appeal or post-trial motions -- that I believe was a wrongful --

Q. Do you --

A. -- death case.

Q. Do you know if it was wrongful -- it was a wrongful death case?

A. I believe it was.

Q. Do you know -- do you know whether the -- the damages pursued in that case were complex?

A. The damages were complex? I don't -- I

don't know.

Q. All right. Other than the fact that it involved a truck, what else can you tell me about that lawsuit?

A. It was substantial damages. It was lost at trial. And it was reversed.

Q. Okay. What were the allegations?

A. I don't recall.

Q. What were the damages that they were trying to collect?

A. I don't recall.

Q. What work specifically did Mr. Dusseault do on that case?

A. My understanding is that they got the trial verdict reversed.

Q. You say "they." I'm talking about Mr. Dusseault.

A. Gibson is with Dusseault, yes.

Q. No. Just Mr. Dusseault. I'm asking you specifically, what work did Mr. Dusseault do on that case?

A. My understanding is that he was in charge of the case. But I'm not sure. He was involved in the case for sure.

Q. Do you know whether or not he took any

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #716F.
 LEXITAS

Page 69

depositions in that case?

A. Well, it was after the trial, so I don't think so.

Q. In fact, his involvement involved the appeal, correct?

A. Could be, yes.

Q. That was your understanding of his involvement. Is that correct?

A. It was after the trial, yes.

Q. All right. And you would agree with me that appellate law is different than personal injury trial practice. True?

A. Aspects of it, sure.

Q. Because an appellate -- in appellate law, you are pulling cases -- case law in and you are arguing the law to judges. Correct?

A. As applied to the facts.

Q. And --

A. You have to -- you have to understand the facts -- you have to understand the facts of the case as well. I mean, you don't have to. But if you're going to do a good job, I think you do.

Q. You don't know one way or the other whether or not Mr. Dusseault understood or didn't understand the facts, but you knew that he handled

Page 70

the appeal. Correct?

A. And that they reversed the verdict.

Q. Okay. All right.

But he wasn't -- he was not on the front lines of that trucking case. True?

A. I believe he was.

Q. Did he try the case?

A. No.

Q. Did he take any depositions?

A. He handled the appeal.

Q. Did he take any depositions in the case?

A. Unless they were after the appeal -- or after the trial, I don't know.

Q. Do you --

A. I don't think so.

Q. I'm sorry.

Okay. His work -- as you understood it in formulating your opinions, his work on that trucking case was limited to the appeal. Correct?

A. To be candid, I -- I couldn't remember. I -- I assume what you're representing is correct. I couldn't remember if it was just winning post-trial motions for the appeal. But let's assume it was the appeal. Sure. So if that's the case, he

Page 71

probably did not handle depositions. He handled the appeal.

Q. All right.

And you talk about the fact that they filed a motion for summary judgment for loss of consortium. Do you know what loss -- what is loss of consortium?

A. Generally, my understanding is that that's what people can file for loss of companionship of their spouse. Most commonly --

Q. Okay.

A. -- that's what I consider it to be.

Q. Please tell me -- and that was the only -- that was the only motion that you can recall that they won a summary judgment motion on. Correct?

A. I think there was another one on damages that they won in part, at least.

Q. That was a partial summary judgment pertaining to pain and suffering. Correct?

A. Could be, yes.

Q. And as you understood it, the pain and suffering claim pertained to the two deceased people dying instantaneously and, therefore, not having a pain and suffering claim. True?

Page 72

A. I've read -- I've read that that was one of the issues. But I'm not -- I haven't actually read that motion or the order involved in it. I just know that their motion was denied in part and granted in part.

Q. Please tell me -- and those were the only two motions that they won. Correct?

A. I don't know.

Q. Well --

A. Those are the two that I had noted. Those are the only two motions for summary judgment that -- that I noted.

Q. Tell me what impact winning those motions had on the value of this case.

A. Well, they eliminated -- obviously, they eliminated the loss of consortium damages. They removed the pain and suffering, based on what you're telling me. But bringing motions has a lot more impact on a case simply than if you win or lose them also.

Q. Sir, you used those as your examples as to why this was a complex case in terms of the factual and legal issues and so, therefore, you had to hire Gibson Dunn.

Because you hired -- because New Prime

Case 6:22-cv-03086-MDH   Document 107-2   Filed 11/10/23   Page 18 of 83

Page 73

hired Gibson Dunn, and you cite the fact that they won a motion for loss of consortium, my question to you is, what impact did that have on the value of the case, if any.

A. What impact did winning the loss of consortium claim? It meant that --

Q. Yes.

A. -- those damages weren't available.

Q. All right. So let's go through this then.

This was also stuff that was in your file. And I'm going to pull up Exhibit 110a. And we'll just go ahead and pop it on the screen.

And as we're doing this, one of the things that you evaluated this as a high-dollar case is based on the mock jury results. Correct?

A. That was one of the considerations that the client made in --

Q. Okay.

A. -- in -- in -- in retaining Gibson and --

Q. All right.

A. -- among the -- the mock jury results reflected that the case had potentially very high value.

(Exhibit 110a, mock jury results, was

Page 74

marked for identification.)

MS. FOWLER: All right. And let's look at -- this is Exhibit 110a.

And let's go ahead and show the whole page, so they can see the exhibit.

This is 110a.

BY MS. FOWLER:

Q. And then going back in, we see the damages that the jury was asked to consider were compensatory damages and punitive damages. Correct?

A. It appears so.

Q. There's no indication in here about a discrepancy made for loss of consortium. Fair?

A. Oh, I don't -- I don't know. I'm not sure if those were included in the compensatory damages or not.

Q. All right. Well, let's look at the next thing. You looked at Eric Nau's deposition and the exhibits attached to it. Correct?

A. I -- I read -- I read Mr. Nau's deposition, yes.

Q. Exhibit 44 was attached to his deposition.

MS. FOWLER: Go ahead and pop that on the screen.

Page 75

(Exhibit 44, jury instruction, was marked for identification.)

BY MS. FOWLER:

Q. And this is a jury instruction for the State of New Mexico in terms of what damages are recoverable in a wrongful death case. Do you see that?

A. I see the exhibit, yeah.

Q. All right. Now, if you scroll down, look at No. 4: "The value of" -- name of decedent's -- "life, apart from" -- name of decedent's -- "earning capacity."

Do you see that?

A. Yes.

Q. All right. So the jury would be asked to determine what the value of that person's life was. Are you with me?

A. I hear you, yes.

Q. All right. So what difference did winning a loss of consortium claim have when ultimately the jury would still be asked what the loss of that life had on the plaintiffs?

A. Well, I'm not -- I mean, I'm not familiar necessarily with this jury instruction separate from what -- the fact that we're looking at it now. I'm

Page 76

not sure about that. But it seems to me that if the plaintiffs were alleging loss of consortium as damages, they were going to seek it and ask for it from the jury. And that it was possible to recover until the motion for summary judgment was granted, which eliminated it. Now, how that impacts this particular instruction, I'm not sure.

Q. Well, sir, you --

A. It might have been separate -- it might have been a separate item of damages from the value. I don't -- I don't -- frankly, I mean, I don't see loss of consortium as part of a value of a decedent's life.

Q. Okay.

A. Damages.

Q. All right. So the jury is being asked to determine what their life was worth. So I guess my question is, why does it matter if you win a loss of consortium claim when you're being asked about the deceased people's life? What's the difference? That's my question.

A. I'm not following you, counsel. This is -- first of all, I'm just not understanding what you're asking.

Q. What's the difference between the value

888-893-3767
www.lexitaslegal.com
Case 6:22-cv-03037-MDH Document 107-2 Filed 11/10/23 Page 19 of 83
LEXITAS

of a loss of consortium claim versus the loss of somebody's life, in numbers? What's the quantitative value difference?

A. Oh, I can't tell you that.

Q. All right.

A. Depends on the -- depends on the case.

Q. I guess, my -- you cited this as your example. So --

MS. FOWLER: We can go ahead and take that down.

BY MS. FOWLER:

Q. You cited this as your example. So I'm just asking you these questions.

How did winning the loss of consortium summary judgment motion change the outcome of this case? How did it move the needle?

A. It eliminated an item of damages.

Q. And you would agree with me that there is an even broader item of damages, which is the loss of those people's lives to their -- their family members and loved ones?

A. I -- sorry. Are you done?

To me, those are separate things.

Q. And I'm asking you --

A. But I assume they're separate -- they're

separate -- they're separate -- I mean -- I assume they're separate items of damages.

Q. I understand they're different words. I get that. But my question is, substantively speaking, how did that change the value of this case?

A. They eliminated -- the -- the elimination of the loss of consortium damages, assuming it was -- otherwise would have been recoverable, reduced the value of the case.

Q. And no --

A. Reduced the amount of damages.

Q. Do you know what the jury awarded for loss of consortium -- the mock jury awarded for loss of consortium on this?

A. No. It may have been part of the compensatory damages.

Q. And do you know how many hours they spent briefing the loss of consortium motion?

A. No.

Q. Sir, you read Mr. Nau's deposition.

A. Yes.

Q. You are the one that tabulated all -- and reviewed all of the entries and the -- and the attorneys' fees. We counted it up. It was 253

hours that they spent on that motion.

A. I don't think so.

Q. Do you remember seeing that?

A. No. Let's look at it.

MS. FOWLER: Go ahead and pull it up then. It was marked as an exhibit that was attached, sir, and you can tell me if I'm wrong. And if you want to take a break --

WITNESS: Are you going to show it on --

No. No. No. Hold on. You're going to put it on the screen, aren't you?

MS. FOWLER: Yeah.

WITNESS: Okay. All right.

MS. FOWLER: Let's do it. Let's do it. We'll go ahead and put it on the screen, sir. And you can go ahead and get your calculator out.

MR. GRIFFIN: What is the exhibit number?

WITNESS: What is the -- what is the -- what is the number at the very end of the document?

MS. FOWLER: Exhibit 15a.

(Exhibit 15a, time entries by date, was marked for identification.)

BY MS. FOWLER:

Q. Okay.

A. What is the number at the very end of

the -- can you go to the last page?

That 253, can you -- can you tell me what that reflects?

Q. Sir, we'll go through it. If you need to go through it, we'll go through it.

A. Okay. Let's -- okay, that's fine.

Q. As we're going through this, I want to make it clear. I've asked you repeatedly what is the value difference between the loss of consortium claim and the other damages that they would be entitled to. Correct?

A. I don't know if that's -- the record will show if that's what you've been asking me.

Q. And you can't say. Correct?

A. Are we talking about this exhibit here? Or why don't you go ahead and ask the question.

Q. I just did.

A. Why don't you go and ask it again then.

Q. You can't say -- you can't say what the -- what the value difference is with the loss of consortium in the case versus it being dismissed out.

A. I think that's correct. I can't say.

Q. All right. Now, if we start on 2/15/17, I've highlighted every time loss of consortium is

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F
LEXITAS

Page 81

mentioned in a billing entry, along with the time spent. Do you see that?

MR. GRIFFIN: What page are you on?

WITNESS: Well, are you talking --

MS. FOWLER: 2/15/17.

WITNESS: Are you talking about what's highlighted? Are you --

BY MS. FOWLER:

Q. Sir, hold on one second.

A. Yes. Sorry.

Q. Page 7 -- starting on page 7. I will start -- I will start over.

A. Sure.

Q. You will see from these time entries, every entry that has loss of consortium and the hours spent, we've tabulated those. We've highlighted that. Do you see that?

A. Okay. So you -- yes, but I have a question. I -- I -- I -- I have a question for you --

Q. All right. Let's go through this.

A. -- so I understand this.

Okay. Is that 10 hours that you highlighted -- is that part of the 253?

Q. Yes, sir.

Page 82

A. And is the --

Q. Is there any reason --

A. Yes. Is the 5.2 part of it?

Q. Yes. All of these hours, are they charged --

A. Excuse me.

Q. Hold on, sir.

A. Yeah. Go ahead.

Q. All of these entries -- and if you -- if you are now saying that you have an issue with the block billing that they're doing, please let me know that. But these --

A. That's the issue.

Q. -- issues pertaining -- these are entries pertaining to loss of consortium.

A. But that's not the work that was --

Q. And these are the hours -- sir, let me finish.

A. Yes.

Q. These are the hours attributed to this billing entry. Do you see that?

A. It's attributed to all of the work in the billing entry, yes.

Q. Your job --

A. This is much more than loss of

Page 83

consortium.

Q. Hold on. Hold on.

Your job was to go through each one of these entries and determine whether what is stated on the page is reasonable. Correct?

A. No.

Q. You reviewed these entries, did you not?

A. Yes.

Q. Your job today is to tell us that these entries and the time spent are reasonable. Correct?

A. My job today? Well, I would have to go through each of these entries and allocate the time related to loss of consortium, if that's what you want me to do. But it's certainly not the total amount billed in the block entries.

Q. Did you not do that --

A. I did not do that.

Q. -- before today?

A. I did not do that.

Q. Why not?

A. Because it wasn't part of my analysis. It wasn't necessary.

Q. Did you ask anybody, "How much time did

Page 84

you spend on this loss of consortium motion"?

A. No. That isn't -- that isn't what I was trying to accomplish. That isn't --

Q. Your job --

A. In my -- my job was to assess the overall reasonableness of the fees and make -- and whether or not the decision to hire Gibson Dunn was a reasonable one. That was my job.

Q. All right.

A. That doesn't mean going through and quantifying the time spent on every little project -- or every big project, for that matter -- in every case. It's not. That's not how you go about doing an analysis at this time.

Q. That's not how you do the analysis.

A. This is an incorrect -- this is an incorrect way to do the analysis that you've done, if that's what you did. If you took all of the time in all of these block entries that are highlighted and totaled that up, and you are saying that's how much time was spent related to the loss of consortium motion, that's just not a valid way to do an analysis. And nobody who does this type of analysis, that are -- that do this kind of work, would do it that way, that I'm aware of.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
LEXITAS

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 21 of 83

Q. Well, sir -- yeah. Well, sir, we'll see about that.

But I'm -- I'm asking you, if you don't know what these entries mean and how much each task -- how much time was spent, then how can you possibly tell us whether or not the work done and the determination to hire Gibson Dunn, period, was reasonable?

A. I think I already said this, but --

Q. Answer the question then.

A. I -- I -- I think I already said this. But, A, I can tell you what they mean -- is what you asked, what you said. There's no issue with that. But I wasn't asked to, nor would I, go through and try to total up all of the time spent on every project of this entire case to assess whether the time spent for individual projects was reasonable. I look at the overall time spent in the case. Sometimes I see work that appears unreasonable for some reason, and I try to quantify it. I didn't see that --

Q. Did you do that here?

A. I did not see that.

Q. You didn't do that here?

A. I did not see that necessary --

Q. You did not --

A. I did not do that here because I didn't see it as necessary here. And I don't see the analysis that you just put up about the loss of consortium indicating that there was any reason to do it for that project. Nor do I think that simply because they won the motion indicates that it wasn't of any value, that the work that they did wasn't of any value.

Q. I'm not sure I understand what your role is at all at this point. You didn't review the -- you didn't review the bills to determine whether --

A. I did review the bills.

Q. Hold on. You didn't review the bills to determine whether or not the work done was reasonable. True?

A. That's wrong.

Q. Okay. Well, then tell me, how much time did they spend on the loss of consortium claim?

A. I would have to go through that and allocate the time in those various block entries you indicated. But that is not the way --

Q. The way --

A. -- I went about -- that is not what I was retained to do. That's not the way I normally go

about doing an analysis. I'm looking at the overall fees that were billed under these various circumstances that were set out in the rules. And I will look at individual projects when there appears to be some problem with those individual projects. I didn't see that here. I certainly don't see it with -- with these loss of consortium entries that you are indicating, which seem to be a minor portion of the 253 hours that you've calculated.

Q. Sir, you would agree with me, block billing is a problem, isn't it?

A. It's a problem in that -- for anybody that's trying to quantify the individual entries within the block entries.

Q. And you as a billing auditor --

A. But there's nothing illegal -- there's nothing illegal about it. There's nothing inappropriate about it unless -- unless the client has told the firm not to block bill.

Q. Well, sir, you would agree with me, the reason why it's problematic is because a client can't look at their bills and determine how much time is being spent on any specific task. True?

A. The reason it's problematic is that no one can do that. But that's not how many clients

choose to manage their cases.

Q. Sir, just -- I want to move to strike the last part of that answer because you're not answering my question. My questions are very simple. Okay?

You would agree with me that the reason why block billing is an issue is because clients can't look at the work performed and determine how much time was spent on any specific task. True?

A. If that's the way they choose to manage their case, yes, that's true.

Q. And, sir, you've reviewed these bills. And you would agree with me that they block billed on every one of these entries. True?

A. I don't know if that's true.

Q. You would agree with me that the -- what we just put up on the screen constituted block billing, did it not?

A. That one -- that -- that page certainly constituted block billing, that I saw.

Q. We can keep going through it. But, sir, you would agree with me that, if you had questions, you certainly did not go back to Gibson Dunn and say, "Can you break this out for me so I can look at this more closely?" True?

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #216F.
Case 6:22-cv-03037-MDH Document 107-2 Filed 11/10/23 Page 22 of 83

Page 89

A. True. I didn't see any need to.

Q. All right. And when you saw loss of consortium on over 50 entries, that didn't raise any red flags for you. True?

A. Yes, it did not.

Q. All right. And when you thought about --

A. They filed a motion for summary judgment. That's -- 50 entries for a motion for summary judgment is not at all unusual.

Q. All right. Well, I'm not saying that it was -- I'm not saying that it was 50. I'm saying it was 253 hours where that was --

A. Even that's not unusual for a motion -- even 253 hours isn't necessarily unusual for a motion for summary judgment. But that's not what they billed here, based on what you just showed me.

Q. You would agree with me that if it's 253 hours worth of time entries on a loss of consortium -- at least in part -- loss of consortium motion -- hold on.

A. I didn't --

Q. Hold on.

-- you would want to know what value that motion had on the case. True?

Page 90

A. Not necessarily.

Q. All right.

Let's talk about the motion practice that you say Gibson Dunn was the right man for the job.

A. Sure.

Q. You say, in your report, they filed -- that there were 60 motions filed. Right?

A. By both sides.

Q. Uh-huh. But the majority were filed by Gibson Dunn. True?

A. I actually don't think so.

Q. All right. Well, we have the docket sheet that was produced to us, marked as 113g(2).

A. I'm sorry. 113 what?

Q. g(2).

A. Okay.

(Exhibit 113g(2), docket sheet, was marked for identification.)

BY MS. FOWLER:

Q. Now, my question to you is, do you see the highlighting on this document?

A. On the document -- on -- on what I have, all the highlighting is the same color on each page.

Q. I have highlighting that's in orange-ish

Page 91

yellow and I have highlighting that's --

A. Yeah, they didn't print it on a color printer.

Q. You -- it didn't print it on a color printer?

A. No.

Q. All right. Sir, do you -- I'm going to -- we're going to email this to you.

A. I may -- I may have it.

Q. All right. Why don't you go ahead and pull that up.

A. Okay.

Q. Tell me when you're ready.

A. I have a copy of it pulled up.

Q. All right. Someone highlighted this in blue and in orange-ish yellow, true?

A. Yes.

Q. Was that you?

A. No.

Q. Who provided this to you?

A. I assume I got it from counsel.

Q. And I would assume you've reviewed this. True?

A. Yes. Yes.

Q. And you would agree with me that the blue

Page 92

highlights are the defense motions. True?

A. I believe so, yes. That was the idea.

Q. And the yellow ones are the plaintiffs' motions. True?

A. I believe so.

Q. And you can go ahead and count it. But it appears to me the majority of the motions highlighted are in blue.

A. Well, counsel, why don't you go count them up.

Q. Sir, if you need to count them up, count them up. My question is, isn't it true --

A. What I counted -- counsel, what I counted --

Q. Let me finish the question.

A. Sure.

Q. Isn't it true that the majority of the motions filed were by the defense?

A. When I counted them up, that was not the case. But I could be wrong. It's very close. And also, I'm not sure that that's -- what that's really relevant to. The fact of the matter is, there were a lot of motions filed by the parties.

Q. But the majority were filed --

A. There was a lot of work done in this

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
LEXITAS

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 23 of 83

case. That's what's relevant.

Q. The majority -- the majority were filed by -- by Gibson Dunn?

A. Okay. I would have to go -- go through, and we can count them up if you want. Do you want to do that right now?

Q. You didn't -- you didn't look at that?

A. I did look at it. I'm just disagreeing with you.

Q. And out of all of the motions that they filed, substantively -- I'm not talking about motions for a page extension. I'm talking about substantive motions based upon law, arguing law, okay? They won two. Correct?

A. No, I believe they --

Q. Sorry. They won one and a half. They won a loss of --

A. I believe --

Q. They won one loss of consortium claim and they won a partial summary judgment on the pain and suffering on two instantaneously dead people. True?

A. On the motions for summary judgment.

Q. All right.

A. I believe that's correct. Although, I'm not even sure about that.

Q. And --

A. But that's my understanding.

Q. We can look through the orders. And either there was no ruling or the -- the motions were otherwise denied.

So I'm asking you, sir, if there are others that they substantively -- substantive motions that they won, let me know.

A. I believe that there were motions in limine that they won.

Q. Okay. Point those to me.

A. Okay.

Q. Why don't we do this. We'll just go about page by page.

Starting on the third page -- well, wait. Hold on. Hold on. Let me do this.

I'm counting. They did win their motion to withdraw. It was unopposed. They lost their motion to exclude the testimony of Brian McDonald.

A. Counsel, I'm sorry. I'm sorry. Where are you?

Q. I'm on page -- we're starting at -- they -- they left the case -- go to page 5.

A. I'm on page 3. I'm on page 3.

Q. Look at page 5, September 26. Order

granting their unopposed motion to withdraw. Do you see that? First -- first one up.

A. Okay. I'm on the page -- I'm on page 5. Uh-huh.

Q. All right. All right.

I -- I do not see anywhere, starting there and moving forward -- anywhere but the two motions for summary judgment, one for the pain and suffering of the two people that died instantaneously, and the other one for loss of consortium, for which we don't know what the value would be on the case. Other than those, I don't see any other orders granting their motions.

A. Well, I see -- okay. I see orders denying plaintiffs' motions. I see on November 22 an order granting Prime's emergency motion to overrule objections. There's a loss of consortium. There's another order denying plaintiffs' motion.

Q. Well, I'm asking you about --

A. Denying plaintiffs' motion --

Q. Sir. Sir, I'm asking you about -- hold on, sir.

I'm asking you about New Prime's motions. I'm asking you about their win/loss ratio on this. My question is --

A. Well, I considered defeating the other side's motions to be relevant.

Q. How many motions did they file that they won?

A. Are you talking about motions for summary judgment?

Q. I'm talking about all of them.

A. Well, I would have to go through and --

Q. And you didn't do that?

A. I didn't look at how many they won or lost because I don't think that's really a relevant consideration.

Q. Well, sir, if the reason why they are the right man for the job is because of their motion practice, and if their win/loss ratio is 2 to 30 --

A. I didn't -- it's not 2 to 30, counsel.

Q. Well, let's just --

A. First of all -- first of all --

Q. Sir, hold on. Hold on. I'm not going to be interrupted again.

If their win/loss ratio, for example, is they won 2, but they filed 30, wouldn't that indicate to you that perhaps their motion practice is not on -- is not spot on?

A. Not necessarily.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 24 of 83
LEXITAS

Page 97

Q. Well, you're telling us, the reason why they should be entitled to charge over $1,000 an hour is because of their motion practice, in part. True?

A. I haven't said that. I mean, they're a very high quality law firm. They do -- I suspect they have a very high quality motion practice. That's not what I've said, though. But I think that's relevant.

Q. Well, why --

A. But I also don't think that -- I also don't think that the premise of your argument that they won just 2 of the 30 motions is even accurate. But that having been said, you file motions for a lot of reasons in -- in cases, counsel, as you know. And it's not only because you're going to win the motions.

Q. Whoa. Whoa. Whoa. Whoa. I'm going to back up.

Are you telling us that one of the opinions you have or one of the ways that you practice is that you file motions that you know you have no basis to win?

A. No.

Q. Are you telling us that one of the

Page 98

reasons why you would file a motion, even if it's meritless, is for some other reason?

A. No.

Q. Why would you file a motion if you didn't think it had merit and that you should win it?

A. I didn't say that. I didn't say that.

Q. You just did.

A. But you file motions all of the time that you don't know that you're going to win.

Q. Well, that's true of every motion a lawyer files.

A. That's exactly right, counsel. And you just made my point.

Q. Right. Right. Well, no, I think I'm making my point.

If you keep losing those motions, is it suggestive of your success in pursuing the motions to begin with, whether they should be filed?

A. It can suggest it. It doesn't mean it's determinative. And that -- and the premise of -- and that does not seem, in any event, to be what was going on here.

Q. Did you look at that? Did you?

A. Did I look? Yes, I've looked at that. And they won certain of their motions and they lost

Page 99

certain of their motions. And they also defeated a number of plaintiffs' motions.

Q. As you sit here today, you can't say what their win/loss ratio is. Correct?

A. I'd have to go -- we could go through the docket sheet, if you want.

Q. No. No. No. No. You didn't do that, did you?

A. No. I -- I -- I knew that they had won the loss of consortium motion for summary judgment. I knew that they had won -- denied in part and granted in part the pain and suffering motion for summary judgment. I knew that they had won and they had lost certain of their motions in limine. I did not quantify those, nor do I think that that was important to do.

Q. Nor did you look at the motions they won. You didn't look at what value that actually had on the case. True?

A. Well, again, counsel, I believe that winning the -- the loss of consortium motion had an impact on the value of the settlement on the case.

Q. Well, sir, they didn't settle the case until --

A. And also -- and also -- and also -- and

Page 100

also the pain and suffering motion.

Q. You can't say what that value is?

A. Well, that's never the case when you settle cases. You don't know what the value of the particular things are.

Q. Well, one thing --

A. But often, those -- you can't necessarily determine what the value is of a loss of consortium claim in a case that settles.

Q. One thing that you could do is, you could reach out to opposing counsel and ask them, "Hey, did that loss of consortium motion -- did that have an impact on -- on your settlement negotiations?" You could have done that.

A. Reach out to whom?

Q. Opposing counsel. The people that you're basing in part your opinions about why Gibson Dunn was the right man for the job.

A. Who -- who do you mean by opposing counsel? Are you meaning plaintiffs' counsel?

Q. Yes.

A. I have -- well, I mean, I suppose. I'm not sure that would have been very fruitful. And I'll have to say, I've -- I've never done that, nor do I know that anybody who does legal fee analysis

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
Case 6:22-cv-03036-MDH   Document 107-2   Filed 11/10/23   Page 25 of 83
LEXITAS

has ever contacted the opposing counsel in a case to get their view of the case. It's not a very common practice. Nor do I --

Q. If you don't know --

A. -- think they would talk to me, frankly. But who knows?

Q. Well, okay. All right.

A. Can I take the docket down?

Q. Yeah.

So the three bases -- just to wrap this testimony up, the three bases of why this was a complex case requiring Gibson Dunn's $1,000-plus-an-hour hourly rate for their top billers was because sleep apnea is complicated. But you have no personal experience about how that relates to trucking cases in general. True?

A. I think I have already testified about this, counsel.

Q. All right.

A. But there are rules and regulations about sleep apnea that clearly relate to trucking cases. I have no prior -- I have no specific understanding of what those rules and regulations are, other than what I've seen in the materials in this case.

Q. The types of damages that were involved

in this case made this another basis for your opinion. Correct?

A. The types of damages?

Q. Yes, sir.

A. There were -- there were issues involving the damages -- there were issues involving the damages, yes.

Q. All right. And you can't say what impact, if any -- and, first of all, you've already stated that wrongful death damages are pretty much the same from one case to another. True?

A. I have not said that.

Q. Well, is that true?

A. That wrongful death damages are the same from one case to another?

Q. Yes, sir.

A. I don't think that's true.

Q. But you wouldn't know, because you have never defended a wrongful death case nor have you reviewed the legal bills on a wrongful death case.

A. Yes, I have. Yes.

Q. All right. And the motion practice that you cite, you didn't get into the details of whether or not the motions that they were filing were successful, what their -- the win/loss ratio was,

and what impact, if any, the prevailing motions had on the value of the case. True?

And you can read it back -- the court reporter can read it back, if you would like.

A. Want to break -- why don't you break that down into parts.

Q. The motion practice you did not review in detail to determine what the win/loss ratio was. True?

A. I didn't quantify the -- I -- I had not quantified the number of overall motions they won or lost, other than in the motion for summary judgment.

Q. Nor did you consider what impact, if any, the ones that they prevailed on had on the value of the case. True?

A. You mean quantifying? Yes, I did not quantify it. That's correct.

Q. All right. Okay.

A. But I did -- I do think they had an impact on the value of the case. I already said that.

Q. Okay. Now, we are -- I'm done with this portion of your opinion. We're going to move on to No. 3.

MS. FOWLER: Does anybody need to go potty?

No?

WITNESS: You mean, should we take a break? That's fine with me. Sure. Why don't we take a break?

MS. FOWLER: You want to take a break? Okay, we'll take a break.

WITNESS: Five minutes okay?

MS. FOWLER: Yeah.

VIDEOGRAPHER: Off the record. 1:43 p.m.

(Recess)

VIDEOGRAPHER: On the record. 1:53 p.m.

BY MS. FOWLER:

Q. All right. So now let's go to the third opinion. And we've covered a lot of stuff. So hopefully we can keep moving a little bit faster now. But --

A. I'll try not to interrupt you so much.

Q. Okay. The nature and amount of work required for handling the litigation and the time limitations imposed by the circumstances. That was factor No. 3 that you considered. Correct?

A. Correct.

Q. All right. So the amount of work that

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

LEXITAS

Gary GreenfieldSeptember 21, 2023

Page 105

has to be undertaken in a case -- this is what you say -- is obviously a major determinant of the reasonableness of the fees and expenses billed, as are any time constraints that the law firm personnel are working under.

In this case, both factors impacted the fees billed, as well as the decision to retain Gibson.

Breaking that apart, what work -- what work did you do to determine the -- the personnel or the time limitations on Gibson Dunn specifically?

A. I'm sorry, counsel. You asked the work I did related to the personnel or to the time limitations?

Q. Time limitations of the personnel from Gibson Dunn.

A. Oh, okay. Well, Gibson was retained in January, really February, in this case that had at that point an August trial, which was, what, six or seven months away. So that's a very tight timeframe for a case within the state, but this particular case was of --

Q. Okay.

A. -- this size and resulted in a lot of work having to be done in a pretty compressed period

Page 106

of time.

Q. I guess I maybe should have asked the question in the inverse.

What work did you determine in terms of other law firms in the area who specialize in trucking litigation? What time commitments they had that precluded them from working on this case.

A. You mean, did I research what other law firms in New Mexico were available to do work on this case?

Q. In New Mexico, California, or any of the bordering states.

A. I did -- I did not do that analysis. Nor do I think that would be appropriate for this particular analysis.

Q. The basis -- the basis of your opinion is the fact that they had seven months from the date that they were hired to the trial date. Is that correct?

A. Whatever the number of months were. It was a tight timeframe. Not -- not the seven months. In this particular case, it was a tight timeframe for getting the case ready for trial.

Q. You don't know what that timeframe was?

A. It was what it was. It was six, seven

Page 107

months.

Q. All right. And --

A. January or February to August.

Q. Okay.

Sir, going back to the docket sheet -- and you may know the answer without having to look, but my question to you is this: Did Gibson Dunn ever file a motion to continue the trial setting?

A. I am not aware of any.

Q. Did any law firm on behalf of New Prime file a motion to continue the trial setting?

A. I'm not aware of any.

Q. All right. Wouldn't that be important to know, whether or not that seven-month period of time, whether it's six- or seven-month window of time, was hard -- a hard deadline or whether or not it was flexible?

A. You mean, what the -- what the Court's view was? Whether it kept a tight time -- my recollection was that this Court tried to keep their trial dates. I believe I read that somewhere. But I don't know that that was -- that that would be determinative. This was the amount of time they had. They had to assume that, until the case was continued, that there was a lot of work that had to

Page 108

be -- had to get done. Even if you moved to continue the trial, which, you know, typically you've got to do a lot of work until you know it's actually been continued.

Q. But no one moved to -- the Gibson Dunn didn't move to continue the trial, did they?

A. Not that I'm aware of.

Q. Okay.

A. But I don't -- I don't know for sure.

Q. And, ultimately, the Court did continue it, did it not?

A. Yes.

Q. Okay. And, in fact, the attorneys that were hired by AIG then continued to represent New Prime for another eight months. True?

A. As far as I know. I believe -- I'll take your word for that. I know that AIG's attorneys that were retained by AIG did take over the case from Gibson, when Gibson withdrew.

Q. Okay.

A. Whatever number of months that was, I'm not sure.

Q. You stated in your opinion, "This was not a simple traffic accident case." You would agree with me this was a straightforward rear-end

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
Case 6:22-cv-03087-MDH   Document 107-2   Filed 11/10/23   Page 27 of 83
LEXITAS

Page 109

accident, would you not?

A. You mean, the events that took place? I'm not sure that they were straightforward. But, you know --

Q. Wait. Can you or can you not say whether or not the facts of the accident were straightforward?

A. What do you mean by "straightforward," counsel? I'm not sure I understand the question.

Q. Well, you say this was not a simple traffic accident case. You understand this was a rear-end accident, do you not?

A. It was a car squashed between two trucks where there were questions about signs and who was turning and so on.

Q. Okay.

A. I mean, I think that there were -- there were some factual disagreements about what had happened. I'm not sure that they were particularly complex.

Q. Is anyone disputing that New Prime's truck came into contact with the Herrera -- Herreras' -- rear end of their vehicle?

A. Not that I'm aware of, no.

Q. Okay. And --

Page 110

A. That doesn't make it straightforward.

Q. Okay. What work did you --

A. As I understand -- as I understand the word "straightforward."

Q. What work did you do to determine what -- whether or not the facts of this accident were or were not straightforward?

A. I'm not sure I know what you mean by "straightforward." Do you mean the facts --

Q. Clear-cut.

A. The facts -- the facts of the accident? The physical -- I mean, what occurred when -- when the -- when the -- when the vehicles collided? Or the facts about the whole case? Or the damages? Or what the driver was doing? What -- what -- what -- what are you talking about as straightforward?

Q. I'm talking about -- you said this is not a simple traffic -- traffic accident case. I'm just asking you --

A. Right.

Q. -- what -- what facts make it complicated?

A. There were questions about what the driver was doing. There were questions about what the -- what -- the brakes on the front truck that

Page 111

were factual disputes. I think there was a question about whether or not the car -- what the car had actually done. There were questions about the signage.

Q. Sir, you would agree with me, if you know, that's sort of common in every rear-end accident.

A. I don't -- well, okay. I will accept your representation.

Q. Nobody asked you --

A. I don't know that that --

Q. Let me ask you a different question.

A. I don't know -- counsel, let me finish -- counsel, let me finish my answer.

Q. I'm going to strike my question. I'm going to strike my question and I'm going to ask it differently.

A. Okay.

Q. Do you know whether those facts are or are not fairly common in trucking accident cases involving rear-end accidents?

A. Just --

Q. Do you know?

A. I -- I assume that some of them are fairly common. And maybe all of them may be common

Page 112

in truck accident cases. But you also have the combination of factors. And you have other things other than the facts of the accident itself that make cases complicated.

Q. All right. You say that one of the reasons that justifies -- and if I'm understanding you correctly -- a higher hourly rate, such as in the range of $1,000 or more for the top three billers -- one of the reasons is because of the number of depositions that have to be taken?

A. Is that a question?

Q. Yeah.

A. What's the question?

Q. The hourly rate that Gibson Dunn -- and you would admit, Gibson Dunn -- Dunn charged a higher hourly rate than any other law firm involved in this case. True?

A. I don't know about all of the law firms. I believe they charged higher hourly rates than the -- than the lawyers that were working for Prime in the lawsuit, yeah. That's -- that's my understanding.

Q. All right. And you don't know whether they -- what they compare to the other law firms that were working on this case? You didn't look at

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
LEXITAS

Page 113

that?

A. I -- I looked at -- I -- I -- I sort of are familiar with the other law firms that were representing -- that were retained by Prime.

Q. You stated that $1,000 an hour is not common in these types of cases. Did I get that wrong?

A. I don't think I said that.

Q. Is it common charging $1,000 for a motor vehicle accident?

A. Depends on the case.

Q. Okay. And would you say that it's common --

A. I -- I don't know how common it is. I -- I don't know how common it is. It depends on the complexity of the case.

Q. One of the -- one of the reasons that you determined that charging a $1,000 an hour was reasonable in this case was due to the number of depositions involved. Is that true?

A. The amount of activity and work required in the case is relevant to the overall reasonableness of the fees in the case. Just one of the things I was looking at.

Q. Sir, as you sit here today, is it your

Page 114

testimony that you did not analyze or have no opinion on whether or not the hourly rate was reasonable?

A. I -- oh, no. I -- I looked at the question of reasonableness of the hourly rate.

Q. Okay. And --

A. From the standpoint of whether or not it was reasonable to retain Gibson. Whether it was a reasonable decision.

Q. And the hourly rate in this case -- you believe that $1,000 an hour or more was reasonable, in part based upon the number of depositions involved. True?

A. It was just one factor in the complexity of the -- of the -- excuse me. One factor in the amount of work that was required that justified the overall retention of Gibson in the case. It's not necessarily related directly to the hourly rate, the number of depositions. And, in fact, as -- as I recall, the depositions for the most part were not taken by Mr. Dusseault.

Q. And, sir, you understand that, when New Prime entered into an agreement with Gibson Dunn, the only individual specifically named in the agreement, the fee agreement that set forth what the

Page 115

hourly rate would be, were Charles Dusseault, Michele Marriott and Richard Doren. Do you understand that?

A. I -- I will take your representation. But that's -- that's normal in fee agreements. They don't typically indicate all of the people that might be involved in a case. And typically at the beginning of a case, you don't know who all the people are that might be involved in a case.

Q. They charge -- and they -- and that fee agreement said their charges were in excess of $1,000 an hour. True?

A. I would have to go look at the fee agreement. But that could be the case.

Q. You reviewed it in order to formulate your opinions, correct?

A. A long time ago.

Q. All right. And, sir --

A. I would just have to -- I'm happy to review it.

Q. All right. Well, if you need for us to --

A. But I accept take your representation.

Q. -- pull documents up, we can do that.

A. No. I -- well, it's up to you.

Page 116

Q. You accept the representation?

A. I accept your representation.

Q. All right.

A. Yes. As to what the fee agreement says, sure.

Q. All right. All right.

And one of the reasons why you say Gibson Dunn -- why it was reasonable to sign off on that fee agreement -- saying, "I agree to a thousand dollars-plus for these three individuals" -- was because of the number of depositions involved. True?

A. No, I don't think they probably even talked about the number of depositions. I don't know what they talked about, counsel. But it wouldn't be normal to be sitting there when you're retaining a law firm to be saying, we -- you know, "You're going to be doing 50 depositions."

Q. Hold on.

A. Might be. Sometimes it will come up.

Counsel, let me finish.

Sometimes it will come up. Sometimes it won't. But, commonly, you don't get into the number of depositions that you're going to have in a case when you are retaining them. It's very common.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F.
LEXITAS

Q. Well, hold on there, sir. Because you just told us your job was to determine whether or not it was reasonable to hire Gibson Dunn. Do you recall that?

A. Yes.

Q. All right. And if you're now telling us that New Prime would have no idea nor would they discuss nor would there be any mention about the volume of work, including depositions, that had to be undertaken before making that decision, how can you say whether or not it was reasonable?

A. That's not what I said. You talked about number of depositions. I am sure that -- I don't doubt at all that they talked about the volume of work in general that was going to be required in this case.

Q. Including the number --

A. And -- let me finish. And the depositions would be included in that. I just don't think they counted up the number of depositions and said, you should -- you know, "There are going to be 50 depositions."

Q. I've got to be honest with you. I feel like I'm not getting a straight --

A. They might have.

Q. -- I'm not getting a straight --

Let me back up. We're just going to look at your report. Because I feel like you're going in circles. And I'm just trying to follow a linear thought with you for one second.

A. Let's look at the report.

Q. Back to No. 3. "The nature and amount of work required for handling the litigation and the time limitations imposed by the circumstances." This factor you reviewed to determine whether or not it was reasonable to hire Gibson Dunn. True?

A. Yes.

Q. All right. And when you talk about the nature --

A. And also the overall --

Q. Sir.

A. Excuse me. Wait. Let me finish.

Q. No. No. No.

A. Let me finish my answer.

It's true. But, also, it's relevant to the overall reasonableness of the fees.

Q. That's fine. That's fine.

A. Thank you.

Q. I'm asking you about your first opinion,

whether or not it was reasonable to hire Gibson and Dunn. And in determining that it was, you determined, based upon the nature and amount of work required for handling the litigation and the time limitations imposed by circumstances, that it was in fact reasonable to hire Gibson Dunn. Correct?

A. That's one of the factors, yes.

Q. All right. And when you specify -- because you don't get to just come into court and say, "due to the nature of the work." You have to be specific, right? You have to specify what that nature and amount of work is. Correct?

Correct?

A. Are you asking what's going to happen in court?

Q. I'm asking you, you specified what that nature and amount of work was in your opinion. Correct?

A. I discuss it. I discuss it, yes.

Q. Included in the nature and amount of work required, you include the number of depositions to be taken. Correct?

A. That is relevant to the overall reasonableness of the fees, yes.

Q. You keep qualifying your answer. I'm

asking you whether or not it was reasonable to hire Gibson Dunn. I'm there. Whether or not it was reasonable to hire Gibson Dunn. Did you consider the number of depositions that were required?

A. As one of the factors, yes.

Q. All right. And as you stated, Chris Dusseault -- who knew Prime, contractually entered into an agreement with, who said he would charge over $1,000 an hour to defend them -- did not attend any depositions. Do you understand that?

A. That's incorrect, I believe.

Q. Let's go ahead and pull up Exhibit 110b -- or -- yeah. 110b.

(Exhibit 110b, deposition attendance by date from Mr. Greenfield's report, was marked for identification.)

BY MS. FOWLER:

Q. Sir, do you have 110b?

We don't even need to pull it up.

Sir, do you have 110b from your file?

A. I'm looking.

MR. GRIFFIN: What's 110b?

MS. FOWLER: It is from his report. It's deposition attendance by date.

MR. GRIFFIN: Okay. I know what you're

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F.

Case 6:22-cv-03037-MDH Document 107-2 Filed 11/10/23 Page 30 of 83

talking about.

MS. FOWLER: Okay.

And so that we can all play along from home, Angie, why don't you go ahead and pull up 110b.

WITNESS: That would be great.

MS. FOWLER: Let's just do that.

WITNESS: Sure.

BY MS. FOWLER:

Q. All right. Here is a chart -- this is 110b. This is a chart that you prepared breaking down deposition attendance by date. Do you see that?

A. Yes.

Q. And so you have identified the date, the biller, the description of the deposition work performed in connection with the deposition, as well as the hours, the rates, the fees, etcetera. Do you see that?

A. Yes.

Q. All right. Now, we're going to go scroll -- we can scroll through this one at a time. Go from this page. Look at the first page.

Do you see Chris Dusseault's name on the first page?

A. Not on the one that's on my screen, no.

Q. This is your document, sir.

Second page. Do you see --

A. Well, but the screen doesn't show -- excuse me. The screen is not showing the entire document, counsel.

Q. All right. We'll zoom out so that you can see it.

There. That's the whole second page.

A. Okay.

Q. Do you see Chris -- do you see Chris Dusseault's name on the second page as a biller?

A. No.

Q. Go to the third page.

Sorry, that was -- this is the second -- next page.

MS. FOWLER: Angie, get the full document in there so he can see the full second page. 2 out of 6. Let's go back. 2 out of 6. Zoom out.

WITNESS: Counsel, let me try to bring this up on my own screen.

BY MS. FOWLER:

Q. Well, go ahead and take a look. Do you -- can you see --

A. Hold on.

Q. -- Mr. Dusseault's --

A. Hold on.

Hold on. Let me try to find this on my own screen.

Q. Okay.

A. This is the exhibit to my report, right?

Q. Yes.

A. I'm just scrolling through the report.

Q. That's fine.

A. Yeah.

Q. Are you looking at the deposition attendance by date?

A. Yeah. Yes, I am.

Q. Okay.

A. And you're right. I -- I -- my understanding was that Mr. Dusseault had attended one of the depositions. But I don't see his name -- I don't see his name on the report.

Q. All right.

A. And most of these depositions were taken by people who were billing at lower rates. And as I recall, Mr. Dusseault was at a -- had a three-week arbitration in the middle of the case. So that may be -- that may be why he wasn't in attendance at any of the depositions. But, in any event, it's -- it's

a -- to me, the fact that -- that it was delegated to somebody else is a good thing, not a bad thing, as long as they're competent attorneys.

Q. Well, the reason why --

A. You can -- counsel, you can take it down. I've looked at it. You can take it down.

Q. The reason why they charge a lower rate is because they are less experienced. True?

A. That's one of the factors.

Q. All right. And we'll get into what their experience levels are in a moment.

But tell me how many times Richard Doren, who was the second person listed on the fee agreement, where they agreed to $1,000-plus an hour on hourly rates -- tell me how many times he attended a deposition.

A. Okay. Well, we'll have to go look at it. But --

Q. Look at it and tell me.

A. Yeah. I'm looking at mine, but you don't have to bring it up.

Q. Okay.

A. Did not look like he was involved with the depositions at all.

Q. All right.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

Case 6:22-cv-03086-MDH   Document 107-2   Filed 11/10/23   Page 31 of 83

LEXITAS

A. Which I think is a good thing, not a bad thing.

Q. All right. Do you think it's good to send less experienced associates to take depositions that will be played at trial?

A. It depends. It depends on the deposition. It depends on the experience --

Q. All right. Tell me what --

A. -- of course. I mean -- and one of the things about managing a case is deciding -- is -- who's going to do what. And there are different levels of experience that are appropriate for different billers.

Q. Tell me what experience --

A. So you don't have -- I don't -- I certainly don't think that Prime was expecting, nor do I think you would think it was reasonable, for those three lawyers who signed the retention agreement to do all of the work in the case.

Q. But not to show up to one deposition?

A. It depends.

Q. Well, I'm asking --

A. You have to show up -- yes, that could be completely -- it could be completely reasonable for the trial lawyer to not show up for a whole series

of depositions.

Q. All right.

MS. FOWLER: Eric and Jim, we must be wasting our time then, I guess.

BY MS. FOWLER:

Q. So M. Lee, what is her experience in depositions?

A. I don't know specific -- any of their experience in depositions.

Q. What is K. Galler's experience in taking deposition?

A. I don't know any of their experience in taking depositions.

Q. So if I went through each one of these billers to determine what experience they have in taking depositions and why it was okay for them to attend as -- as opposed to the lead counsel, you can't say. Is that fair?

A. I don't know any of their experience in taking deposition. But it is common in cases and the norm in cases for lead counsel not to be taking a lot of the depositions in the case.

Q. All right. Let's back up. Let's back up then. Because you keep talking about the norm and how it's common. I want to know what your knowledge

base is to be able to say that, when it comes to trucking liability cases. What's your knowledge base?

A. I don't -- I have not done a tremendous number of trucking liability cases. But complex litigation, like this, it's often the case that the partners are not taking depositions. Sometimes they do. Sometimes they don't.

Q. You understand that complex -- whether or not this case was complex is an issue. It's -- it's a dispute in this case. Do you understand that?

A. Yes, but I -- yes, but, in my opinion, it was.

Q. All right. And so you're sort of bootstrapping your argument here a little bit, aren't you? If you say, well, it was -- "I have experience in complex cases and this was a complex case; so, therefore, my experience relates to this case," that would not -- that would be a logical fallacy, would it not?

A. I don't understand your question. But I'm not bootstrapping it. And I don't see it -- whether it's a fallacy or not, I don't know, because I don't understand your question at all. So why don't you read it back?

Q. Well, I -- I -- you keep talking about what is common.

A. Right.

Q. And -- and I have -- I -- I take issue with that because you've already disqualified yourself in terms of your personal or professional experience on trucking liability cases. You have zero --

A. I don't think I'm disqualified.

Q. -- experience doing it.

A. I have not disqualified myself on anything, counsel.

MR. GRIFFIN: Yeah. Let me object to the form of that question.

Go ahead.

BY MS. FOWLER:

Q. Let me ask you it differently.

Sir, you have no professional experience in trying a trucking liability case. True?

A. That's true.

Q. You have no experience in staffing a trucking liability case. True?

A. I have not handled a trucking liability case when I was in practice. That's correct.

Q. And so whether or not it is reasonable or

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #216F.
LEXITAS

appropriate to send junior associates to -- to cases -- to depositions where the client believes there's high exposure -- you can't say, in a trucking liability case, whether that -- that was appropriate. True?

A. Well, first of all, there's a whole set of premises now that I -- I don't know. And I don't necessarily agree that, A, that these are junior associates. They may or may not be. I don't know. I don't think so. But they may be.

And I would also like to point out that -- that Mr. Roper, in his -- in his opinion, didn't question any of these things in terms of how the case was handled. His issue was with the -- as I understand it, was with the rates.

Q. Well, sir -- and you didn't look at the rates, did you?

A. I did look -- of course, I looked at the rates.

Q. Well, we'll go back in -- in the deposition, and we'll look at that and what you said about that. We're not going to retread that old ground.

But you said that there was extensive motion practice --

A. A major portion of my analysis --

Q. I'm moving on.

A. -- was about the rates.

Q. I'm moving on.

You said that there was extensive motion practice and that justified charging a higher hourly rate.

A. They made the decision -- it -- it reflected the fact that the overall fees were reasonable.

Q. Because they filed a lot of motions?

A. Yes. And so it was a very, very active case. That -- see, because the number of motions impacts the amount of time. The amount of time impacts the amount of fees. So that's one of the reasons the fees were reasonable.

Q. Here's the problem that I'm having. You say that they had to attend a lot of depositions. They filed and responded to a lot of motions. That justified their hourly rate of $1,000 or more. Is that wrong?

A. That's not -- yes, you are -- what I have said is that these --

Q. No. No. No. Is that wrong? Did I --

A. That is wrong.

Q. No. Just answer my -- let me -- let me just ask --

A. That is wrong.

Q. Let me ask that question, and then I'm going to --

Okay. That's wrong. All right.

A. Let me -- no.

Q. Let me ask the next question.

A. Are you withdrawing -- are you withdrawing the question?

Q. Let me -- I'm now withdrawing the question. You just said it was wrong. So let me just --

A. I want to answer it.

Q. -- ask the next question. Let me ask the next question.

A. I want to answer the last one.

MR. GRIFFIN: Let's take a break. Let's take a break. Let's take a break.

We'll be back in five minutes.

VIDEOGRAPHER: We are going off the record. 2:23 p.m.

(Recess)

VIDEOGRAPHER: On the record. 2:31 p.m.

BY MS. FOWLER:

Q. Okay. We've talked about depositions. We've talked about the extensive motion practice that you said -- that we've already talked about. But, specifically, I want to ask you this: The nature and amount of work required for handling the litigation. And you said the extensive motion practice. Was that based on the decision to hire Gibson and Dunn? Does that go into the decision of whether or not it was reasonable to hire them?

A. Well, I -- it -- it -- I'm not positive in January of 2017 whether they were aware or had talked about the nature of the motion practice that would have been required. It would be probably more relevant to the question of the overall reasonableness of the ultimate fees. They may have discussed the motion practice that was going to be required. But it would be more of a factor that I would think that would be relevant to the overall reasonableness of the fees.

Q. There are two time periods that --

A. And the fact that -- can I -- can I just add one other thing?

The fact that Gibson does a lot of motions. I mean, big firms often do have an extensive motion practice. So if they were

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
Case 6:22-cv-03037-MDH  Document 107-2  Filed 11/10/23  Page 33 of 83
LEXITAS

Page 133

anticipating a number of motions or that they wanted to bring a lot of motions, a firm like Gibson would be well-positioned to do that. I'm not sure that was actually discussed, however.

Q. This is -- this is the problem that I'm having, is that you're -- you're kind of entering the world of speculation. I want to know exactly what your knowledge base is as to why the decision-making was reasonable and why the fees charged and the work done was reasonable.

So we're looking at two different time periods. We're looking at the start of January 2017, whether or not to hire Gibson Dunn to begin with. Are you with me?

A. Yes.

Q. So Gibson Dunn is hired in January of 2017. The question at that point in time was, was it reasonable for Eric Nau and Steve Crawford to decide that hiring this law firm charging $1,000-plus an hour was reasonable. Right? Are you with me?

A. They were making a decision based on a lot of factors that were going on in the case on whether or not --

Q. No. No. No.

Page 134

A. -- to hire Gibson Dunn --

Now, hold on. Let me finish.

-- whether to hire Gibson Dunn as a firm was reasonable. And the people that they were talking to, they billed $1,000 an hour. Other people didn't. But -- but that's not what the overall fees for the firm were.

But the -- the point was, there were a lot of factors that went into their decision that they needed to hire Gibson Dunn that go beyond, you know, the number of motions that -- that were made. They probably didn't even know the number of motions that would be filed in the case.

Q. So, sir, I guess my question is very simple. What factors did New Prime rely on to hire Gibson Dunn to begin with?

A. Okay. They -- the exposure. I mean, it's -- it's -- it's listed in my report. But I'll go through it. The -- the exposure that they had in the case --

Q. Well, no. Sir, we've -- we've -- we've gone through --

Hold on. Hold on.

MR. GRIFFIN: You're interrupting -- you're interrupting him, Meg.

Page 135

MS. FOWLER: Okay.

MR. GRIFFIN: You can't ask that question and then stop him from answering it.

BY MS. FOWLER:

Q. Okay. Go ahead, sir.

A. I lost my train of thought. You might want to read back the question.

Q. Let me ask you the question differently.

A. Okay.

Q. We've gone through your report so far. And we're going to continue to go through your report. But you should be well-versed to tell me what factors existed to say, "Meg, it was reasonable for New Prime to hire Gibson Dunn in January of 2017."

And you said the high exposure, right?

A. Yes, that's one factor. Yeah. Big factor.

Q. What are the other factors --

A. Very big factor.

Q. What are the other factors as of January 2017 that made it reasonable to hire Gibson Dunn, with respect to their hourly rates in particular? Go ahead.

A. Well -- well, it's not with respect to

Page 136

their hourly rates in particular. I mean, Gibson Dunn has higher hourly rates than a lot of firms that do personal injury work. There's no question about that.

So let's just talk about the reasonableness of their decision, and why they hired Gibson Dunn. And it was based on a lot -- a lot of factors. It was based on the exposure. They had already gone through two local defense firms that hadn't worked out. They had worked with Gibson Dunn in, admittedly, non-trucking cases. But they had a lot of confidence in them. They -- and they -- the plaintiffs on the other side were turning out to be very good, very aggressive, very competent -- competent lawyers. They had a relatively short period of time before trial. Seven months is not a lot of time to get certain cases to trial. And so there were a number -- a number of other factors that went into the decision to hire Gibson Dunn. And in my view, looking at it --

Q. Keep listing -- keep listing them.

A. The overall quality of Gibson as a firm.

We talked about the prior relationship between them.

They had contacted several other firms

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 34 of 83

Page 137

that couldn't do the work or decided they shouldn't do the work.

They had some concerns, I recall, about hiring local counsel, just -- just local counsel because of the -- the fact that they had already terminated or been terminated by two local counsel firms.

That's what I recall right now.

Q. Is that -- is that it?

A. That's what I recall right now, yeah.

Q. All right. I want to -- I want to break this down a little bit, sir.

Starting with the prior relationship that New Prime had with Gibson Dunn. Now, Eric Nau is the only person from New Prime that you talked to, correct?

A. On substance. It's possible I talked to somebody about getting some file. But I don't even think I did that. I did not talk to Mr. Crawford, if that's what you're asking.

Q. And Mr. Crawford is the only one that had prior dealings with Gibson Dunn. You understand that?

A. My understanding is that he had a prior relationship with them -- that Prime had a prior

Page 138

relationship with him. And that -- and that he was the one that was familiar with them.

Q. All right. And the prior relationship -- you didn't ask Steve Crawford, "Off the record, tell me about that relationship. Why did you have this confidence in them?" Right?

A. Correct.

Q. The only thing we have from Steve Crawford is his deposition testimony, correct?

A. I don't -- I don't know what you have from Mr. Crawford besides his deposition testimony. It's the only thing I reviewed from Mr. Crawford.

Q. All right. Now, you understand that Steve Crawford testified in his deposition that Gibson Dunn had never handled a trucking liability case with them -- for them. Do you understand that?

A. I believe that's the case. I don't recall Mr. Crawford saying that in his deposition.

Q. All right. Let's go to page -- do you have Steve Crawford's deposition?

MR. GRIFFIN: Meghan, there's not an issue about that.

MS. FOWLER: Okay.

MR. GRIFFIN: Gibson Dunn had not been

Page 139

hired on a trucking case previously. There's no issue about that.

MS. FOWLER: Okay. And that's fine.

BY MS. FOWLER:

Q. If you go to page 57 of Steve Crawford's deposition, line 19.

Gibson Dunn's experience -- or sorry. New Prime's experience -- line 19 -- their experience with Gibson Dunn was never with respect to catastrophic personal injury cases, correct? You understand that's what he testified to?

A. Okay.

Q. And that his only experience with Gibson Dunn related to employment law and to some condo development, real estate stuff, down in the South maybe. Do you understand that?

A. That's what he says.

Q. All right. So when we talk about the prior relationship, they had zero track record on how capable they were of handling a catastrophic personal injury case such as this. True?

A. Well, they had the prior case that Mr. Dusseault handled on the appeal.

Q. He didn't handle that for New Prime, did he?

Page 140

A. Oh, for New Prime, no.

Q. New Prime had zero track record with Gibson Dunn as it pertained to catastrophic personal injury cases when they hired them for this case. True?

A. I believe that's correct, yes.

Q. All right. And when we talk about other law firms, do -- you understood that the -- there were other law firms that New Prime would routinely reach out to for catastrophic or trucking liability cases?

A. I don't know about catastrophic cases. Certainly for trucking liability cases, they had -- they had a group of law firms, yes.

Q. All right. And, in fact, those list of law firms are in your file, correct?

A. Yes.

Q. Included in those list of law firms is Maranga Morgenstern, correct?

A. I don't know.

Q. Do we -- do you want us to pull it up?

A. I -- I -- I believe your representation, counsel. But I'm not going to know much about Maranga Morgenstern.

Q. They are a panel -- or they are a counsel

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
LEXITAS

they use for California statewide -- New Prime uses for statewide. Do you understand that?

A. I don't have any independent knowledge of that.

Q. Well, sir, this is in your file.

MS. FOWLER: Let's go ahead and pull it up.

(Exhibit 113l(1), Maranga Morgenstern website, was marked for identification.)

BY MS. FOWLER:

Q. This is one of the documents that you relied upon in order to formulate your deposition -- or your opinions today.

A. Well, I didn't rely on everything -- counsel, I didn't rely on everything in my file. What's -- what's -- what's been produced to you is everything I received.

Q. All right. Well, then that's even more important. Did you consider this?

So I'm going to ask you this: Did you consider, as you see here in front of you, that New Prime had counsel for the state of California statewide called Maranga Morgenstern? Did you consider that?

A. No.

Q. All right.

MS. FOWLER: Let's go ahead and pull up --

WITNESS: This is California statewide, right? Yeah, it is.

BY MS. FOWLER:

Q. Yeah. Just -- just -- Gibson Dunn is from the state of California, correct?

A. Well, it's one of their offices, yeah.

Q. The attorneys working on this case were from the state of California, correct?

A. I don't know. Gibson Dunn has attorneys working in cases from all over.

Q. Sir, do you know what states these lawyers were working from, from Gibson Dunn?

A. Not all of them. I assume that -- my sense is that Mr. Dusseault was working from Los Angeles. I don't know about -- about -- about them specific.

Q. All right. Let's pull up --

A. We can go find out.

Q. Shouldn't you have done that before giving your opinions?

A. I don't think so.

Q. All right.

Now, if we look at this website -- did you look at the Morgenstern Law Group website at all?

A. No.

Can you scroll down some, please?

Q. Sure.

A. Okay. Can you keep going?

Q. Well, sir, let me ask you -- page 3. Here's a list of their clients: UPS, Werner Enterprises. Do you see those? Along with Prime, Inc. Do you see that?

A. Yes.

Q. Those are big trucking companies, are they not?

A. I don't know. Prime is -- Prime, I understand, is a big company.

Q. What about --

MS. FOWLER: Keep going down. Pull out, Angie.

BY MS. FOWLER:

Q. Did you look to see what their client list was?

A. Morgenstern? No.

MS. FOWLER: Keep going up. Keep going up.

BY MS. FOWLER:

Q. We have got Western Express.

A. Counsel, I don't know who Morgenstern's clients were.

Q. And you didn't research that, did you?

A. I did not research who Morgenstern's clients were.

Q. But one of your opinions is the fact that no other law firms were available to New Prime besides Gibson Dunn, essentially. True?

A. No.

Q. All right. You said that you had -- they had concerns hiring just local counsel, that there were other firms that they weren't able to get involved. Isn't that right?

A. There were -- my understanding is that there were firms that they contacted who ultimately couldn't get involved, that they had some concerns with hiring New Mexico counsel. Again, they had already gone -- had two firms that hadn't worked out very well. And that ultimately --

Q. Right. So --

A. -- they had a -- let me finish, please. They had a relationship with -- with Gibson Dunn on other matters. A lot of trust in

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 36 of 83

Page 145

them. They -- Gibson Dunn, obviously, has a very, very good reputation. And given all of these factors, along with the others that are referenced in my report that we've been talking about, they made a decision to hire Gibson Dunn. That doesn't mean that there was no other law firm that could have done it. I mean, I don't -- maybe there -- there may have been many law firms that could have done it. I don't know. But that was a decision that they made based on the factors that they had to deal with.

Q. The question is -- is whether or not that's true. In -- in order for you to determine whether or not their decision was reasonable, you sort of have to kick the tires on what information was available to them, don't you?

MR. GRIFFIN: I don't even understand the question.

WITNESS: No.

MR. GRIFFIN: I object to it.

WITNESS: Sorry.

BY MR. FOWLER:

Q. Well, you know that they have --

A. I don't -- I mean, I don't -- I would consider what they did in terms of looking at other

Page 146

law firms in certain cases, sure. It might be relevant. But I don't have to kick the tires and go through all of their -- the law firms in their list and look at each one and research them and see whether they would have been the right ones. I -- I don't believe that was -- was at all necessary to reach the conclusion that, under the circumstances presented here, the decision to hire Gibson Dunn was a reasonable one. Doesn't mean it was the only firm they could hire, but that it was a reasonable decision. That's my opinion.

Q. Well, sir, when you're going through this in determining the reasonableness of hiring a California law firm, and then you are supplied information that they had a California law firm that they had vetted and have used in the past, that has specialties involving auto and trucking litigation, wouldn't you want to know more about that?

A. Not necessarily.

Q. Because this is on --

A. What it would tell me -- what it would tell me -- what it would tell me is that they had other firms that did auto and trucking litigation. They could have considered and probably did consider other firms that had auto and trucking litigation.

Page 147

And based on the circumstances they were presented with here, they made the decision that Gibson was right firm for them and not Morgenstern. Perhaps.

Q. But, sir, did you look at Gibson Dunn's website?

A. I have -- for certain things, I have looked at Gibson Dunn's website.

Q. No. Did you look at Gibson Dunn's website for this lawsuit?

A. Yes. Yes. I'm sorry. Yes.

Q. Did they advertise their experience as a firm in auto and trucking litigation?

A. I don't believe that they did. I don't recall seeing it.

Q. All right.

A. But that's not -- you know, if it was an area of their specialty, that might be relevant. But the fact that it wasn't, under the circumstances presented here, doesn't mean that it wasn't a reasonable decision to hire them as a firm.

Q. All right.

And you see here, Morgenstern advertised their auto and trucking litigation experience. "Extensive legal acumen in the area of auto and trucking claims. Our firm has represented and

Page 148

continues to represent individuals, trucking businesses and delivery companies in personal injury and other cases."

Do you see that?

A. Yes.

Q. All right. And they have been used by New Prime in the past. Right?

A. I assume so. They're on their list.

Q. And you didn't ask why --

A. I don't know --

Q. You didn't ask why -- "Eric, why didn't you hire them for this case"?

A. I did not ask Eric why they didn't hire a particular other law firm for the case.

MS. FOWLER: All right. Let's take that down.

Let's pull up the next law firm on this list.

BY MS. FOWLER:

Q. Colorado is a neighboring state to New Mexico, is it not?

A. I think so.

Q. All right. I had to look it up, just so you know.

A. I know. I know. I had to think. I've

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #716F.

LEXITAS

Case 6:22-cv-03086-MDH   Document 107-2   Filed 11/10/23   Page 37 of 83

Page 149

been rafting there. So I think I've rafted from one to the other. So I assume they're neighboring.

Q. All right. And we have on the list for Colorado -- let's look at that.

(Exhibit 113l(2), Reza Rismani website, was marked for identification.)

BY MS. FOWLER:

Q. Do you see Reza Rismani for Colorado?

A. Yes, I see it. I believe it's a person.

Q. Okay. Did you investigate who she is and what her areas of expertise are?

A. No.

Q. All right.

A. Nor do I think that's -- that's something that I would normally do in a situation where I'm evaluating the reasonableness of the fees.

Q. Okay. If we go to Exhibit 113l(2).

If you just look her up, and you can see she is a senior shareholder from Treece, Alfrey and Musat. Do you see that?

A. I can see it, counsel.

MR. GRIFFIN: Did you send us copies of these things that are --

MS. FOWLER: I will. I will. Angie will

Page 150

send that to you in one second.

Can we go up a little bit?

BY MS. FOWLER:

Q. "Reza Rismani joined TAM in 2001 and became a shareholder in 2005. He's a proven problem solver and a seasoned litigator. His practice areas include" -- and if you look -- "trucking and transportation law and litigation."

Do you see that?

A. Yeah.

Q. And it says, if you go down, "From the inception of a lawsuit to settlement or through trial, Reza actively manages all phases of litigation. He collaborates with his clients to develop the best strategy for each case."

And it goes on. Do you see that?

A. Yes.

Q. He was "selected as a 'Rising Star' litigator by the publisher of Colorado Super Lawyers."

Do you see that?

A. Yes. I'm laughing because I don't think I've seen a single lawyer that wasn't in some super lawyers. But anyway.

Q. Okay.

Page 151

A. When they're publicizing themselves.

MS. FOWLER: All right. Go to page 4 out of 5.

MR. GRIFFIN: I was just inducted into the "Fallen Stars" club.

WITNESS: No comment.

BY MS. FOWLER:

Q. Do you see memberships and associations? He's in the Trucking Industry Defense Association. Do you see that?

A. Yes.

Q. And he's a neighbor to the state of New Mexico. Did you look to see whether or not he would have been available to help New Prime out on this lawsuit?

A. No. Nor do I think it's relevant to whether the decision to hire Gibson Dunn in this case was reasonable.

Q. All right. You said --

MS. FOWLER: You can go ahead and take that down.

And we'll email these things to you.

BY MS. FOWLER:

Q. But you said that --

A. I --

Page 152

Q. I want to make sure that I am understanding your testimony.

Eric Nau told you that he tried to reach out to other law firms and was not able to find other law firms to represent him for New Prime. Is that true?

A. Not quite.

Q. Tell me where I got -- went wrong on that.

A. My understanding is that there was a law firm in New Mexico he contacted, and they had a conflict.

There was another law firm in Oklahoma, and I don't recall the reason he didn't select them.

And that, ultimately, given the -- all of the facts and circumstances here, and because of their knowledge and experience in complex litigation with Gibson Dunn, they decided that Gibson Dunn was the right choice for them.

Q. Okay. Well, he also didn't tell you that he reached out to these two sets of lawyers to see if they were available. True?

A. I have no idea what you're talking about.

Q. The lawyers that we just went through

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F.
Case 6:22-cv-03037-MDH Document 107-2 Filed 11/10/23 Page 38 of 83
LEXITAS

Page 153

that have expertise in trucking litigation.

A. Oh. Oh. Oh. Excuse me.

No, he didn't say that one way or the other.

Q. All right. And, sir, do you actually understand what Mr. Nau testified to under oath about how Gibson Dunn --

A. I read his deposition.

Q. All right.

And do you understand that it was -- Steve Crawford is the one that actually reached out to Gibson Dunn?

A. You know, counsel, I think we covered this before. It was Mr. Crawford who knew about Gibson Dunn in his prior work with them. Not Mr. Nau.

Q. No. No. No. No. You're missing me. It was Steve Crawford who contacted Gibson Dunn to get them on board.

A. Okay.

Q. Did you know that?

A. I would suspect that that was the case. I may have known it.

Q. Well, that's not what it says --

A. I don't know what it's relevant to.

Page 154

Q. Well, that's not what it says in your report.

A. Well, then -- what do I say in my report?

Q. Okay. Let's go to page 9 of your report under -- and we'll get into the -- the extent of this in a little bit. But just this little sentence here. "The nature of the management of the litigation by the client and counsel." That opinion right there.

Go to the second paragraph, right after the footnote, Footnote No. 6. It says, "When Civerolo determined that it needed to withdraw from the case, Mr. Nau contacted several firms about taking over the case and ultimately chose Gibson, based on its experience, expertise, resources and Mr. Dusseault's recent successful handling of a similar case."

Did I read that correctly?

A. Yes.

Q. All right. Do you understand -- and we'll go through the deposition testimony, if you would like -- that's in direct contradiction to what these two gentlemen said in their depositions?

A. No.

Q. All right. Then let's go through it.

Page 155

Going to Eric Nau's deposition, page 62.

Wait, that's not it.

Okay, it's actually Steve Crawford.

Do you understand that Steve Crawford is the one that sent Michele Marriott an email asking her if she had any recommendations for a law firm?

A. I don't know. Am I supposed to be looking at his deposition or something?

Q. No. Did you understand that?

A. I'm not sure how the exact contact came through. It could have been.

Q. Sir, when you offered this report, that was before you actually received Steve Crawford's deposition testimony. True?

A. That's correct.

Q. And when you reviewed -- you reviewed Steve Crawford's deposition, did you not?

A. Yes.

Q. And you did not change your report, did you?

A. No.

Q. And so when he says, I hired -- "I am the one that reached out to Gibson Dunn and asked them if they had any recommendations," and Michele Marriott says, "I don't know. Let me get back to

Page 156

you," you didn't think that was relevant?

A. It may have been relevant, but that's -- I'm not -- the -- the fact that -- well, never mind. It may have been relevant.

The fact of the matter is that Prime ended up choosing Gibson Dunn. And my understanding -- do you want me to tell you what my understanding is, counsel?

Q. Yeah, please.

A. Okay. My understanding is that Nau and -- and Mr. Crawford discussed the situation. It's a difficult situation. Worst one the company ever had faced and probably still is. They discussed what they should do. Ultimately, the company -- whether it was Mr. Dusseault -- or Mr. Nau, I frankly don't know. But I think now it's pretty plain that it was Mr. Crawford. He talked to Gibson Dunn. Talked about the situation. Said, "Do you have anybody who could handle this?" And, apparently, she recommended Mr. Dusseault because of his experience. And they thought about it. And -- and they ultimately did it.

Now, who chose him -- which is what I said in my report where I say, "Mr. Nau ultimately chose Gibson." It may have been -- I'm sure that it

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F.

Case 6:22-cv-03067-MDH   Document 107-2   Filed 11/10/23   Page 39 of 83

LEXITAS

Page 157

was part of discussions with Mr. Crawford. Whether he made the ultimate decision or Mr. Crawford made the ultimate decision, I don't know. But it sounds like they both made the decision because they worked together on -- on matters all of the time, and particularly on something that was as important as this.

Q. Let's -- let's take a five-minute --

A. So it was really that Prime -- it's really -- I'm sorry?

MS. FOWLER: Let's take a five-minute break. I'm going to get the deposition testimony together for you so that we're not arguing in the dark. One second.

WITNESS: Okay.

VIDEOGRAPHER: Off the record. 3:03 p.m.

(Recess)

VIDEOGRAPHER: On the record. 3:12 p.m.

BY MS. FOWLER:

Q. All right. Going back, your expert report specifically talks about when -- on page 9. "When Mr. Civerolo determined that it needed to withdraw from the case, Mr. Nau contacted several firms about taking over the case and ultimately chose Gibson, based upon its experience, expertise,

Page 158

resources, and Mr. Dusseault's recent successful handling of a similar case."

Did I read that correctly?

A. Yeah. I think that's what you read before, right?

Q. Okay. Go to page 44 of Eric Nau's deposition.

Are you there?

A. Okay. Yes, uh-huh.

Q. Line 20.

"Okay." -- this is Eric Nau's deposition testimony -- "Had you ever dealt with Gibson Dunn before?"

Answer. "No."

"Okay. As I understand, Gibson Dunn handled New Prime's real estate. There was a real estate transaction in Florida. And they also handled some of the employment issues that may have arisen over time. Does that track with your memory?"

Answer. "I don't have any recollection of the real estate cases you're talking about. I know that Steve has worked with them in some very high-profile, high-exposure cases that are non-trucking."

Page 159

"Non-trucking?"

"Right."

"All right. Not dealing with personal injury. Am I getting that right?"

"Not that I'm aware of."

"But that's a correct statement? Not personal injury?"

"I don't know. Not that I'm aware of."

A. Counsel, I'm sorry to interrupt you. I've lost where you are. Where are you again? What page?

Q. Page 44, line 20.

A. Gotcha.

Q. Keep reading. I've read all of that. Okay?

And then go to page 50, line 3.

"And, my understanding, that it was ultimately Steve's decision to hire them, not yours?"

"Steve would have had the relationship with them, yes."

"Okay. And we've already talked to Steve about the decision-making about hiring them.

Did you ever look at their bios to see what sort of experience or qualifications they had?"

Page 160

Answer. "No. I figure that if Steve has probably vetted them and talked with them, and if they said that they were comfortable handling this lawsuit, then that's fine with -- I'm fine with that."

Did I read that correctly?

A. Yes.

Q. That is different than what your report says and what your opinion is based upon. Is that true?

A. No.

Q. All right.

A. I mean, it's -- my -- my report says in the -- in the continuation of the sentence, "Mr. Nau ultimately chose Gibson." But the -- the fact of the matter is that I'm not sure who actually called up Gibson and said, "You're it." It clearly came from Mr. Crawford's relationship or his knowledge of the firm. And that's -- and I think there's a lot of testimony about that in the deposition, that I'll try to find, where he talks about the fact that he discussed this with Mr. -- with Mr. Crawford. But that was their common practice.

Q. Well, during your -- during your lunch break that we'll be taking, why don't you go ahead

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F

LEXITAS

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 40 of 83

Page 161

and pull that testimony and we'll look at it.

A. I'm not going to do -- I'm not going -- counsel, I'm not going to be working during my lunch break. We can sit here and do it now, if you want.

Q. I'm not going to waste the record on that because that testimony doesn't exist.

A. Nor am I going to waste my lunch on that.

Well, may or may not. My understanding is that -- that wherever the -- the -- the relationship was with -- with Gibson, which came from Mr. Crawford --

Q. All right.

A. -- was based in part on that --

Q. Sir --

A. -- on his understanding of the case that -- that they were selected.

Q. All right. Sir, going to the -- the skill, expertise, and resources required to handle the necessary work; and experience, reputation, and ability of the lawyers selected to handle that work, which would be No. 5 on your list.

Do you see that? It's on page 8 of your report, sir.

Page 162

A. Yes, uh-huh.

Q. All right. Sir, did you do any research whatsoever to look at what experience or expertise the timekeepers had on trucking cases?

A. I don't recall if I did or not.

Q. Did you look to see what experience, if any, any of the timekeepers had on personal injury lawsuits?

A. Well, with Mr. Dusseault, I did. I don't recall about the other timekeepers.

Q. Well, based upon all of the work that was done, you saw that Joe Roper prepared a spreadsheet, did you not, that broke down the top -- the billing attorneys, along with their areas of expertise, and the time spent on the file? You're aware of that?

A. I -- I -- I don't -- you can bring it up. I don't -- I know that he did a spreadsheet. But I don't remember what -- exactly what it said.

Q. Well, sir, you were provided all of this, and you were asked to review it. You did do that, did you not?

A. I reviewed a lot of materials, yes. I just don't remember the specifics of Mr. Roper's spreadsheet. Why don't we just bring it up and look at it?

Page 163

Q. All right. We will. We're doing that now.

But, sir, as we pull this up, I need to know -- here's the question to you. Do you have any reason to dispute the accuracy of this chart? That's going to be the question. We're going to pull it up in a second. And that's the question.

I believe it's Exhibit 116a. If you have that in your file, go ahead and pull it out.

(Exhibit 116a, spreadsheet of Mr. Roper, was marked for identification.)

WITNESS: I'm going to see.

Hold on. I have Mr. Roper's -- yeah, save the day. Hold on.

BY MS. FOWLER:

Q. There you go.

A. Which -- which -- I got to find it. Which exhibit are you talking about?

Q. It's in front of you on the screen.

A. Oh, sorry. Okay.

Q. Do you see that Kirsten Galler is the top biller? She did 14 percent of the work on this case. She billed over 1,400 hours on this case.

Do you have any reason to dispute that?

A. I -- I don't know. I mean, I have no

Page 164

reason to dispute it, but I don't -- I don't have any independent knowledge of that.

But if -- if Mr. Roper says that that's what he extracted from their website, then I have no reason not to believe him.

Q. Well, sir, these hours and fees charged were based upon your material.

A. Oh, I thought you were talking about their years of expertise. If these were based on our materials, then, yeah, then that would be accurate.

Q. Okay. So listen to my question -- listen to my question again.

Do you have any reason to dispute that the hours charted and the fees incurred are inaccurate?

A. I would have to look at our analysis of it. But I don't, without doing that.

Q. But, sir, when you were asked to review Mr. Roper's material, including this chart, wasn't one of the responsibilities that you had was to determine whether or not this was accurate?

A. I -- I might have.

Q. All right.

A. I don't recall determining that it was

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F

LEXITAS

inaccurate.

Q. All right. And so you see that Kirsten Galler did 14 percent of the work. Do you see that?

A. Yes.

Q. He also went to the website and looked up what they are publicizing to the general public about what their areas of expertise are in the law. You understood that?

A. I suspect that's what he did. And that may be what his report said. And if that's what he said and that's what he did, I already said I have no reason to think the way he has summarized it there is inaccurate.

Q. All right.

A. I mean, it's the same thing as when we were looking at the other law firms where they're publicizing what they do.

Q. All right. But, sir, let me ask you the question. I think you've already testified to this.

You did not independently check out what their area -- these timekeepers' areas of expertise are, other than Chris Dusseault. True?

A. I don't recall. I may have at some point, counsel. But I don't recall anybody other

than Mr. Dusseault.

Q. All right. So you -- when you're looking at Kirsten Galler, her areas of expertise are litigation, class actions, security litigation, transactional litigation, and foreign judgments. Correct?

A. Yes.

Q. Now, litigation is a very broad term. You would agree?

A. Yes.

Q. Litigation -- I looked it up -- can mean the process of taking legal action. It can mean the process of settling a dispute in court. Would you agree with those two -- that definition?

A. Not -- not alone maybe. But, I mean, those are part of litigation.

Q. All right. When a person says they have expertise in litigation, that doesn't tell us what area of the law they have litigation experience in. Is that correct?

A. Well, it tells you that it's -- what I call litigation is distinct from transactional work.

Q. Okay.

A. But it doesn't tell you whether it's --

Q. Meaning --

A. -- personal injury or trucking or securities or labor or any number -- antitrust, unfair competition, environmental. Any -- any -- any number of other areas, of course.

Q. Divorce, employment discrimination, real estate disputes, criminal. Right?

A. It could.

Q. Right? It could include all of those topics.

A. I think I already answered that. I think I just said, yes, that's right, counsel.

Q. All right. And so in order to understand what their areas of expertise are, "litigation" doesn't help us. But we can look at the other areas that are more specified: class actions, securities litigation, transactional litigation and foreign judgments. Do any of those areas of the law indicate a specific expertise as it relates to personal injury law?

A. Well, okay. First of all, it's transnational, not transactional.

Q. Oh, sorry. Thank you.

A. But, yes. You're talking about experience and expertise in complex cases. And this

was a complex case.

Q. Sir --

A. Not in terms of necessarily -- let me finish. Not that it was necessarily complex in that it was a personal injury case, which can be simple or can be complex.

But Kirsten Galler had experience, it appears, based on Mr. Roper's summary, in complex litigation. And that's what was required here, based on the judgment of New Prime.

MS. FOWLER: Move to strike as nonresponsive.

BY MS. FOWLER:

Q. My question is, does this area of expertise mention anything about personal injury law?

A. Oh, no. Sorry. That's what you asked. No.

Q. Does this area of expertise for Kirsten Galler, the top biller on this case -- does it list anything about transportation law?

A. No.

Q. All right. And, sir, we can go through each and every one of these. And I would like for you to do that.

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F

LEXITAS

Page 169

Michael Lee.  There is no --

MR. GRIFFIN:  No.  No.  No.  No.  No. Just -- let's just stop.  Let's just stipulate that none of them say anything about --

MS. FOWLER:  Okay.

MR. GRIFFIN:  -- personal injury or transportation.

MS. FOWLER:  Okay.

MR. GRIFFIN:  And I will -- I will put a neon sign that I will flash in the courtroom that says that, if I don't have to listen to these questions.

MS. FOWLER:  Okay.  All right.

BY MS. FOWLER:

Q.  But the areas of expertise that we see from these attorneys include entertainment law, right?

A.  Two of them, yes.  Uh-huh.  Yeah.

Q.  You can keep going through it.

And some of these -- one of the -- the third top biller is a first-year associate.  Do you see that?

A.  That's what it says.

Q.  Let's see.  Let's see.  First-year associate --

Page 170

A.  I doubt --

Q.  -- Sam -- he's the fourth top biller.

A.  Uh-huh.  Wait.  Third or fourth?  I see third.

Q.  Okay.  He did more work than Chris Dusseault did on this case.

A.  That's common.  In fact, that's a sign of -- often of good management of a case.

Q.  Okay.

A.  Although, I sort of wonder about this Gibson, 2016 through 2019.  He was a first-year associate all those years?  I'm beginning to wonder about this sheet.  I don't think that's probably an accurate --

Q.  Well, did you --

A.  If that's -- if that's a reflection of him being a first-year associate for the years 2016 through '19, I question that.  Although, he may have been during the course of this case.

Q.  Okay.  Well, it looks like he started at Gibson in 2016.  Do you see that?

A.  I see what it says.

Q.  This lawsuit was filed in 2017.  He would have been --

A.  I think if the lawsuit was filed --

Page 171

counsel, I think the lawsuit was filed in 2016. Gibson came on in 2017.

Q.  Sir, there's no disagreement about that. And I'm -- and I'm not going to argue with you about the terminology.

If you need to take a break to have some lunch, let's do that now.

MS. FOWLER:  Let's take that down.

BY MS. FOWLER:

Q.  Sir, do you need to take a lunch break? If you do, we'll do it now.

A.  How much longer -- how much longer --

Q.  We're going to go --

A.  How much longer are we going to --

Q.  Well, it depends if I can get answers.

MR. GRIFFIN:  Give us an estimate, Meg, please.

MS. FOWLER:  You've got -- I've got about 40 more minutes.

WITNESS:  Let's go on, if it's really going to be, you know, less than an hour.  Let's do it.

MS. FOWLER:  All right.

MR. GRIFFIN:  See?  Aren't you glad I interceded?

Page 172

WITNESS:  We knew you were good for something.

MR. GRIFFIN:  That's a first.

MS. FOWLER:  All right.  So we'll keep going.

BY MS. FOWLER:

Q.  So when you talk about the skill, expertise, reputation, experience that these lawyers had that justified Gibson being on this case, your testimony is you did not research what areas of expertise the lawyers had on this case, other than Chris Dusseault.  True?

A.  Other than what I've already testified to, that's right.

Q.  And with respect to Chris Dusseault, the only knowledge you have in terms of his expertise as it pertains to trucking litigation specifically is that he worked on an appeal.  True?

A.  The knowledge I have is that Mr. Dusseault handled an appeal in a large trucking personal injury case, yes.

Q.  All right.  And you do not have knowledge that he tried the case or took any depositions in the working up of that trucking case.  Correct?

A.  Counsel, I think we've covered this.  But

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

Page 173

I don't believe -- he did not try the case. I don't -- I'm not aware he took any depositions in the case or did anything else other than handled the appeal or maybe other matters after the trial.

Q. And out of all of the timekeepers -- I think there's, like, 13 timekeepers -- 13 timekeepers that worked on this file, you have no idea what their areas of expertise are, besides Chris Dusseault?

A. As I sit here right now, I don't recall.

Q. All right.

Now, let's go to -- so we have covered the prior relationship between the client and counsel. And we've talked about that.

We have talked about the skill, expertise, and resources. We talked -- we just covered that.

And then the quality and approach of opposing counsel. Let's go there. That's page 8.

All right. You indicate that opposing counsel were good attorneys specializing in personal injury.

A. Okay.

Q. In other words, they knew what they were

Page 174

doing. Correct?

A. I wouldn't put it that -- quite like that, but that's one way to put it.

Q. And Gibson Dunn, you believe, were good attorneys. Correct?

A. Yes. Generally, they are very good attorneys.

Q. And other than what we spoke about with Chris Dusseault, you don't know if they had any experience in personal injury. True?

A. Gibson Dunn?

Q. Yes, sir.

A. That, I'm not sure of, whether they have handled other -- the firm has handled other personal injury cases. I doubt that's the case. I suspect they have, but I don't -- I don't know. Personal injury is a broad --

Q. You think that there -- you think that there were other attorneys from Gibson Dunn that specialized in personal injury that didn't work on this file?

A. I didn't say -- A, I didn't say specialized. B, I didn't say worked on this file -- didn't work on this file. I'm just saying Gibson Dunn as a firm -- it's a big firm -- they have

Page 175

handled other cases involving personal injuries.

Q. All right. Now, you say --

A. It's a very broad area. It's not just cars and trucks, counsel, as you know.

Q. Yeah. But when we talk about this case, we are talking about cars and trucks, aren't we?

A. That wasn't what your question was about.

Q. All right. You say they're good because they're aggressive. Plaintiffs' counsel was aggressive.

A. That was one of the things about them in this case.

Q. How were they aggressive, sir?

A. They were -- they -- my understanding is that they really dug into the sleep apnea issue. They went after on the texting and sexting issue. So they were -- they were -- you know, they were really in the -- they really delved into discovery. Other than that, I don't -- I don't know. They filed, you know, motions. And Mr. Roper said that they had impeccable credentials as a law firm.

Q. Are you relying on Mr. Roper --

A. Which would reflect that -- that he respected -- that he -- it would reflect that he

Page 176

respected them as well.

Q. You got to let me finish my question. Are you relying on --

A. Oh, I was still answering.

Q. Are you -- are you relying on Mr. Roper to formulate your opinions as to whether or not this was a respectable firm?

A. Not entirely, no.

Q. All right.

A. But the fact that he agreed with that, I think is relevant.

Q. Sir, the two issues that you set forth: They really drill down on sexting and texting, as well as the sleep apnea issue. Right? That's what made them aggressive?

A. Those were a couple of the things that happened in the case.

Q. All right. So they tried to establish their case of liability and punitive damages, and that made them aggressive?

A. That doesn't necessarily make you aggressive.

Q. And did you look at what their win rate was for the motions that -- you said they filed a lot of motions.

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 44 of 83
LEXITAS

A. No. That would be the opposite --

Q. Did they file a lot --

A. Excuse me. It would be the opposite of Gibson Dunn's, though.

Q. Did they file a lot of motions?

A. Well, we've already gone through this, counsel. But my recollection is that they filed -- both -- both firms filed close to 30 in the time period that Gibson was involved in the case. Or approximately.

Q. Did you look at what -- did you look substantively at what motions they filed?

A. What do you mean, "substantively"?

Q. Did you look at the motions they filed? What were they filing?

A. They were filing -- there were motions for summary judgment. There were motions in limine. There were motions to compel discovery.

Q. Sir. Stop. The plaintiffs' firm, what motions did you look at?

A. Motions for summary judgment, as I recall. Maybe there weren't, but I think there were. Motions in limine. Motions to compel discovery.

Q. All right.

A. Maybe there weren't motions for summary judgment. I could be wrong about that.

Q. All right. And did you look at what the Court's ruling was with respect to the motions to compel?

A. I read some of them. I don't recall them in specifics.

Q. Now, you say you've defined filing a lot of motions as being aggressive. Did you substantively look at what they were asking for?

A. Well, I -- I -- I didn't say that they were -- that they were -- filing a lot of motions was a reflection of their aggressiveness. That's not what my report says.

What was the rest of your question?

Q. The reason -- one of the things that you considered in the quality and approach of opposing counsel was their aggressiveness. Correct?

A. Well, they were aggressive.

Q. You said that they were inundating New Prime with discovery requests.

A. That's what Mr. Richards said, yes.

Q. Did you -- did you look to see what they were asking for?

A. You mean, did I look at the

interrogatories and so on? I don't -- I don't recall doing that.

Q. Did you determine whether or not this was pretty standard discovery in cases like this?

A. I just said I did not look.

Q. Did you make that determination?

A. First of all --

Q. Did you make that determination?

A. Okay. A. I didn't look specifically at the discovery requests. B. The fact that -- that that discovery may be standard in personal injury cases does not necessarily mean you are or are not aggressive, for that matter. If that's what you're looking -- I mean, if that's the -- the source of the aggressiveness. You can be very aggressive with standard discovery -- discovery requests or not aggressive. Depends.

Q. I'm going to read the sentence. I'm going to read your words. Okay?

A. Sure.

Q. You say, "Here, the opposing law firm" -- is it Peifer, Hanson, Mullins and Baker -- "was an excellent general litigation practice firm, and it took a very aggressive approach to the case."

Did I read that correctly?

A. Yes.

Q. What was the aggressive approach that they took to the case?

A. Well, they had a substantial number of discovery requests, according to Mr. Richards. Their settlement demands were high. They were -- those are the basic things that I can recall. But I don't think there's any question that they were aggressive. Maybe there is.

Q. Well, how would you know if you didn't look?

A. Well, because Mr. Richards said that they were. And I took it at face value. There were a lot of discovery requests --

Q. Where is the --

A. There was -- there were -- there were substantial motions. Ultimately, there were both -- they had more experts than -- than Prime did. There were a number of depositions taken in the case.

Q. Well, sir, where does Mr. Richards --

A. There were a number of factors that indicated that they were aggressive.

I'm sorry, counsel. I just had a --

Q. You just said something that I need to say, "Wait a second."

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
LEXITAS

Page 181

Where did Mr. Richards say that they are aggressive?

A. Oh, that's my characterization.

Q. All right. Mr. Richards didn't say that. You said that. Correct?

A. I just said that was my characterization.

Q. All right. And you said it's because he said they were inundated with discovery requests?

WITNESS: Counsel, hold on. I'm going to -- I'm going to need to go to a different speaker because my earphones are going out. Hold on a second, please.

MS. FOWLER: I can't hear you.

WITNESS: Can you still hear me?

MS. FOWLER: Yeah, I can hear you now.

Tell me when you're ready. I'm going to walk over to the other side of the room.

WITNESS: Yeah. Hold on one second.

You guys -- you guys can hear me, right?

MR. GRIFFIN: Yes.

MS. FOWLER: All right. Hold on one second.

WITNESS: Yep.

Page 182

BY MS. FOWLER:

Q. All right.

Sir, I would like for you to -- so just to -- to make sure I'm -- I'm chasing down the right path, the two reasons why you characterize opposing counsel as aggressive is because of the discovery requests and the settlement demand being in the upper eight figures. Correct?

A. No, it was more than that.

Q. You just didn't say it in your report?

A. I didn't say that in my report either.

Q. Well, do you want me to read your report?

A. Sure. I'm sorry.

MR. GRIFFIN: No. Please. Please don't.

BY MS. FOWLER:

Q. You do note that -- you said aggressive. I asked you what that's based on. And in the report it says, quote unquote, "Inundated with discovery requests. Moreover, Mr. Richards believed that plaintiffs' settlement demand was in the upper eight figures -- would be in the upper eight figures."

A. But the report also talks about the number of experts, the number of motions, the number

Page 183

of depositions that were taken. So there are many -- a number of factors that reflect the aggressiveness of counsel in the case.

Q. But it's not contained within this opinion. And I understand what you're saying. And I just --

A. It's not -- it's not in that sentence.

Q. Here's the issue that I have. It's that you are going to testify in front of the jury that opposing counsel was aggressive. Okay? And you're going to come with an air of authority when you say that, because you're an expert. Okay? It's important for me to know what work you did as an expert to make the conclusion that opposing counsel was aggressive or acted differently than other common practices that we see in trucking liability cases. Okay? That's the question.

MR. GRIFFIN: And he has answered it. And you have given a speech now. And I don't know where -- where -- where we have advanced the ball any.

WITNESS: Yeah. I mean, counsel, I relied on a number of factors beyond the -- Mr. Richards' statement there as to the quality of the opposing counsel, including, as I said, the number

Page 184

of depositions that were taken, the number of experts, the overall approach to the case, relying on what Mr. -- how Mr. Nau characterized it -- and Mr. Dusseault. And those are --

BY MS. FOWLER:

Q. Well, sir --

A. Those are the types of things that I rely on, that I think any expert in doing what I do relies on, in assessing the overall reasonableness of fees.

Q. Sir, I have an issue with you drawing the conclusion that Gibson Dunn should have been hired because this firm needed -- or was more aggressive than any other law firms out there.

A. I didn't say that.

Q. If they are doing the same sort of things that most plaintiffs' attorneys do -- hold on -- most plaintiffs' attorneys do in trucking liability cases, you would agree with me, if that is the case, then all of us defense attorneys should be charging over $1,000 an hour. Fair?

A. Is that a serious question?

Q. It is a serious question. Go ahead and answer it.

MR. GRIFFIN: Then I have a serious

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 46 of 83

objection. It's nonsensical.

Go ahead, Gary.

WITNESS: Counsel, I didn't say that -- that -- that these things were different than other lawyers are doing out there. Some lawyers are doing it. Some lawyers aren't. And that's not what I'm talking about. These could be very -- very common tactics. That's not the only issue involved. My understanding, and I think this is consistent with -- with Mr. Roper's analysis as well, frankly, which I just think supports my conclusion that this is a very good law firm on the other side, and they were being very aggressive. And it caused a big concern to Prime that wasn't unreasonable. Prime has a lot of -- has a lot of trucking cases. They do this all of the time. They're used to -- they're -- they are used to trucking cases. They made a decision here that, instead of hiring one of their -- the typical kind of law firms that they hire, they needed a different kind of law firm. And in my opinion, that was a reasonable decision based on all of the factors in this case.

BY MS. FOWLER:

Q. Have we gone through all of the factors that you believe were reasonable, or justified their

hiring Gibson and Dunn?

A. You mean in today's deposition?

Q. Yes, sir.

A. I don't know.

Q. You don't know. Go ahead and look.

A. I don't -- I mean --

Q. Tell me the ones we missed.

A. It's been a long deposition.

MR. GRIFFIN: That's kind of an impossible question to answer. You can -- you can ask -- you can ask him if anything comes to mind that we haven't covered, but -- that would be a reasonable question. But the way you asked it is not.

BY MS. FOWLER:

Q. This is the question I'm going to ask you. Besides interviewing Chris Dusseault and Eric Nau and taking their account of things that they told you in the course of this lawsuit, it is fair to say that you did no other independent investigation as to what the truth was of what was occurring in the underlying lawsuit.

MR. GRIFFIN: That's completely false. I object to that.

BY MS. FOWLER:

Q. Go ahead. You disagree?

A. Yes.

Q. You didn't look at any of the motions that were filed. Correct?

A. No, I didn't say that.

Q. Did you review any of the motions that were filed?

A. I believe so. I don't -- I don't recall specifically, but I believe so.

Q. But I asked you probably 40 minutes worth of questions about the motions. And you said that you couldn't recall reviewing them.

A. I don't recall specifically the motions that I reviewed. I -- I -- I honestly don't recall the specific motions. But, counsel, I reviewed a large portion of the material. I mean -- you can see I received a lot of materials. I received a lot of the -- I received and reviewed a lot of the filings. I don't recall specifically which ones anymore.

Q. So here's the problem.

A. Let me finish. In terms of the results on the motion, which is what we were talking about a lot, I was looking at the docket -- just as you were, I think -- and codifying the -- the -- the

motions. But I didn't look -- I don't recall looking at which specific motions that -- that were filed in the case. But there were a lot of them. I mean, there were not a lot of them for certain cases, but there were enough to testify to the amount of time that was spent in this case.

Q. You didn't review any of the depositions that were taken. True?

A. In the underlying case?

Q. Yes, sir.

A. I don't recall. I don't think so. Right.

Q. You didn't call any law firms or do any independent investigation as to what other law firms in trucking litigation do in these types of cases. True?

A. That's correct. Nor would I consider that to be something --

Q. That's fine.

A. -- nor would I expect that to be what somebody analyzing the reasonableness of fees would normally do. You don't -- you don't go through and contact a whole list of other law firms.

Q. You didn't look to see what the average hourly rate is for personal injury lawyers. True?

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #716F.
LEXITAS

A. Well, I can see what Mr. -- what Mr. Roper said. I didn't do --

Q. But you didn't --

A. Excuse me. I didn't do -- I'm sorry. I didn't do an independent analysis of that. I looked at what he said. But I don't think that's the relevant determination here. This was not an average case.

Q. And when we talk about the actual billing that was done on this, when I tried to ask you questions about what work was done and why, you told me, "It's hard for me to say what's loss of consortium or otherwise because it's block billing." True?

A. What? I didn't understand the question. Say it again, please.

Q. Sir, the billing that you reviewed --

A. You asked me to respond to that. Here's what I think you're asking me. You asked me --

Q. No. No. No. If you don't understand the question, I'll ask the question over. I'll actually rephrase the question.

A. Okay.

Q. The question is this. You reviewed the timed entries. And you would agree with me there's

a number of entries that are block billing. True?

A. Yes.

Q. And so you could not tell me how much time was devoted to any specific task within that block billing entry. True?

A. That's correct.

Q. And, sir, if we were to pull out all of the Gibson Dunn bills that you reviewed, you would agree with me that the great majority are block billing. True?

A. That, I don't know. But -- I don't know. I would have to look.

Q. And you can't tell us --

A. Within --

Q. Hold on.

You can't tell us what specific things these attorneys did on specific tasks. True?

MR. GRIFFIN: Objection to form of the question. That's way too broad.

WITNESS: That's wrong.

BY MS. FOWLER:

Q. When you look at their entries, can you tell us how much time they devoted to each specific task?

A. That's a different question.

Q. I'm asking that question now.

A. Well, let me finish, please.

That's a different question. And when they are block billed, without doing analysis of them, you cannot determine how much time was spent on individual tasks within the block-billed entries. Sometimes you can, though. And I do it all of the time, frankly, where I have to break down the block time in block bill entries. But I make -- and sometimes you're stuck with making estimates.

But I can tell you this, that the -- based on the analysis that you did, the total that you had on that, that does not reflect the amount of time that was spent on those time entries on loss of consortium. That's what the questions were that you were asking me.

Q. Sir, the question is this. Can you tell me, based upon -- because your whole job -- because you didn't look at what the standard practice is in trucking litigation on how lawyers operate. So your -- your review was limited to the review -- hold on, sir.

Your review was limited to the legal fees and expenses. Correct?

MR. GRIFFIN: Objection. That doesn't

make any sense. I object.

WITNESS: I don't understand the question, counsel. Try again, please.

BY MS. FOWLER:

Q. Your -- you reviewed the legal fees and expenses in this case to determine whether or not they were reasonable. True?

A. Yes.

Q. And you can't say, based upon the invoicing done by the attorneys, how much time was spent on any given task. True?

A. Depends on the billing. I would have to look at it.

Q. But -- and you admitted that this firm had a tendency to block bill. True?

A. Some of the billers did. Some of the billers did not, I believe. But I'm not sure. I would have to go back and look.

Q. And you don't know substantively how the work that they did changed the value of this case. True?

A. I think when they won the motion for summary judgment, I think it probably changed the value of the case. And --

Q. Sir --

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #016F

Case 6:22-cv-03037-MDH    Document 107-2    Filed 11/10/23    Page 48 of 83

A. And the other motion for summary judgment that they won in part.

Q. Sir, I showed you --

A. Let me finish. I would be surprised if it didn't change the value of the case. I don't know the amount.

Q. And you have no experience whatsoever in trying a personal injury case. True?

MR. GRIFFIN: You're getting repetitive now, Meghan.

WITNESS: You already asked me that.

BY MS. FOWLER:

Q. And the answer is true?

A. Yeah, I do.

Q. Sir, I'm just trying to understand. You come in here and you tell us that you're an expert and that, as an expert, you can say that choosing Gibson Dunn -- who charged a thousand dollars an hour plus for the three top lawyers -- was a reasonable decision. And the basis of that is because this was a catastrophic case. Is that right?

A. That's one of the factors.

Q. And then when you're asked whether or not their attorneys' fees and expenses were reasonable,

you can't say what specific work they did, whether or not it moved the needle, or whether or not it was justified. True?

MR. GRIFFIN: I object to the form of the question. Complete misstatement of the whole day's testimony.

BY MS. FOWLER:

Q. I mean, sir, we're going to go off the record. Here's the question, and I'm going to -- I'm going to wrap this up. Like -- let's just -- let's take a five-minute break. Let me see. I think I'm about done.

Oh, wait. I'm not done. I've got one more line of testimony -- or one more line of opinions.

So let's go to opinion No. 8.

All right. Sir, the final reason why you believe hiring Gibson Dunn to begin with and the attorneys' fees and expenses they charged were reasonable was whether the client is incurring and paying the fees and expenses during the litigation without certainty of reimbursement.

Did I read that correctly?

A. I believe so, yeah.

Q. All right. So basically what you're

saying to us is, if a person is spending their own money, they will have a tendency to be more cautious on how they spend it. Is that true?

A. One way to put it.

Q. All right. If a person believes that they are spending, let's say, an insurance company's money --

A. I assume you mean --

Q. Hold on.

A. -- the company's money.

Q. Let me back up.

The gist of this opinion is, if a person or a company is spending their own money and they believe it's their money on the line, they're going to be more cautious with how they spend that money. True?

A. Often the case, yes.

Q. And you -- well, that's the basis of your opinion, isn't it?

A. Well, my opinion is that it's relevant in assessing the reasonableness of fees if a company is paying the fees on an ongoing basis during the course of a case, yes. Particularly if they're not -- if they -- they don't have any prospect or reasonable prospect or certainty of being

reimbursed.

Q. Okay.

A. But it's relevant. It's not determinative, but it's relevant.

Q. All right. And the inverse would be true, of if they believed that they are getting reimbursed, if they believe that it's the insurance company's money ultimately that's on the line, they might be a little bit more liberal on how they spend it. True?

A. Depends.

Q. But that's the -- the basis of your opinion, is it not?

A. No. The basis of my opinion is that, when it is their money on the line, it's a reasonable inference -- reasonable to take that into account.

Q. All right. Before -- you also state that Eric Nau was reviewing all of these bills.

And let me go to it specifically. You say in your report, page 10, "It had sophisticated in-house counsel carefully managing the case, reviewing the bills before they were paid, and ultimately paying the bills. That is itself a strong indication of both the reasonableness of the

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F.
Case 6:22-cv-03086-MDH   Document 107-2   Filed 11/10/23   Page 49 of 83
LEXITAS

Page 197

defense costs that were incurred and of the decision to retain Gibson as counsel."

Did I read that correctly?

A. I think so, yeah.

Q. All right. And, sir, I want you to go to Eric Nau's deposition.

All right. Let's take -- let's take a two-minute break. I've lost my -- my --

A. Okay.

Q. All right. Hold on one second. One second. One second.

All right. All right. Go to page 62 of Eric Nau's deposition.

Tell me when you're there.

A. Okay.

Q. Go to line 4.

"Who is getting -- who is receiving these bills?"

This is Eric Nau's deposition testimony.

Answer. "Well, I'm not trying to be elusive about this. It says New Prime. I assume that these are coming to me."

"Okay."

"Yeah."

"That's what I wanted to know."

Page 198

"Yeah."

"You would be reviewing these bills in order to pay them, correct?"

"I'm paying them."

"All right."

"I'm not reviewing them."

Did I read that correctly?

A. Yes.

Q. That is in direct contradiction to your findings in your report. Correct?

A. Yeah, I don't know what else he said during -- I don't recall what else he said during the course of this deposition. But, yeah.

Q. You mean he might have contradicted himself?

A. Might have, yeah.

Q. Okay. Now, in terms of what the expectations were, is it your testimony that New Prime did not know or thought that it was their money on the line?

A. Well, it -- my understanding, counsel, is that there was -- there was approximately $5 million of their money on the line. Whether they were right or not -- there's been a lot of confusion about what was on the line here. That's my understanding.

Page 199

They had at least their SIR on the line. So they had a substantial amount of money on the line. They also had potential exposure, it's my understanding, for punitive damages that they would have to pay. So I think they -- and I think that they were concerned, even in the terms of their insurance carriers, in terms of how much money was being spent on the case.

Q. Here's my question. Did New Prime expect to be reimbursed for the Gibson Dunn bills when they were writing the checks?

A. I'm not sure what the level of reimbursement would be. But they also -- as I just said, I believe there was exposure that was not insured.

Q. Do you -- do you know one way or the other what New Prime's expectation was from January 2017 through August 2017 about who was going to pay for the legal fees and bills?

A. I am -- I am not certain whether they thought that they had certainty of reimbursement from the insurance company or not.

Q. So should we pull that factor out then?

A. No.

Q. Let me -- did you read -- you read Steve

Page 200

Crawford's deposition testimony. True?

A. Oh, you mean -- yes. Yes. Yes. I'm sorry. I thought you meant just now. Yeah. Yes.

Q. You read Eric Nau's deposition testimony. True?

A. Yes.

Q. Did you review Dean Hoedl's deposition?

A. No.

Q. And, sir, I'm just confused here. You understand this whole lawsuit is based upon New Prime saying they expected to be reimbursed at the time that the insurance was procured. You understand that?

MR. GRIFFIN: That -- that is -- you have got to make a more complete statement to make that accurate. So that's an inaccurate statement. I asked him to assume the accurate -- accuracy -- I asked him to assume the $5 million number that's in his report. And -- and we'll -- we'll -- we'll live or die by that assumption. But that's where that came from.

MS. FOWLER: All right.

BY MS. FOWLER:

Q. So they -- it's your position, the basis of your eighth opinion is two-fold. No. 1, they

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #016F
LEXITAS

Page 201

were not certain about whether or not they were going to get reimbursed for the legal fees and expenses. True?

A. It -- it can be a factor. But if -- if -- if they are fronting the money, if they're paying the fees on an ongoing basis, I think it's a -- it's a relevant consideration. Whether they -- whether they know or not that they're being reimbursed is a -- is -- is also relevant. But it doesn't -- it doesn't -- it's still a factor to be considered.

Q. The second factor that ties it all in is that you say, well, the safety net is Eric Nau, who is reviewing the bills and making sure they're reasonable before he's paying them. True?

A. The second -- the second -- I'm not sure what you're saying, counsel.

There are a number of factors that go into -- that go into this analysis.

Q. I'm just -- sir, I'm just reading your report. This is coming straight from your report.

A. Sorry. What's the question?

Q. If it's your opinion or it's your assumption that New Prime's sophisticated in-house counsel was carefully managing the case, reviewing

Page 202

the bills before they were paid. That is an assumption you rely on in order to formulate this last opinion. Correct?

A. One of the assumptions, yes.

Q. All right. And if Eric Nau testifies in direct contradiction to that, your opinion would change. Correct?

A. I would have to -- I would have to look at it in the context of all -- of all of the factors.

MS. FOWLER: All right. Let me take a five-minute break. I think I'm about done.

So let's go off.

VIDEOGRAPHER: Off the record. 4:03 p.m.

(Recess)

VIDEOGRAPHER: On the record. 4:08 p.m.

BY MS. FOWLER:

Q. All right. Sir, you have said a number of times during the course of your deposition that your file material is rather large, but not everything in your file is relevant to your opinions. Is that correct?

A. I don't -- I don't think I said that.

Q. Is that a correct statement, sir?

A. That not everything in my file is

Page 203

relevant to my opinions?

Q. Yes.

A. Probably.

Q. What?

A. Probably. I assume there are things in my file for this case that aren't relevant to my opinion.

Q. Have we discussed all of the data you relied on in order to formulate your opinions today?

A. I -- I -- counsel, I'm not sure what you're talking about. I'm not sure what data you're talking about. You just said we discussed all of the data I relied on in forming my opinions. When did we do that? I'm not sure what you're talking about.

Q. We discussed your -- we discussed your opinions. And I asked you for the data that you relied upon in formulating those opinions. And you went through that with me.

Sir, my question is very simple. You had said to me when -- I started bringing things out of your file to ask, "What's the relevance of this," and you told me, "Not everything in my file is relevant." And so we got into your opinions. And I

Page 204

went through, I thought pretty methodically, what did you rely on to make that determination? What did you rely on to formulate that opinion? Have we discussed all of the data that you relied on to formulate your eight opinions set forth in your report?

Let's start there.

A. Okay. When you say data, are you talking about time entries? Are you talking about motion results?

Q. Have we discussed all of the information relevant to support your opinions?

A. I don't know, counsel.

Q. Okay. Do you want to take a break and find out, since this is my only chance to talk to you?

A. There's no way I'm going to be able to figure out whether we have talked about today everything I relied on in formulating my opinions.

Q. Sir, I was -- I thought that I was very clear that I was asking your opinions, what do you rely on to formulate that opinion?

A. You went through --

Q. And you gave it to me. You told me what it was that you relied upon.

A.  Everything that I told you about what -- when you asked me specific questions about what was in my report, said, "What did you rely on for that," I tried to answer you.  I don't -- I don't -- you know, at the time, I was telling you exactly what I could recall I relied upon.  You're now saying, have I told you everything I relied upon for my -- for my entire report.  I don't know.  I tried to answer your questions about everything I relied upon when you asked me a specific question about what was in my report.

Does that -- does that answer your question?

Q.  No.  As part of your -- as part of the deposition process for an expert, it's my responsibility to ensure that I have found out all of the data that you relied on in order to formulate your opinions.  So my question -- and I feel like we've done that.  But I don't want a game of gotcha on the other side where you say, "Oh, this thing over here that we never discussed, that's important.  That would be important to me."

A.  Counsel, I -- I -- I don't know if I testified about everything I relied on, you know.  I did the best I could to testify.

Q.  Why don't you go through your file -- why don't you go through your file and see if there's anything else we need to -- to address.

A.  I -- counsel, I can't -- I can't do that.  I mean, my file --

Q.  You cannot do that?

A.  My file is enormous.

Q.  Your file is sitting right in front of you.  We produced it to you.

A.  Here it is.

Q.  Yeah.  Sir, that's not a lot.

A.  Well, for me to go through it right now, it's a lot.

MR. GRIFFIN:  Think about whether or not -- you -- you asked very specific questions sometimes; sometimes you asked general questions.  I -- I don't know how the question can be answered.  So I think it's -- it's an impossible question to answer.

BY MS. FOWLER:

Q.  All right.  I'm asking a general question then.  I want you to go through your file and tell me what documents were relevant to your opinions.

A.  I do -- I do not --

Q.  If you want to go off the record, we can.

And we can go through your file.

A.  This is absurd.

Q.  Why is it absurd?

MR. GRIFFIN:  I think it's absurd.

WITNESS:  I don't know what to do here.  I've -- I've answered all of your questions the best I can, when you asked me a specific question about what I relied on in reaching the opinions that are set forth in my report.  Is that what you're asking me?

BY MS. FOWLER:

Q.  Yeah.  I am asking you what --

A.  What's the question?

MR. GRIFFIN:  Then -- then -- then -- then, Gary, tell her -- tell her that you have provided all of the specific -- all of the stuff you relied upon in response to her specific questions.

WITNESS:  That's what I did.

BY MS. FOWLER:

Q.  That's what I want to know.

A.  I answered your questions as to what I relied on, in response to your specific questions about what was in my report.

Q.  Okay.  And so your report -- is it fair to say your report contains all of the opinions you

intend to give in this case?

A.  Oh, yes.  As far as I know, it does.

Q.  And have we discussed all of the opinions you intend to give in this case?

A.  I don't -- I don't know, counsel.

Q.  You don't know.  In chatting today --

A.  That we discussed today in the deposition?

Q.  Chatting today, I asked you the questions that are on the page.  Did that trigger additional opinions that you think that you will render in this case?

A.  Not other than what I testified today.  I don't recall anything -- I'm not aware of any opinions that I have not testified about regarding the reasonableness of the fees, or the reasonableness of the decision to hire Gibson, that are not in my report.

Q.  Is there any additional work that you intend to do on this case?

A.  I don't know.  That, I don't know.

Q.  What work do you have in mind that you will be doing on this case, if any?

A.  Depends upon counsel.  It's something I would discuss with counsel.  There's going to be

888-893-3767  Lexitas Operates in all 50 states and is licensed where required  Nevada Registration #216F.
www.lexitaslegal.com
Case 6:22-cv-03086-MDH  Document 107-2  Filed 11/10/23  Page 52 of 83
LEXITAS

Page 209

trial -- assuming you don't settle the case, there will be trial preparation. I will re-review various materials. I will look at my report. I will look at Mr. Roper's report. Look at all kinds of materials.

Q. Well, other than what's already in your file that's been provided to you, is there any additional information that you intend to seek out or think it would be reasonable for you to seek out in order to finalize your opinions?

A. I'm not aware of any right now. There may be.

Q. I mean, the answer is maybe?

A. I don't know.

MR. GRIFFIN: His answer is, he is not aware of any right -- he's not aware of any.

WITNESS: There's nothing in my mind that I'm going to be seeking out.

Does that answer your question?

BY MS. FOWLER:

Q. Mr. Griffin was correct. I asked very specific questions and I have asked very general questions. And the purpose was to flesh out the basis of your opinions, the facts relevant to your opinions, the data that you relied upon in order to

Page 210

formulate your opinions. Do you believe that you have provided all of that to us today?

A. I -- I -- I -- counsel, I've answered your questions. That's all I can say. I'm not aware of anything that I have not said today, in response to any of your questions, that I should have said.

Q. Okay. That's -- that's not my question, to be honest with you. That's not my question.

My question is, in addition to what we've already testified to, is there any area, subject, fact, data that we should -- "Meg, you need to take a look at that because that's an additional basis for why I'm saying what I'm saying." That's what I'm asking.

MR. GRIFFIN: Asked and answered.

WITNESS: Not that I'm aware of.

MS. FOWLER: Not that you're aware of. Okay. That's fine.

I don't believe I have any further questions.

MR. GRIFFIN: Eric, please let us go free.

MR. JOHNSON: I have fewer than two hours more of questions.

Page 211

MR. GRIFFIN: I know you have fewer than two hours.

MR. JOHNSON: How about no questions?

MR. GRIFFIN: There you go.

I have no questions.

MS. FOWLER: Okay.

VIDEOGRAPHER: Off the record at 4:17 p.m.

MS. FOWLER: Are we reading?

MR. GRIFFIN: Reading and signing.

MS. FOWLER: Okay.

So I'm going to -- I'm going to send all of the deposition exhibits to the court reporter, but I'll CC you all in too, so you all have your own copy.

(Court reporter asks for transcript requests.)

MR. GRIFFIN: This is Jim Griffin for the Plaintiffs. We would like a mini -- a PDF mini, a PDF full-size and send a TPX also. Sometimes people like to use the TPX. By email, please.

MS. FOWLER: And I will take an etran.

MR. JOHNSON: Yes, same for me. Etran is fine.

(Deposition concluded at 4:20 p.m.)

Page 212

CERTIFICATE OF REPORTER

I, JOYCE D. LAWRENCE, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

_____

Joyce D. Lawrence
Certified Shorthand Reporter
Registered Professional Reporter
State of Illinois CSR License #84-1716
State of Missouri CCR License #1329

My commission expires:
August 4, 2026

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
Case 6:22-cv-03037-MDH Document 107-2 Filed 11/10/23 Page 53 of 83
LEXITAS

Page 213

LEXITAS LEGAL
711 N. 11th Street
St. Louis, Missouri  63101
800.280.3376

September 29, 2023

Mr. Jim Griffin
Scharnhorst Ast Kennard Griffin PC
1100 Walnut Street, Suite 1950
Kansas City, Missouri  64106-2197

In Re:  New Prime, Inc. vs. McGriff Insurance Services, Inc., et al.

Dear Mr. Griffin:

Please find enclosed your copy of the deposition of GARY GREENFIELD, taken on September 21, 2023, in the above-referenced case.  Also enclosed is the original signature page and errata sheet.

Please have the witness read your copy of the transcript, indicate any changes and/or corrections desired on the errata sheet, and sign the signature page before a notary public.
Please return the errata sheet and notarized signature page to LEXITAS LEGAL for filing prior to trial date.
Thank you for your attention to this matter.
Sincerely,

Joyce D. Lawrence

Enclosures

cc:  Ms. Meg Fowler
     Mr. Eric Johnson

Page 214

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

NEW PRIME INC.,                )
        Plaintiff,             )
    vs.                        )NO.6:22-cv-03037-S-MDH
MCGRIFF INSURANCE SERVICES,    )
INC., as successor in          )
interest to REGIONS INSURANCE, )
INC.,                          )
            and                )
AMWINS BROKERAGE OF THE        )
MIDWEST, LLC,                  )
        Defendants.            )
_____

        I, GARY GREENFIELD, being first duly sworn on oath, state that I have read the foregoing transcript of the testimony given by me at my deposition on September 21, 2023, and that said transcript constitutes a true and correct record of the testimony given by me at the said deposition, except as I have so indicated on the errata sheet(s) provided herein for such:
     No corrections (please initial):_____
     Number of errata sheets submitted:___

                _____
                          GARY GREENFIELD
        IN WITNESS WHEREOF I have hereunto set my hand and affixed my Notarial Seal this ____day of _____, 2023.
                _____
                          NOTARY PUBLIC

Page 215

CERTIFICATE

   I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT I HAVE READ THE FOREGOING DEPOSITION AND THAT, TO THE BEST OF MY KNOWLEDGE, SAID DEPOSITION IS TRUE AND ACCURATE (WITH THE EXCEPTION OF THE FOLLOWING CORRECTIONS LISTED BELOW):

    PAGE     LINE     REASON FOR CHANGE.
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____      _____
   DATE                       WITNESS
        IN WITNESS WHEREOF I have hereunto set my hand and affixed my Notarial Seal this _____day of _____, 2023.
                _____
                          Notary Public

## Exhibits

**152913 Greenfield, Gary 09.21. 23 EX 2**  2:8 56:6

**152913 Greenfield, Gary 09.21. 23 EX 15a**  2:20 79:20,21

**152913 Greenfield, Gary 09.21. 23 EX 44**  2:21 74:22 75:1

**152913 Greenfield, Gary 09.21. 23 EX 110**  2:11 16:12

**152913 Greenfield, Gary 09.21. 23 EX 110a**  2:12 73:12,25 74:3

**152913 Greenfield, Gary 09.21. 23 EX 110b**  2:13 120:12,13,14

**152913 Greenfield, Gary 09.21. 23 EX 113a**  2:14 30:2,3

**152913 Greenfield, Gary 09.21. 23 EX 113g(2)**  2:15 90:17

**152913 Greenfield, Gary 09.21. 23 EX 113j (1)**  2:16 47:20

**152913 Greenfield, Gary 09.21. 23 EX 113l(1)**  2:17,18 141:8 149:5,18

**152913 Greenfield, Gary 09.21. 23 EX 113l(2)**  2:18 149:5,18

**152913 Greenfield, Gary 09.21. 23 EX 116a**  2:19 163:8,10

## $

**$1,000**  34:12 97:2 112:8 113:5,9,18 114:11 115:12 120:9 130:20 134:5 184:21

**$1,000-plus**  124:14 133:20

**$1,000-plus-an-hour**  101:13

**$10**  48:3,5

**$165**  40:20 41:6

**$211**  35:11

**$227**  33:2

**$250**  35:17

**$251**  33:5

**$3**  55:15 56:24 57:5,7,15 58:19

**$47**  41:2

**$5**  198:22 200:18

**$600**  16:22

**$900**  34:10

## 1

**1**  49:25 52:19,21 200:25

**1,400**  163:23

**1.5**  19:3,14 28:10

**10**  81:23 196:21

**110**  16:12

**110a**  73:12,25 74:3,6

**110b**  120:13,14, 18,20,22 121:5,11

**113**  90:14

**113a**  30:2,3

**113g(2)**  90:13,17

**113j(1)**  47:20

**113l(1)**  141:8

**113l(2)**  149:5,18

**116a**  163:8,10

**11:39**  4:15

**12:45**  61:11

**12:56**  61:14

**13**  173:6

**14**  163:22 165:3

**15**  26:7

**15a**  79:20,21

**16**  52:17

**19**  139:6,8 170:18

**1975**  5:7

**1976**  5:8

**1980**  5:9

**1991**  5:8,10 7:4 8:16

**1:43**  104:11

**1:53**  104:13

## 2

**2**  50:3 55:24 56:6 96:15,16,22 97:13 122:18,19

**2/15/17**  80:24 81:5

**20**  48:2 158:10 159:12

**2001**  150:4

**2003**  56:25

**2005**  150:5

**2013**  39:6 41:1,23 50:2

**2015**  39:6 40:19 41:23 50:2

**2016**  45:24 170:11,17,21 171:1

**2017**  132:11 133:13,17 135:15, 22 170:23 171:2 199:18

**2019**  170:11

**2020**  30:3,8,11,21, 22,23

**2022**  26:7

**2023**  4:14

**20s**  66:18

**21**  4:14

**211**  35:12

**22**  95:15

**25**  33:18

**253**  78:25 80:2 81:24 87:9 89:12, 14,18

**26**  94:25

**2:23**  131:22

**2:31**  131:24

## 3

**3**  19:15 28:10 50:5 94:24 103:25 104:23 118:7 143:8 159:16

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 55 of 83

**30** 47:25 96:15,16, 22 97:13 177:8

**31** 48:9 52:6 54:20

**32** 7:6 52:17

**3:03** 157:16

**3:12** 157:18

---

**4**

**4** 52:7 56:19 75:10 151:2 197:16

**40** 171:19 187:10

**44** 74:22 75:1 158:6 159:12

**45** 6:21,22 7:2

**4:03** 202:14

**4:08** 202:16

**4:17** 211:7

**4:20** 211:25

---

**5**

**5** 18:22 94:23,25 95:3 151:3 161:23

**5.2** 82:3

**50** 89:3,8,11 116:18 117:22 159:16

**57** 139:5

**58.5-million-dollar** 41:1

---

**6**

**6** 61:21 122:19 154:11

**60** 90:7

**62** 155:1 197:12

**63101** 4:1

**650** 17:3

---

**7**

**7** 20:9 54:20 81:11

---

**8**

**8** 161:24 173:20 194:16

**80.9** 49:14

**81** 32:19

---

**9**

**9** 154:4 157:21

**9,000,601** 49:14

**9.6** 49:14

---

**A**

**a.m.** 4:15

**ABA** 18:12

**ABA's** 19:3,15 28:10

**ability** 161:22

**absurd** 207:2,3,4

**accept** 111:8 115:23 116:1,2

**accessible** 17:18

**accident** 6:13 14:13 23:7 40:21 44:6,12,20 45:9 62:11 65:12,17 108:24 109:1,6, 11,12 110:6,11,18 111:7,20 112:1,3 113:10

**accidents** 65:3 111:21

**accomplish** 84:3

**account** 21:14 32:10 39:1 186:18 196:17

**accountants** 5:21

**accounting** 5:22

**accrued** 56:22

**accuracy** 163:5 200:17

**accurate** 97:13 164:11,22 170:14 200:16,17

**Act** 62:15

**acted** 183:15

**action** 38:18,24 49:23 166:12

**actions** 166:4 167:16

**active** 130:12

**actively** 150:13

**activity** 113:21

**actual** 10:20,23 12:5 189:9

**acumen** 147:24

**add** 132:22

**addition** 49:12 210:10

**additional** 26:6,9, 12 208:10,19 209:8 210:13

**address** 63:2 206:3

**adjudication** 66:11

**Adjusted** 32:22

**adjustments** 11:22 12:1,8

**admissible** 39:23

**admit** 112:15

**admitted** 192:14

**admittedly** 136:11

**adults** 66:17

**advanced** 183:20

**advertise** 147:11

**advertised** 147:22

**agency** 63:16

**aggressive** 136:14 175:10,11,14 176:15,20,22 178:9,19 179:13, 15,17,24 180:2,9, 22 181:2 182:6,18 183:10,15 184:13 185:13

**aggressiveness** 178:13,18 179:15 183:3

**agree** 15:13 31:9 35:6 46:8 48:12 65:19 69:10 77:18 87:10,20 88:6,13, 16,22 89:18 91:25 108:24 111:5 116:9 129:8 166:9,14 184:19 189:25 190:9

**agreed** 4:2 124:14 176:10

**agreement** 114:23,25 115:11, 14 116:4,9 120:8 124:14 125:19

**agreements** 115:5

**ahead** 23:12,21 27:8 30:1 40:15 53:11 55:22 63:9, 12 73:13 74:4,24 77:9 79:5,15,16

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F

80:16 82:8 91:10 92:6 120:12 121:4 122:23 128:15 135:5,24 141:6 142:2 151:20 160:25 163:9 184:23 185:2 186:5 187:1

**AIG** 108:14,18

**AIG's** 108:17

**air** 183:11

**Alfrey** 149:20

**allegation** 65:12

**allegations** 41:5 65:9,16 66:2 68:7

**alleged** 65:14

**alleging** 76:2

**allocate** 83:14 86:21

**allowing** 38:1

**amended** 26:7

**amount** 11:19,20 12:5 20:6 38:17, 24 40:2 43:7 49:22 50:8 78:12 83:17 104:20,25 107:23 113:21 114:16 118:7 119:3,12,17,20 130:14,15 132:5 188:6 191:13 193:6 199:2

**amounts** 40:8 42:22 56:22

**amwins** 15:17 55:24 56:6,7,12, 14

**analysis** 11:16 12:15,20 18:24 19:21,23 22:20 23:17 26:4,22,23

27:6 29:18 83:23 84:14,15,17,23,24 86:4 87:1 100:25 106:13,15 130:1 164:17 185:10 189:5 191:4,12 201:19

**analyze** 8:20 11:18 26:14 29:4 37:1 114:1

**analyzed** 31:2

**analyzing** 9:17 31:18 45:3 188:21

**Angeles** 142:18

**Angie** 30:5 121:4 122:17 143:19 149:25

**answering** 36:8,9 38:3 88:4 135:3 176:4

**answers** 55:9,12 56:17 171:15

**anticipated** 50:3

**anticipating** 133:1

**antitrust** 167:3

**anymore** 187:20

**apnea** 62:5,21 63:2,17 64:13,18, 21,22 65:5,9,16, 20 66:2 101:14,21 175:16 176:14

**apparently** 58:10 156:20

**appeal** 67:16 69:5 70:1,10,13,20,24, 25 71:2 139:23 172:18,20 173:4

**appears** 64:25 74:11 85:19 87:4 92:7 168:8

**appellate** 69:11,14

**apples** 28:5

**applied** 69:17

**approach** 18:12 29:21 173:19 178:17 179:24 180:2 184:2

**appropriateness** 18:3

**approximately** 177:10 198:22

**arbitration** 123:23

**area** 20:5 28:13,22 31:6 34:18,22 35:3 106:5 147:17,24 165:22 166:19 168:14,19 175:3 210:11

**areas** 8:25 20:5 24:8 27:3,4,11 28:20,21 64:9 149:12 150:6 162:14 165:8,22 166:3 167:5,14, 15,18 169:15 172:10 173:8

**argue** 171:4

**arguing** 69:16 93:13 157:13

**argument** 97:12 127:15

**arisen** 158:19

**article** 25:10

**asks** 211:16

**Aspects** 69:13

**assembly** 50:20

**assess** 84:5 85:16

**assessing** 19:4 26:17 184:9 195:21

**associate** 169:21, 25 170:12,17

**associates** 125:4 129:1,9

**Association** 151:10

**associations** 151:8

**assume** 10:21 57:10 60:23,24 70:22,24 77:25 78:1 91:21,22 107:24 111:24 142:16 148:8 149:2 195:8 197:21 200:17,18 203:5

**assumed** 51:1

**assuming** 78:8 209:1

**assumption** 200:20 201:24 202:2

**assumptions** 202:4

**attached** 27:10 28:9 74:19,22 79:7

**attempt** 10:17

**attend** 120:9 126:17 130:18

**attendance** 120:14,24 121:12 123:12,24

**attended** 123:16 124:16

**attorney** 37:6

**attorneys** 42:7 67:11 108:13,17 124:3 142:10,12 162:14 169:16

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #716F.

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 57 of 83

173:22 174:5,7,19 184:17,18,20 190:17 192:10

**attorneys'** 10:19, 24 39:10 57:11 78:25 193:25 194:19

**attributed** 82:20, 22

**auditing** 8:8 44:5, 23

**auditor** 51:23 62:10 87:15

**August** 105:19 107:3 199:18

**authored** 26:8

**authority** 183:11

**auto** 146:17,23,25 147:12,23,24

**automobile** 56:23

**average** 29:18 35:10,13,20 188:24 189:8

**awarded** 51:18 78:13,14

**awarding** 51:15

**awards** 49:3,5 54:15

**aware** 42:11 55:12,16 57:17,18 84:25 107:9,12 108:7 109:24 132:11 159:5,8 162:15 173:2 208:14 209:11,16 210:5,17,18

**B**

**back** 22:10,25 24:10 25:2 37:7

38:6 47:3 52:11 54:17,18,22 74:8 88:23 97:19 103:3,4 107:5 118:2,7 122:19 126:23 127:25 129:20 131:20 135:7 155:25 157:20 192:18 195:11

**background** 50:15,18

**bad** 124:2 125:1

**Baker** 179:22

**ball** 183:20

**bankruptcy** 5:20

**base** 127:1,3 133:8

**based** 45:24 53:14 59:16 72:17 73:16 89:16 93:13 114:12 119:3 132:7 133:22 136:7,8 145:10 147:1 154:15 157:25 160:9 161:15 162:11 164:7,9 168:8,10 182:19 185:21 191:12,18 192:9 200:10

**bases** 101:10,11

**basic** 180:7

**basically** 13:11 28:24 194:25

**basing** 100:17

**basis** 45:12 61:16 97:23 102:1 106:16 193:20 195:18,22 196:12, 14 200:24 201:6 209:24 210:13

**begin** 98:18 133:13 134:16 194:18

**beginning** 46:17 115:8 170:12

**behalf** 11:17 107:10

**believed** 182:21 196:6

**believes** 129:2 195:5

**benefit** 10:13

**big** 21:19 40:1 58:20,22,25 84:12 132:24 135:17,20 143:13,16 174:25 185:13

**bigger** 58:9,13

**biggest** 59:16,23 60:22 61:5

**bill** 12:3 17:20 51:23 87:19 191:9 192:15

**billed** 11:13 12:5 32:3 83:17 87:2 88:13 89:16 105:3,7 134:5 163:23 191:4

**biller** 121:16 122:12 163:22 168:20 169:21 170:2

**billers** 27:3 101:14 112:9 125:13 126:15 192:16,17

**billing** 8:23 9:2,17 17:5 81:1 82:11, 21,23 87:11,15 88:7,18,20 123:21 162:13 189:9,13, 17 190:1,5,10 192:12

**bills** 8:8,20 9:9,11, 13,15,17,22 12:2 32:5 44:5,11,19 86:12,13,15 87:22 88:12 102:20 190:8 196:19,23, 24 197:18 198:2 199:10,19 201:14 202:1

**bios** 159:24

**bit** 5:2 6:1 41:8 50:18 56:13 62:16 64:15 104:17 127:15 137:12 150:2 154:6 196:9

**bits** 39:20

**block** 82:11 83:17 84:19 86:21 87:10,14,19 88:7, 13,17,20 189:13 190:1,5,9 191:4,8, 9 192:15

**block-billed** 191:6

**blue** 91:16,25 92:8

**board** 153:19

**bootstrapping** 127:15,22

**bordering** 106:12

**box** 24:22,23 56:4

**brakes** 110:25

**break** 17:22 37:23 61:4,8,9 79:8 88:24 103:5 104:5,6,7,8 131:18,19 137:11 157:12 160:25 161:4 171:6,10 191:8 194:11 197:8 202:12 204:14

**breaking** 28:12 105:9 121:11

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
LEXITAS

**breaks** 32:15 35:2

**Brian** 94:19

**briefing** 78:19

**bring** 122:20 124:21 133:2 162:16,24

**bringing** 72:18 203:22

**broad** 166:8 174:17 175:3 190:19

**broader** 77:19

**broke** 162:13

**Brokerage** 56:7,14

**brought** 13:1

**bunch** 9:10,15

**business** 5:11

**businesses** 148:2

---

**C**

**calculated** 87:9

**calculator** 79:16

**California** 106:11 141:1,22 142:4,8, 11 146:14,15

**call** 5:11 26:22 166:22 188:13

**called** 4:19 141:23 160:16

**candid** 70:21

**capable** 139:20

**capacity** 75:12

**car** 6:13 40:22 109:13 111:2

**career** 12:24 51:5, 19,23

**carefully** 196:22 201:25

**Carrier** 62:15

**carriers** 199:7

**cars** 175:4,6

**case** 6:5,13 9:24 11:5,12 12:4,7 13:17 14:13,17 15:1 17:7,24 19:12 20:3,4,11, 25 25:1 32:12 33:10 38:16 41:6, 14,16,23 43:20,23 44:3,20 45:9 46:11,15 47:3,15 49:2,24 51:2,10 52:21 54:3 57:17 58:3,9,16,19,20, 22,25 59:15,16,23 60:22 61:5 62:1,5, 12,17 63:5 64:10, 24 65:12 66:3,12 67:14,19,21,24 68:13,21,23,24 69:1,15,21 70:5,7, 12,20,25 72:14, 19,22 73:4,15,23 75:6 77:6,16 78:6, 10 80:21 84:13 85:16,18 88:11 89:25 92:20 93:1 94:23 95:12 99:19,22,23 100:3,9 101:1,2, 12,24 102:1,11, 15,19,20 103:2, 16,21 105:1,6,18, 21,22 106:7,10, 22,23 107:24 108:18,24 109:11 110:14,18 112:17, 25 113:11,16,19, 22,23 114:10,17 115:7,8,9,14 116:24 117:16 123:23 125:10,19 126:22 127:6,10, 11,18,19 128:19, 22,24 129:4,14 130:13 133:23 134:13,20 138:16, 18 139:1,21,22 140:4 142:10 148:12,14 150:15 151:18 153:22 154:13,14,17 157:23,24 158:2 161:17 163:23 168:1,5,20 170:6, 8,19 172:9,11,21, 23,24 173:1,3 174:15 175:5,13 176:17,19 177:9 179:24 180:3,19 183:3 184:2,19 185:22 188:3,6,9 189:8 192:6,20,24 193:5,8,21 195:17,23 196:22 199:8 201:25 203:6 208:1,4,12, 20,23 209:1

**cases** 6:6 7:18,20, 21,24 9:16 10:14, 16,18,19,22 11:24 12:9,14 13:5,6,12 14:5,11 18:18 23:7 27:7 31:18 35:21 39:15 40:1, 9 41:9 42:2,9,12, 16,19 43:3,5,6,7, 10,14,15,16,18,21 44:25 45:2,9,25 46:24 49:5 55:2,6 57:6 58:10,14 59:11 63:7 65:20 66:1 67:4,12 69:15 88:1 97:15 100:4 101:16,21 111:20 112:1,4 113:6 126:20,21 127:2,5,17 128:7 129:2 136:11,17

139:10 140:4,11, 12,13 142:13 146:1 148:3 158:22,24 162:4 167:25 174:15 175:1 179:4,12 183:17 184:19 185:15,17 188:5, 15

**catastrophic** 139:10,20 140:3, 10,12 193:21

**categories** 22:14

**category** 35:24 36:4

**caused** 65:4 185:13

**cautious** 195:2,15

**Central** 4:15

**certainty** 194:22 195:25 199:21

**Certified** 4:6

**chance** 64:1 204:15

**change** 77:15 78:5 155:19 193:5 202:7

**changed** 20:18 192:20,23

**Chapter** 20:9

**characterization** 16:5 181:3,7

**characterize** 182:5

**characterized** 184:3

**charge** 16:22 20:14 68:22 97:2 115:10 120:8 124:7

Lexitas Operates in all 50 states and is licensed where required Nevada Registration #016F

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 59 of 83

LEXITAS

**charged** 16:24 17:7 19:16 20:4, 13,19 21:3,8,10, 16 33:10 34:6 42:1 49:24 82:5 112:15,19 133:10 164:6 193:18 194:19

**charges** 20:15 115:11

**charging** 34:9,11 113:9,18 130:6 133:19 184:20

**Charles** 115:1

**chart** 121:10,11 163:5 164:20

**charted** 164:15

**chasing** 182:4

**chatting** 208:6,9

**check** 48:5 165:21

**checkbook** 48:4

**checks** 199:11

**choice** 152:19

**choose** 88:1,10

**choosing** 156:6 193:17

**chose** 154:14 156:23,25 157:25 160:15

**Chris** 120:6 121:24 122:11 165:23 170:5 172:12,15 173:9 174:9 186:17

**circles** 118:4

**circumstances** 9:24 12:4 87:3 104:22 118:9 119:5 146:7 147:1,18 152:16

**cite** 73:1 102:23

**cited** 77:7,12

**Civerolo** 45:24 154:12 157:22

**claim** 55:15 57:4 71:23,25 73:6 75:20 76:19 77:1 80:10 86:19 93:19 100:9

**claimants** 56:22

**claims** 56:21 147:25

**class** 166:4 167:16

**clear** 21:1,18 80:8 204:21

**Clear-cut** 110:10

**client** 10:10,13,14, 16 11:16 73:18 87:18,21 129:2 143:21 154:8 173:14 194:20

**clients** 8:16 29:2 32:4 87:25 88:7 143:9 144:4,7 150:14

**Clio** 24:20 25:2,3, 5,8,10,19,22 26:1, 2,3,4,14,20,21 27:2,8,10,22,23 28:6,9,15,23,25 29:1,3,9,11,19,24 30:9 31:3,8,11,14 47:17

**Clio's** 27:6

**close** 92:20 177:8

**closely** 88:25

**club** 151:5

**coat** 16:17

**codifying** 187:25

**collaborates** 150:14

**collect** 24:25 31:1 68:10

**collided** 110:13

**collision** 40:22

**color** 90:23 91:2,4

**Colorado** 148:20 149:4,8 150:19

**combination** 112:2

**comfortable** 160:3

**comment** 151:6

**commercial** 5:17, 18,23 7:1 56:23 62:11,20 63:3 64:22 65:8

**commitments** 106:6

**common** 11:14, 18,22,24 30:23 64:22,25 65:11,16 101:2 111:6,20,25 113:6,9,13,14,15 116:25 126:20,25 128:2 160:23 170:7 183:16 185:7

**commonly** 71:10 116:23

**companies** 8:19 143:13 148:2

**companionship** 71:10

**company** 41:2 43:20 44:1 143:16 156:12,15 195:13, 21 199:22

**company's** 195:6, 10 196:8

**comparable** 29:6

**compare** 23:3 24:13 112:24

**compel** 177:18,23 178:5

**compensatory** 49:14 74:10,15 78:17

**competent** 124:3 136:14,15

**competition** 167:4

**complete** 194:5 200:15

**completely** 125:24 186:23

**complex** 6:10 35:21 45:3 61:24 64:21 67:24,25 72:22 101:12 109:20 127:5,9, 10,17 152:17 167:25 168:1,4,6, 8

**complexity** 35:15 61:19 66:6 113:16 114:14

**complicated** 101:14 110:22 112:4

**compressed** 105:25

**concept** 65:21

**concern** 185:14

**concerned** 21:19 199:6

**concerns** 137:3 144:13,18

**concluded** 211:25

**conclusion** 22:6, 15 146:7 183:14

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F.

184:12 185:11

**condition** 64:16

**condo** 139:14

**conduct** 18:16

**confidence** 136:12 138:6

**confirm** 15:21 26:25 29:23

**conflict** 152:12

**confused** 27:25 200:9

**confusion** 198:24

**conjunction** 62:17

**connection** 121:17

**consideration** 96:12 201:7

**considerations** 73:17

**considered** 19:4 20:24 21:9,13,22, 24 22:15 96:1 104:23 146:24 178:17 201:11

**consistent** 185:9

**consortium** 66:11 71:6,7 72:16 73:2, 6 74:13 75:20 76:2,12,19 77:1, 14 78:8,14,15,19 80:9,21,25 81:15 82:15 83:1,15 84:1,22 86:5,19 87:7 89:3,20 93:19 95:11,17 99:10,21 100:8,12 189:13 191:15

**constituted** 88:17, 20

**constraints** 105:4

**consulted** 8:22

**consulting** 8:16

**contact** 109:22 155:10 188:23

**contacted** 8:24 10:9 101:1 136:25 144:17 152:11 153:18 154:13 157:23

**contained** 183:4

**contents** 19:9

**context** 48:15 53:8 64:24 202:9

**continuation** 160:14

**continue** 107:8,11 108:2,6,10 135:11

**continued** 107:25 108:4,14

**continues** 148:1

**contractually** 120:7

**contradicted** 198:14

**contradiction** 154:22 198:9 202:6

**copies** 149:23

**copy** 47:13,15 91:14 211:15

**correct** 7:12,22 8:8 10:25 15:18 16:23 18:12 19:6, 11 21:4,5 22:8,18, 22 23:8 24:17 25:12,24 27:12 30:14 33:10 34:7 38:25 39:4,7 42:20 43:23,24 44:1,2,6 45:10,14 50:7 51:15 52:23

53:1,16 54:15 59:17 60:11,17,18 63:22 65:24 66:17,22 67:1 69:5,8,16 70:1,20, 22 71:16,20 72:7 73:16 74:10,19 80:11,14,23 83:5, 12 93:14,24 99:4 102:2 103:18 104:23,24 106:19 115:16 119:6,12, 13,18,22 128:24 137:16 138:7,9 139:10 140:6,16, 19 142:8,11 155:15 159:6 166:6,20 172:24 174:1,5 178:18 181:5 182:8 187:4 188:17 190:6 191:24 198:3,10 202:3,7,22,24 209:21

**correctly** 19:18 46:3 52:14 53:2 62:2 66:13 112:7 154:18 158:3 160:6 179:25 194:23 197:3 198:7

**cost** 5:11 20:6

**costs** 42:23,24 43:3,4 55:15,16 56:24 57:4,7,10, 11 197:1

**counsel** 4:3 18:23 28:17 30:15 36:12 37:12 43:17 44:15 45:16,23 76:22 91:21 92:9,13 94:20 96:16 97:15 98:12 99:20 100:11,16,20 101:1,18 105:12 109:9 111:13,14

116:15,21 122:6, 20 124:5 126:17, 21 128:12 137:4,6 140:23,25 141:15, 22 144:3,13,19 149:22 153:13 154:8 156:8 159:9 161:3 165:25 167:12 171:1 172:25 173:15,20, 22 175:4,10 177:7 178:18 180:23 181:10 182:6 183:3,10,14,22,25 185:3 187:15 192:3 196:22 197:2 198:21 201:17,25 203:11 204:13 205:23 206:4 208:5,24,25 210:3

**count** 92:6,9,11 93:5

**counted** 78:25 92:13,14,19 117:20

**counties** 50:1

**counting** 94:17

**couple** 176:16

**court** 4:16 18:11 37:5,22 38:10 103:3 107:20 108:10 119:9,15 166:13 211:13,16

**Court's** 107:18 178:4

**courtroom** 169:10

**coverage** 6:5,11 7:10 15:1,23

**covered** 15:5 48:25 104:16 153:13 172:25 173:13,18 186:12

**COVID** 25:11 28:8, 16 29:14

**Crawford** 47:21 52:1 54:13 59:25 60:7 133:18 137:19,21 138:4, 9,11,12,14,19 153:11,14,18 155:3,4 156:11,17 157:1,2 160:22 161:13

**Crawford's** 47:8 138:21 139:5 155:13,17 160:18 200:1

**created** 17:19

**creates** 16:19

**credentials** 175:22

**criminal** 20:11 167:7

**critical** 32:8,9

**criticism** 31:20

**criticisms** 31:14

**criticizing** 31:16

**current** 54:9

**customarily** 19:16 20:4,13,19 21:3,7, 9

**customary** 20:9, 10,15

**D**

**damage** 66:9

**damages** 10:22 41:3 49:15 66:7, 11,25 67:7,24,25 68:5,9 71:17 72:16 73:8 74:9, 10,16 75:5 76:3,

10,15 77:17,19 78:2,8,12,17 80:10 101:25 102:3,6,7,10,14 110:14 176:19 199:4

**dark** 157:14

**data** 27:5 31:21 32:2 203:8,12,14, 18 204:4,8 205:17 209:25 210:12

**date** 4:14 26:7 79:21 106:17,18 120:15,24 121:12, 15 123:12

**dated** 30:21

**dates** 56:22 107:21

**day** 37:10 163:14

**day's** 194:5

**dead** 93:21

**deadline** 107:16

**deal** 145:11

**dealing** 27:7 159:3

**dealings** 137:22

**deals** 29:14

**dealt** 158:12

**Dean** 57:13 200:7

**death** 7:25 14:17 67:4,11,19,21 75:6 102:10,14, 19,20

**deaths** 40:23 66:21 67:1

**deceased** 71:23 76:20

**decedent's** 75:10, 11 76:13

**December** 26:7

**decide** 133:19

**decided** 137:1 152:18

**decides** 52:19

**deciding** 125:10

**decision** 18:3 22:17 26:13 58:24 84:7 105:7 114:9 117:10 130:8 132:7,8 133:22 134:9 136:6,19 145:5,9,14 146:8, 11 147:2,20 151:17 157:2,3,4 159:18 185:18,21 193:20 197:1 208:17

**decision-making** 133:9 159:23

**defeated** 99:1

**defeating** 96:1

**defend** 120:9

**defendant** 20:11 56:7,12,13

**Defendants** 4:4

**defended** 43:25 102:19

**defending** 44:6, 12,19 57:16 66:1

**defense** 12:18 13:17 42:2,7,23, 24 43:3,4 44:5,11, 19 55:2,6,16 56:24 57:6,10 92:1,18 136:9 151:9 184:20 197:1

**defined** 178:8

**definition** 166:14

**degree** 27:13

**delegated** 124:1

**delivers** 47:3

**delivery** 148:2

**delved** 175:19

**demand** 45:14 46:1,10 48:8 50:4 182:7,22

**demands** 46:13, 14,18 48:3,9,11, 18 49:2,5 59:9 180:6

**denied** 72:4 94:5 99:11

**denying** 95:15,18, 20

**depend** 48:6

**Depending** 19:9

**depends** 11:10 12:16 77:6 113:11,15 125:6, 7,21 171:15 179:17 192:12 196:11 208:24

**deposition** 4:4 5:1 17:14 47:8,20 52:2 53:15 57:19, 21 74:18,21,23 78:21 120:14,24 121:12,16,17 123:11 124:16 125:7,20 126:11, 20 129:21 138:9, 11,14,19,21 139:6 141:12 153:8 154:21 155:1,8, 14,17 157:12 158:7,11 160:20 186:2,8 197:6,13, 19 198:13 200:1, 4,7 202:19 205:15 208:8 211:13,25

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #216F
LEXITAS

**depositions** 69:1 70:9,11 71:1 112:10 113:20 114:12,19,20 116:11,14,18,24 117:9,13,19,20,22 119:21 120:4,10 123:17,20,25 124:24 125:4 126:1,7,9,13,16, 22 127:7 129:2 130:18 132:1 154:23 172:23 173:2 180:19 183:1 184:1 188:7

**description** 121:16

**detail** 22:5 103:8

**details** 32:1 102:23

**determinant** 105:2

**determination** 47:2 59:15 85:7 179:6,8 189:7 204:2

**determinative** 58:7 98:20 107:23 196:4

**determine** 11:8 13:18 18:5 42:21 49:1 50:11 75:16 76:17 83:4 86:12, 15 87:22 88:8 100:8 103:8 105:10 106:4 110:5 117:2 118:10 126:15 145:13 164:22 179:3 191:5 192:6

**determined** 11:12 12:10 113:18 119:3 154:12 157:22

**determining** 28:10 38:23 49:22 61:17 64:21 119:2 146:13 164:25

**develop** 150:15

**development** 139:15

**devices** 64:16

**devoted** 190:4,23

**dialogue** 63:14

**die** 200:20

**died** 66:17 95:9

**difference** 75:19 76:20,25 77:3 80:9,20

**differently** 34:5 111:17 128:17 135:8 183:15

**difficult** 62:4 156:12

**direct** 154:22 198:9 202:6

**directly** 114:18

**disagree** 187:1

**disagreeing** 93:8

**disagreement** 171:3

**disagreements** 109:18

**discovery** 175:19 177:18,24 178:21 179:4,10,11,16 180:5,14 181:9 182:6,20

**discrepancy** 74:13

**discrimination** 167:6

**discuss** 18:1 21:12 22:21 27:20 66:7 117:8 119:19 208:25

**discussed** 24:9 132:16 133:4 156:11,14 160:22 203:8,13,17 204:4,11 205:21 208:3,7

**discusses** 28:11 38:17

**discussing** 23:23

**discussions** 157:1

**dismissed** 80:21

**dispute** 127:11 163:5,24 164:1,14 166:13

**disputes** 111:1 167:7

**disputing** 109:21

**disqualified** 128:5,9,11

**distinct** 10:23 166:22

**district** 40:20,25

**districts** 50:2

**divorce** 20:6,8 167:6

**docket** 90:12,17 99:6 101:8 107:5 187:24

**document** 24:20 27:19 30:24,25 31:2 79:19 90:21, 22 122:2,6,17

**documents** 31:1 115:24 141:11 206:23

**dollars** 52:19,22

193:18

**dollars-plus** 116:10

**Doren** 115:2 124:12

**doubt** 31:8 59:25 117:14 170:1 174:15

**drawing** 184:11

**drill** 176:13

**driver** 110:15,24

**drivers** 62:20 63:3 64:23

**drugs** 64:17

**due** 113:19 119:10

**dug** 175:16

**duly** 4:19

**Dunn** 18:4 30:13 33:9 34:6 49:23 66:1 67:11 72:24 73:1 84:7 85:7 88:24 90:4,10 93:3 100:17 105:11,16 107:7 108:5 112:14,15 114:23 116:8 117:3 118:12 119:2,6 120:2,3 132:8 133:13,16 134:1,3,10,16 135:14,22 136:2, 7,10,19 137:14,22 138:15,25 139:9, 14 140:3 142:7, 12,15 144:10,25 145:1,5 146:8 151:17 152:18 153:7,12,15,18 155:23 156:6,18 158:12,15 174:4, 11,19,25 184:12 186:1 190:8

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F
**LEXITAS**

193:18 194:18 199:10

**Dunn's** 22:6,7,16 50:12 101:12 139:7 147:4,7,8 177:4

**Dusseault** 41:13 60:1,3 67:14 68:12,17,18,19,20 69:24 114:21 115:1 120:7 123:16,22 139:23 142:17 156:15,20 162:9 165:23 166:1 170:6 172:12,15,20 173:9 174:9 184:4 186:17

**Dusseault's** 121:24 122:12 123:1 154:16 158:1

**dying** 71:24

**E**

**earlier** 30:21

**earning** 75:11

**earphones** 181:12

**effectively** 8:20

**eighth** 200:25

**element** 28:10

**elicit** 15:9

**eliminated** 72:15, 16 76:6 77:17 78:7

**elimination** 78:7

**else's** 10:17

**elusive** 197:21

**email** 91:8 151:22 155:5 211:21

**emergency** 95:16

**employment** 139:14 158:18 167:6

**end** 5:19 79:19,25 109:23

**ended** 11:11 30:13 156:6

**enormous** 206:7

**ensure** 205:16

**entered** 114:23 120:7

**entering** 133:6

**Enterprises** 143:10

**entertainment** 169:16

**entire** 85:16 122:5 205:8

**entitled** 11:4 66:25 80:11 97:2

**entries** 17:20 78:24 79:21 81:14 82:9,14 83:4,7,11, 14,17 84:19 85:4 86:21 87:7,13,14 88:14 89:3,8,19 189:25 190:1,22 191:6,9,14 204:9

**entry** 81:1,15 82:21,23 190:5

**environmental** 167:4

**equate** 46:10

**Eric** 57:14 59:2,17 60:16 74:18 126:3 133:18 137:14 148:11,13 152:3 155:1 158:6,11 186:17 196:19 197:6,13,19 200:4

201:13 202:5 210:22

**essentially** 144:10

**establish** 176:18

**estate** 139:15 158:16,17,22 167:7

**estimate** 171:16

**estimates** 191:10

**etcetera** 61:18 121:18

**etran** 211:22,23

**evaluate** 9:8

**evaluated** 73:15

**evaluating** 9:1,13, 20 149:17

**event** 31:11 98:21 123:25

**events** 109:2

**exact** 155:10

**EXAMINATION** 4:21

**examine** 44:11

**examined** 4:20

**examples** 72:21

**exceeded** 55:15 56:24 57:5,7

**excellent** 179:23

**excess** 34:10,11 115:11

**exclude** 94:19

**excuse** 16:16 25:6 36:1 82:6 114:15 118:18 122:5 153:2 177:3 189:4

**exhibit** 16:12 30:2, 3 47:20 56:6 73:12,25 74:3,5,

22 75:1,8 79:6,17, 20,21 80:15 90:17 120:12,14 123:6 141:8 149:5,18 163:8,10,18

**exhibits** 74:19 211:13

**exist** 63:2 161:7

**existed** 135:13

**existence** 61:23

**existing** 28:7

**expect** 46:18 188:20 199:9

**expectation** 199:17

**expectations** 198:18

**expected** 46:1 200:11

**expecting** 125:16

**expenses** 9:22,24 10:2 11:8,9 18:2 57:11 105:3 191:24 192:6 193:25 194:19,21 201:3

**experience** 5:5 6:2 7:15 8:21 11:6 14:5,7 44:22,23 45:3,8 65:25 67:10 101:15 124:11 125:7,12, 14 126:6,9,10,12, 15,19 127:17,18 128:7,10,18,21 139:7,8,9,13 147:11,23 152:17 154:15 156:21 157:25 159:25 161:21 162:3,6 166:19 167:25 168:7 172:8

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 64 of 83

174:10 193:7

**experienced** 124:8 125:4

**expert** 8:25 9:3,5,8 10:19 11:6 44:11, 24 157:20 183:12, 14 184:8 193:16, 17 205:15

**expertise** 27:3 149:12 153:1 154:15 157:25 161:20 162:3,14 164:9 165:8,22 166:3,18 167:14, 19,25 168:15,19 169:15 172:8,11, 16 173:8,17

**experts** 180:18 182:25 184:2

**explain** 9:20 26:16 36:7 37:13

**exposure** 43:19 129:3 134:17,19 135:16 136:8 199:3,14

**Express** 144:2

**extension** 93:12

**extensive** 129:24 130:5 132:2,6,25 147:24

**extent** 154:5

**extracted** 164:4

**extremely** 11:22

---

### F

**face** 180:13

**faced** 156:13

**fact** 21:14 25:17 45:13 49:25 58:18 67:3 68:2 69:4

71:4 73:1 75:25 92:22 106:17 108:13 114:19 119:6 124:1 130:9 132:21,23 137:5 140:15 144:8 147:18 156:3,5 160:15,21 170:7 176:10 179:10 210:12

**factor** 38:23 58:15 104:23 114:14,15 118:10 132:17 135:17,18,20 199:23 201:4,10, 12

**factors** 18:14,18, 19,23 19:4,11,25 20:24 22:4 35:23 42:8 49:21 105:6 112:2 119:7 120:5 124:9 133:23 134:9,15 135:13, 19,21 136:8,18 145:3,10 180:21 183:2,23 185:22, 24 193:23 201:18 202:10

**facts** 14:10 48:7 66:12 69:17,20,25 109:6 110:6,9,11, 14,21 111:19 112:3 152:16 209:24

**factual** 61:19,24 66:6 72:23 109:18 111:1

**fair** 7:7,20 8:1 16:2,4 26:8 27:15 38:9 42:15 43:22 44:25 46:11 47:4 48:24 62:7 65:21 74:13 126:18 184:21 186:19 207:24

**fairly** 61:4 111:20, 25

**fall** 6:17

**fallacy** 127:20,23

**Fallen** 151:5

**false** 22:24 23:10, 19 186:23

**familiar** 75:23 113:3 138:2

**familiarity** 62:14

**family** 66:20 77:20

**fan** 16:18

**faster** 104:17

**February** 105:18 107:3

**federal** 62:15 63:16

**Fedex** 40:21 41:6

**fee** 12:20 19:15 20:3,9,10 100:25 114:25 115:5,10, 13 116:4,9 124:13

**feel** 117:23 118:3 205:18

**fees** 9:1,3,21,22 10:2,15,17,19,22, 24 11:3,7,9,13,18, 25 12:1,8 13:19 18:2,8,24 19:5 20:12 21:2 39:10 45:3,8 57:11 58:19,21 61:25 78:25 84:6 87:2 105:3,7 113:23 118:22 119:24 121:18 130:9,15, 16 132:15,19 133:9 134:7 149:17 164:6,15 184:10 188:21 191:23 192:5

193:25 194:19,21 195:21,22 199:19 201:2,6 208:16

**fell** 6:16,18

**felt** 43:19 51:18

**fewer** 210:24 211:1

**fifty-fifty** 10:5

**figure** 29:8 160:1 204:18

**figures** 46:2 182:8,23

**file** 24:20 25:23 27:15 28:6 30:1 71:9 73:12 96:3 97:14,22 98:1,4,8 107:8,11 120:20 137:18 140:16 141:5,15 162:15 163:9 173:7 174:21,23,24 177:2,5 202:20, 21,25 203:6,23,24 206:1,2,5,7,8,22 207:1 209:7

**filed** 59:7 71:5 89:7 90:6,7,9 92:18,23,24 93:2, 11 96:22 98:18 130:11,19 134:13 170:23,25 171:1 175:21 176:24 177:7,8,12,14 187:4,7 188:3

**files** 98:11

**filing** 20:9 102:24 177:15,16 178:8, 12

**filings** 187:19

**final** 194:17

**finalize** 209:10

888-893-3767 Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F www.lexitaslegal.com

**find** 46:22 123:3 142:21 152:4 160:21 163:17 204:15

**finding** 63:13

**findings** 198:10

**fine** 9:23 31:19 53:22 80:6 104:5 118:23 123:9 139:3 160:4 188:19 210:19 211:24

**finish** 24:7 38:1 58:12 82:18 92:15 111:13,14 116:21 117:18 118:18,20 134:2 144:23 168:4 176:2 187:22 191:2 193:4

**finishes** 38:2

**firm** 5:7,10,14 7:4 10:1,10,11,12 32:23 33:1 44:5, 11,19 67:14 87:19 97:6 105:4 107:10 112:16 116:17 133:2,19 134:3,7 136:22 145:6 146:9,14,15 147:3,12,20,25 148:14,17 152:11, 13 155:6 160:19 174:14,25 175:22 176:7 177:19 179:21,23 184:13 185:12,20 192:14

**firm's** 13:17 23:18

**firms** 8:17,22 10:6 21:21 23:4,6,7,24 29:1 32:3,4 33:2 35:3,10 106:5,9 112:18,24 113:3 132:24 136:2,9,25

137:7 140:8,9,14, 16,18 144:9,14, 17,20 145:8 146:1,3,23,25 152:4,5 154:13 157:24 165:17 177:8 184:14 185:19 188:13,14, 23

**firms'** 21:25 24:14

**first-year** 169:21, 24 170:11,17

**five-minute** 157:8, 11 194:11 202:12

**fixed-fee** 20:4

**flags** 89:4

**flash** 169:10

**flesh** 209:23

**flexible** 107:17

**Florida** 158:17

**FLOWER** 36:25

**focus** 52:3,7,10 53:19,20,23 54:7, 12,13,21 59:8,13

**follow** 38:7 118:4

**footnote** 19:2,10, 14 154:11

**foreign** 166:5 167:17

**form** 22:23 128:14 190:18 194:4

**forming** 203:14

**formulate** 14:6 18:10 115:15 141:12 176:6 202:2 203:9 204:3,5,22 205:17 210:1

**formulating** 70:19 203:19 204:19

**forward** 37:21 95:7

**found** 62:4 205:16

**fourth** 170:2,3

**FOWLER** 4:22 15:11,12 16:1,7, 14 22:25 23:2,11, 20,25 30:5,7 32:17,19,21 33:12,16 36:13, 19,22 37:2,14,17, 25 38:11,13,14 40:14 47:22 53:22,25 54:5 56:10,19,20 57:22,24 61:7,15 74:2,7,24 75:3 77:9,11 79:5,12, 14,20,23 81:5,8 90:19 104:1,7,10, 14 120:17,23 121:2,7,9 122:17, 22 126:3,5 128:16 131:25 135:1,4 138:24 139:3,4 141:6,10 142:2,6 143:18,20,24 144:1 145:22 148:15,19 149:7, 25 150:3 151:2,7, 20,23 157:11,19 163:15 168:11,13 169:5,8,13,14 171:8,9,18,23 172:4,6 181:14, 16,23 182:1,17 184:5 185:23 186:15,25 190:21 192:4 193:12 194:7 200:22,23 202:11,17 206:20 207:11,19 209:20 210:18 211:6,9, 11,22

**Francisco** 5:7,15

**frankly** 35:14 76:11 101:5 156:16 185:10 191:8

**free** 210:23

**frequently** 12:12, 13 65:13

**front** 32:14 70:4 110:25 141:21 163:19 183:9 206:8

**fronting** 201:5

**fruitful** 100:23

**full** 122:17,18

**full-size** 211:20

**funny** 63:13

---

**G**

---

**g(2)** 90:15

**Galler** 163:21 165:3 166:3 168:7,20

**Galler's** 126:10

**gambit** 5:18

**game** 205:19

**Gary** 4:18,24 15:21 16:12 185:2 207:15

**gather** 32:5

**gathered** 27:24 31:12,21 32:1,2

**gathering** 28:25

**gathers** 31:15

**gave** 50:17 59:22 204:24

**general** 14:7,8 24:25 35:24 67:2, 5 101:16 117:15

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

LEXITAS

165:7 179:23 206:16,21 209:22

**generally** 5:23 46:12,16 66:23,24 71:8 174:6

**generated** 61:25

**gentlemen** 154:23

**geographic** 27:4 28:21

**germane** 53:5

**Gibson** 18:4 21:13,14 22:6,15, 16 26:13 30:13 33:9 34:6,9 49:23 50:11 66:1,10 67:10 68:18 72:24 73:1,20 84:7 85:7 88:24 90:4,10 93:3 100:17 101:12 105:8,11, 16,17 107:7 108:5,19 112:14, 15 114:8,17,23 116:7 117:3 118:11 119:1,6 120:2,3 132:8,23 133:2,13,16 134:1,3,10,16 135:14,22 136:1, 7,10,19,22 137:14,22 138:15, 25 139:7,9,13 140:3 142:7,12,15 144:10,25 145:1,5 146:8 147:2,4,7,8 151:17 152:18 153:7,12,15,18 154:14 155:23 156:6,18,25 157:25 158:12,15 160:15,17 161:12 170:11,21 171:2 172:9 174:4,11, 19,24 177:4,9 184:12 186:1

190:8 193:18 194:18 197:2 199:10 208:17

**Gibson's** 22:6 23:23 24:13

**gist** 195:12

**give** 9:10 14:25 15:4,16 38:16 49:13 171:16 208:1,4

**giving** 36:13,14 37:8 142:23

**glad** 171:24

**glean** 60:19

**good** 8:22 69:22 124:2 125:1,3 136:14 145:2 170:8 172:1 173:22 174:4,6 175:9 185:12

**gotcha** 159:13 205:19

**graduated** 5:6

**granted** 72:5 76:5 99:12

**granting** 95:1,13, 16

**great** 9:6 121:6 190:9

**Greenfield** 4:18, 24,25 16:12

**Greenfield's** 120:15

**Griffin** 15:7,8,19 16:3,6 22:23 23:9, 19 32:16,20 33:11 36:10 37:6,11,19 40:10 53:17,19,23 54:2 61:3,10 79:17 81:3 120:22,25 128:13

131:18 134:24 135:2 138:22,25 145:17,20 149:23 151:4 169:2,6,9 171:16,24 172:3 181:22 182:15 183:18 184:25 186:9,23 190:18 191:25 193:9 194:4 200:14 206:14 207:4,14 209:15,21 210:16, 22 211:1,4,10,18

**ground** 129:23

**group** 53:23 54:7 140:14 143:2

**groups** 52:3,7,10 53:20 54:12,14,21 59:8,13

**guess** 58:2 76:17 77:7 106:2 126:4 134:14

**guys** 181:20

---

**H**

**half** 10:6,14,15 93:16

**handle** 71:1 139:24 156:19 161:20,22

**handled** 6:5 13:12 67:15 69:25 70:10 71:1 128:23 129:14 138:15 139:23 158:16,18 172:20 173:3 174:14 175:1

**handling** 104:21 118:8 119:4 132:5 139:20 154:16 158:2 160:3

**handy** 16:10

**Hanson** 179:22

**happen** 119:14

**happened** 109:19 176:17

**happy** 115:19

**hard** 47:12 61:1 107:16 189:12

**hardest** 38:1

**harvested** 29:3 31:3

**hear** 55:7 75:18 181:14,15,16,20

**hearing** 16:19

**helpful** 25:4 26:17

**helps** 15:10

**Herrera** 35:6 52:8 54:14 55:14 57:3 66:3 67:12 109:22

**Herreras** 66:16

**Herreras'** 109:23

**Hey** 61:3 100:11

**high** 45:14 46:9, 12,13,18 50:3 73:23 97:6,7 129:3 135:16 180:6

**high-dollar** 73:15

**high-exposure** 158:24

**high-profile** 158:24

**higher** 21:15,18 112:7,16,19 130:6 136:2

**highlighted** 80:25 81:7,17,24 84:19 91:15 92:8

**highlighting** 90:21,23,25 91:1

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F

**highlights** 92:1

**hire** 11:16 26:13 29:1 58:24 72:24 84:7 85:7 117:3 118:11 119:1,6 120:1,3 132:7,9 133:13 134:1,3, 10,15 135:14,22 136:19 145:5 146:8,10 147:20 148:12,13 151:17 159:18 185:20 208:17

**hired** 72:25 73:1 106:18 108:14 133:16 136:6 139:1 140:4 155:22 184:12

**hiring** 29:2 133:19 137:4 144:13,19 146:13 159:23 185:18 186:1 194:18

**Hoedl** 57:13

**Hoedl's** 57:20 200:7

**hold** 59:5 79:10 81:9 82:7 83:2 86:14 89:21,23 94:16 95:21 96:19 116:19 117:1 122:25 123:2,3 134:2,23 163:13, 14 181:10,12,19, 23 184:17 190:15 191:22 195:9 197:10

**home** 121:4

**honest** 28:1 117:23 210:9

**honestly** 187:14

**hour** 16:22 34:10, 12 97:3 113:5,18

114:11 115:12 120:9 124:14 133:20 134:5 171:21 184:21 193:19

**hourly** 12:11 21:2 22:21 23:3,18 28:11 32:15,22 33:2,5 34:6,18,22 35:10,17,25 42:5, 6 101:13 112:7, 14,16,19 114:2,5, 10,18 115:1 124:15 130:6,20 135:23 136:1,2 188:25

**hours** 17:13 78:18 79:1 81:16,23 82:4,17,20 87:9 89:12,14,19 121:18 163:23 164:6,15 210:24 211:2

**huge** 58:8

**hundreds** 13:4

**hurt** 6:16,18

---

**I**

**idea** 92:2 117:7 152:23 173:8

**identical** 18:17

**identification** 16:13 30:4 47:21 56:9 74:1 75:2 79:22 90:18 120:16 141:9 149:6 163:11

**identified** 121:15

**identify** 27:2 56:21

**illegal** 87:16,17

**Illinois** 4:6

**impact** 66:25 72:13,19 73:3,5 99:22 100:13 102:9 103:1,14,21

**impacted** 105:6

**impacts** 61:25 76:6 130:14,15

**impeccable** 175:22

**important** 43:14, 16,18 57:25 58:15 99:16 107:13 141:19 157:6 183:13 205:21,22

**imposed** 104:22 118:9 119:5

**impossible** 186:10 206:18

**impression** 59:23

**in-house** 196:22 201:24

**inaccurate** 164:16 165:1,14 200:16

**inappropriate** 12:3,6 87:18

**inception** 150:12

**inches** 24:21

**include** 15:4 23:17 119:21 150:7 167:9 169:16

**included** 20:23 22:20 39:10 51:17 74:15 117:19 119:20 140:18

**includes** 57:10

**including** 14:9 41:2 55:15 57:6 66:8 117:9,17 164:20 183:25

**incorrect** 84:16,17

120:11

**incurred** 10:3 11:9 18:2,8 58:19 164:15 197:1

**incurring** 194:20

**independent** 42:18 43:9 141:3 164:2 186:20 188:14 189:5

**independently** 41:17 50:22 165:21

**indicating** 86:5 87:8

**indication** 47:6 59:22 74:12 196:25

**indications** 50:8

**individual** 85:17 87:4,5,13 114:24 191:6

**individuals** 116:10 148:1

**inducted** 151:4

**industries** 63:18

**industry** 26:24 151:9

**inference** 196:16

**influence** 25:12

**information** 25:1 27:24 28:17,25 31:12 37:13 39:20,25 40:4,8 41:11 59:14,22 63:19 64:5,8 145:15 146:15 204:11 209:8

**injuries** 6:6 7:12 13:13,14 175:1

**injury** 5:24 6:3,4,

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 68 of 83

LEXITAS

10,24,25 7:3,15, 18 12:18 13:2,7, 18 14:9 21:17 29:19 35:7,9,16, 17 44:3,24 51:20 54:8 65:8 69:11 136:3 139:10,21 140:4 148:2 159:4,7 162:7 167:2,20 168:5,15 169:6 172:21 173:23 174:10,15, 17,20 179:11 188:25 193:8

**instantaneously** 71:24 93:21 95:10

**instruction** 75:1,4, 24 76:7

**insurance** 6:5 7:10 15:1,23,24 195:6 196:7 199:6,22 200:12

**insured** 199:15

**intend** 14:25 38:16 208:1,4,20 209:8

**interceded** 171:25

**interchangeable** 54:3

**interchangeably** 54:1

**interested** 26:19

**interfering** 38:4

**interpreted** 15:6

**interrogatories** 55:10,13,18 56:8, 15 179:1

**Interrogatory** 56:19

**interrupt** 104:19 159:9

**interrupted** 96:20

**interrupting** 134:24,25

**interview** 41:21 59:2,17 60:8,10, 20,21

**interviewing** 186:17

**inundated** 181:9 182:20

**inundating** 178:20

**inverse** 106:3 196:5

**investigate** 42:1,4 59:7 149:11

**investigation** 186:21 188:14

**invoice** 17:4,9

**invoices** 17:11

**invoicing** 192:10

**involve** 9:14 12:18 65:8

**involved** 6:6 7:22, 25 9:16 13:6,13, 15 18:16 21:21 23:5 41:21 46:6 59:8 68:3,23 69:4 72:3 101:25 112:16 113:20 114:13 115:7,9 116:11 124:23 144:15,18 177:9 185:8

**involvement** 30:13 62:24 69:4, 8

**involves** 13:2

**involving** 6:10 40:21 42:16,19 45:8 56:23 66:2 102:5,6 111:21 146:17 175:1

**irrelevant** 58:6

**issue** 21:19 64:21 82:10,13 85:13 88:7 127:10 128:4 129:14 138:23 139:2 175:16,17 176:14 183:8 184:11 185:8

**issued** 45:14 54:15

**issues** 5:22 8:23 9:2,18 13:15 61:20,24 62:4 66:6,8,10 72:2,23 82:14 102:5,6 158:18 176:12

**item** 76:10 77:17, 19

**items** 78:2

---

**J**

**January** 105:18 107:3 132:11 133:12,16 135:14, 21 199:17

**Jim** 15:8 16:2 23:20 37:25 38:9 126:3 211:18

**job** 8:22 69:22 82:24 83:3,10,13 84:4,5,8 90:4 96:14 100:18 117:2 191:18

**Joe** 28:9 162:12

**JOHNSON** 210:24 211:3,23

**joined** 150:4

**JOYCE** 4:5

**judges** 69:16

**judgment** 66:9 71:5,15,19 72:11

76:5 77:15 89:7,9, 15 93:20,22 95:8 96:6 99:10,13 103:13 168:10 177:17,21 178:2 192:23 193:1

**judgments** 166:5 167:18

**judicial** 40:19,25

**junior** 129:1,8

**juries** 49:11 51:3 53:16 59:13

**jurors** 50:16,21 51:4,6

**jury** 40:20,25 47:3 49:3,5,12 50:5,15, 17,23,25 51:2,12, 13,16,24 52:18,20 73:16,22,25 74:9 75:1,4,15,21,24 76:4,16 78:13,14 183:9

**justified** 49:23 114:16 130:6,20 172:9 185:25 194:3

**justifies** 112:6

**justify** 10:2

---

**K**

**kick** 145:15 146:2

**kind** 15:22 27:6 84:24 133:6 185:19,20 186:9

**kinds** 5:21 11:21 12:8 13:7 20:11 21:17 28:20 29:6 43:6,9 209:4

**Kirsten** 163:21 165:2 166:3 168:7,19

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #016F

LEXITAS

**knew** 69:25 99:9, 11,13 120:7 153:14 172:1 173:25

**knowledge** 63:21 64:5,13,18 126:25 127:2 133:8 141:3 152:17 160:18 164:2 172:16,19, 22

**L**

**labor** 167:3

**Lance** 45:23

**large** 6:9 38:25 39:3,10 172:20 187:16 202:20

**larger** 26:22

**late** 45:24

**laughing** 150:22

**law** 5:6,7,14,25 6:3,24,25 7:4,15 8:17,22 10:1,6,9, 11,12 21:24 23:4, 5,6,18,24 24:14 29:1 32:3,4,23 33:1,2 35:3,10 69:11,14,15,16 93:13 97:6 105:4 106:5,8 107:10 112:16,18,24 113:3 116:17 133:19 139:14 140:8,9,14,16,18 143:2 144:9 145:6,8 146:1,3, 14,15 148:14,17 150:8 152:4,5,10, 13 155:6 165:8,17 166:19 167:18,20 168:16,21 169:16 175:22 179:21 184:14 185:12,19,

20 188:13,14,23

**LAWRENCE** 4:5

**lawsuit** 7:3 10:20 13:2,18 23:5 35:7 52:8 54:14 55:14 56:22 57:16 66:3 67:12 68:4 112:21 147:9 150:12 151:15 160:4 170:23,25 171:1 186:19,22 200:10

**lawsuits** 12:17 35:15 41:17 59:7 65:8,17 162:8

**lawyer** 44:22,23 51:19 62:10 98:11 125:25 150:23

**lawyers** 28:18 29:19 32:23 33:5, 9 34:9 35:3 41:21 112:20 125:18 136:15 142:15 150:20,24 152:21, 25 161:22 172:8, 11 185:5,6 188:25 191:20 193:19

**lay** 38:5

**lead** 126:17,21

**learning** 9:16

**Lee** 126:6 169:1

**left** 5:10 7:4 53:3 94:23

**legal** 8:8,20 9:1,3, 9,21,22 10:2,22 11:7 15:2 19:17 21:4 26:24 30:3,8 43:5 61:19,24 64:14 66:6 72:23 100:25 102:20 147:24 166:12 191:23 192:5 199:19 201:2

**level** 199:12

**levels** 28:18 124:11 125:12

**liability** 15:24 56:24 57:17 127:2,5 128:7,19, 22,23 129:4 138:15 140:10,13 176:19 183:16 184:18

**liberal** 196:9

**life** 75:11,16,22 76:13,17,20 77:2

**limine** 94:10 99:14 177:17,23

**limitations** 104:22 105:11,14,15 118:9 119:5

**limited** 28:16 70:20 191:21,23

**linear** 118:4

**lines** 15:9 70:5

**list** 140:15,18 143:9,22 146:3 148:8,18 149:3 161:23 168:20 188:23

**listed** 19:2,10,25 22:5 34:7 35:10, 16,17 124:13 134:18

**listen** 164:12 169:11

**listing** 136:21

**litigating** 7:10,11

**litigation** 5:11,18, 20 6:10 8:18 14:9, 10 21:17 29:6,7 43:9 45:4 46:20 50:9 104:21 106:6 118:8 119:4 127:6

132:6 146:17,23, 25 147:12,23 150:8,14 152:17 153:1 154:8 166:4,5,8,11,16, 18,19,22 167:14, 17 168:9 172:17 179:23 188:15 191:20 194:21

**litigator** 5:17,23 7:1 150:6,19

**live** 200:19

**lives** 77:20

**LLC's** 56:7,14

**local** 136:9 137:4, 6 144:13

**locales** 21:16

**localities** 27:12 28:12

**locality** 19:16 21:3 23:6

**located** 35:22

**location** 31:6 35:14

**logical** 127:19

**long** 29:14 115:17 124:3 186:8

**longer** 38:3 171:12,14

**looked** 25:3,15 26:2,13 27:23 29:17 38:23 51:13,14,16 74:18 98:24 113:2 114:4 124:6 129:18 147:7 165:6 166:11 189:5

**Los** 142:17

**lose** 72:19

**losing** 98:16

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and licensed where required. Nevada Registration #016F
LEXITAS

**loss** 66:11 71:5,6, 9 72:16 73:2,5 74:13 75:20,22 76:2,12,18 77:1, 14,19 78:8,14,19 80:9,20,25 81:15 82:15,25 83:15 84:1,21 86:4,19 87:7 89:2,19,20 93:17,19 95:10,17 99:10,21 100:8,12 189:12 191:14

**lost** 68:5 94:18 96:11 98:25 99:14 103:12 135:6 159:10 197:8

**lot** 5:20 11:2 30:17,20 35:23 41:15 45:2 72:18 92:23,25 97:15 104:16 105:24 107:25 108:3 126:22 130:11,18, 19 132:23 133:2, 23 134:9 136:2,7, 12,17 144:25 160:19 162:22 176:25 177:2,5 178:8,12 180:14 185:15 187:17,18, 24 188:3,4 198:24 206:11,13

**Louis** 4:1

**loved** 77:21

**lower** 46:18 123:21 124:7

**lunch** 160:24 161:3,8 171:7,10

---

**M**

**Madam** 38:10

**made** 19:21 73:18 74:13 98:13 102:1

130:8 134:11 135:22 145:5,10 147:2 157:2,4 176:15,20 185:18

**main** 45:23

**major** 39:20 105:2 130:1

**majority** 9:6 12:13 90:9 92:7,17,24 93:2 190:9

**make** 10:7 11:21, 25 12:8 19:23 28:1 59:15 62:9 80:8 84:6 110:1, 21 112:4 152:1 176:21 179:6,8 182:4 183:14 191:9 192:1 200:15 204:2

**makes** 12:5

**making** 98:15 117:10 133:22 191:10 201:14

**man** 90:4 96:14 100:18

**manage** 8:18 88:1, 10

**management** 5:12 154:7 170:8

**manages** 150:13

**managing** 125:10 196:22 201:25

**manner** 50:20

**Maranga** 140:19, 24 141:8,23

**marked** 16:13 30:4 47:21 55:24 56:8 74:1 75:1 79:6,22 90:13,18 120:15 141:9 149:6 163:11

**marketing** 26:24

**Marriott** 115:2 155:5,25

**material** 59:21 62:17 63:24 64:2, 3 164:7,20 187:16 202:20

**materials** 41:13,15 55:18 56:1,5 64:10 101:24 162:22 164:10 187:17 209:3,5

**matter** 31:16,17 67:2 76:18 84:12 92:22 156:5 160:16 179:13

**matters** 144:25 157:5 173:4

**Mcdonald** 94:19

**meaning** 8:16 100:20 167:1

**means** 48:14,18, 19,23

**meant** 73:6 200:3

**measured** 52:25

**medical** 63:1

**meet** 46:22

**Meg** 37:11,19 40:10 53:20 61:3 134:25 135:13 171:16 210:12

**Meghan** 138:22 193:10

**members** 66:20 77:21

**memberships** 151:8

**memory** 8:5 158:20

**mention** 117:8 168:15

**mentioned** 22:1 81:1

**merit** 98:5

**meritless** 98:2

**met** 4:25

**method** 50:20

**methodically** 204:1

**Mexico** 29:20 33:1 75:5 106:9,11 144:19 148:21 151:13 152:11

**Michael** 169:1

**Michele** 115:2 155:5,24

**mid** 66:18

**middle** 46:22 123:23

**Midwest** 56:7,14

**million** 40:20 41:2, 6 48:3,5 55:15 56:25 57:5,7,16 58:19 198:22 200:18

**mind** 156:3 186:11 208:22 209:17

**mine** 124:20

**mini** 211:19

**minor** 87:8

**minutes** 104:9 131:20 171:19 187:10

**missed** 186:7

**missing** 45:21 153:17

**Missouri** 4:1,6

888-893-3767
www.lexitaslegal.com
Lexitas Operates in all 50 states and is licensed where required. Nevada Registration #116F.
LEXITAS

**misstatement** 194:5

**misunderstood** 40:18 44:16

**mock** 49:11,12 50:5,14,17,21,23, 25 51:2,3,12,13, 16,20,24 52:20 53:16,24 59:13 73:16,22,25 78:14

**model** 18:15,17 19:3,15 20:2 28:11

**modeled** 18:11

**moment** 41:10 124:11

**money** 66:21 195:2,7,10,13,14, 15 196:8,15 198:20,23 199:2,7 201:5

**months** 105:20 106:17,20,21 107:1 108:15,21 136:16

**Morgenstern** 140:19,24 141:8, 23 143:2,23 147:3,22

**Morgenstern's** 144:3,6

**motion** 10:24 71:5,14,15 72:3,4 73:2 76:5 77:15 78:19 79:1 84:1, 22 86:7 89:7,8,13, 15,21,25 90:3 94:17,19 95:1,16, 18,20 96:14,23 97:3,7 98:1,4,10 99:10,12,21 100:1,12 102:22 103:7,12 107:8,11

129:25 130:5 132:2,6,12,16,25 187:23 192:22 193:1 204:9

**motions** 11:2 66:9 67:16 70:24 72:7, 11,13,18 90:7 92:1,4,7,18,23 93:10,12,13,22 94:4,8,9 95:8,13, 15,23 96:2,3,5 97:13,14,17,22 98:8,16,17,25 99:1,2,14,17 102:24 103:1,11 130:11,13,19 132:24 133:1,2 134:11,12 175:21 176:24,25 177:5, 12,14,16,17,18, 20,21,23 178:1,4, 9,12 180:17 182:25 187:3,6, 11,13,15 188:1,2

**motor** 62:15 113:9

**move** 77:16 88:3 103:24 108:6 168:11

**moved** 108:1,5 194:2

**moving** 95:7 104:17 130:2,4

**Mullins** 179:22

**multimillion-dollar** 42:12,17,19 52:11 54:15,22 59:9

**Musat** 149:21

---

**N**

**named** 114:24

**nature** 14:8 104:20 118:7,15

119:3,10,12,17,20 132:5,12 154:7

**Nau** 41:13 57:14 59:2,17 60:16 133:18 137:14 152:3 153:6,16 154:13 156:10,16, 24 157:23 160:14 184:3 186:18 196:19 201:13 202:5

**Nau's** 57:19 74:18, 20 78:21 155:1 158:6,11 197:6, 13,19 200:4

**nearby** 50:1

**necessarily** 7:11 20:14 25:8 27:5 29:4 46:10 58:6 61:24 75:24 89:14 90:1 96:25 100:7 114:18 129:8 146:19 168:3,4 176:21 179:12

**needed** 134:10 154:12 157:22 184:13 185:20

**needle** 77:16 194:2

**negotiations** 46:6, 17 100:13

**neighbor** 151:12

**neighboring** 40:19,24 148:20 149:2

**neon** 169:10

**net** 201:13

**non-law** 8:17

**non-trucking** 136:11 158:25 159:1

**nonlawyers** 32:23 35:3

**nonresponsive** 168:12

**nonsensical** 185:1

**norm** 126:21,24

**normal** 46:20 115:5 116:16

**note** 21:20 182:18

**noted** 72:10,12

**notes** 55:25 60:7, 8,19,25 61:2

**November** 95:15

**number** 9:15 57:5 79:17,19,25 99:2 103:11 106:20 108:21 112:10 113:19 114:12,19 116:11,14,23 117:13,17,20 119:21 120:4 127:5 130:13 133:1 134:11,12 136:18 167:3,5 180:4,19,21 182:25 183:2,23, 25 184:1 190:1 200:18 201:18 202:18

**numbers** 31:7 51:15,17 77:2

---

**O**

**oath** 55:13 153:6

**object** 22:23 128:13 145:20 186:24 192:1 194:4

**objection** 23:9,19 185:1 190:18 191:25

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #216F
Case 6:22-cv-03086-MDH   Document 107-2   Filed 11/10/23   Page 72 of 83

**objections** 57:9 95:17

**obtaining** 32:2 66:10

**occurred** 13:22 14:19 110:12

**occurring** 186:22

**offer** 52:19

**offered** 155:12

**offers** 46:19

**offices** 142:9

**Oklahoma** 152:13

**one-fifth** 33:11,12, 15

**ongoing** 195:22 201:6

**operate** 191:20

**operated** 15:5

**opinion** 18:10 38:20,21,22 43:1, 11,14,16 45:13 49:10,11 58:2 102:2 103:24 104:16 106:16 108:23 114:2 118:25 119:17 127:12 129:12 146:11 154:8 160:9 183:5 185:21 194:16 195:12,19,20 196:13,14 200:25 201:23 202:3,6 203:7 204:3,22

**opinions** 7:15,19 11:12 14:6,25 15:2,3,9,16,20,23 24:17,18 25:23 26:7,10,12 38:15 41:19 70:19 97:21 100:17 115:16

141:13 142:23 144:8 176:6 194:15 202:22 203:1,9,14,18,19, 25 204:5,12,19,21 205:18 206:23 207:8,25 208:3, 11,15 209:10,24, 25 210:1

**opposed** 126:17

**opposing** 10:16 100:11,16,19 101:1 173:20,21 178:17 179:21 182:5 183:10,14, 25

**opposite** 177:1,3

**orange-ish** 90:25 91:16

**oranges** 28:5

**order** 18:5,10 72:3 94:25 95:16,18 115:15 141:12 145:13 167:13 198:3 202:2 203:9 205:17 209:10,25

**orders** 94:3 95:13, 14

**organized** 5:2

**outcome** 77:15

**overrule** 95:17

---

**P**

**p.m.** 61:12,14 104:11,13 131:22, 24 157:16,18 202:14,16 211:8, 25

**paid** 10:11 196:23 202:1

**pain** 71:20,22,25 72:17 93:20 95:8 99:12 100:1

**panel** 140:25

**paragraph** 19:15 154:10

**Pardon** 8:12

**part** 12:14 38:20 59:4 71:18 72:4,5 76:12 78:16 81:24 82:3 83:23 88:3 89:20 97:3 99:11, 12 100:17 114:12, 20 157:1 161:15 166:16 193:2 205:14

**partial** 71:19 93:20

**participated** 51:20 54:7

**parties** 15:25 92:23

**partner** 5:9

**partners** 127:7

**parts** 103:6

**party** 11:3

**past** 146:16 148:7

**path** 182:5

**pause** 37:22

**pay** 198:3 199:4, 18

**paying** 194:21 195:22 196:24 198:4 201:6,15

**payouts** 57:6

**PDF** 211:19,20

**Peifer** 179:22

**people** 36:2 51:2 64:16 71:9,23 93:21 95:9 100:16

115:6,9 123:21 134:4,6 211:20

**people's** 76:20 77:20

**percent** 33:18 163:22 165:3

**performed** 88:8 121:17

**period** 13:2 85:7 105:25 107:14 136:16 177:9

**periods** 132:20 133:12

**person** 11:7 46:9 60:15 124:13 137:15 149:10 166:17 195:1,5,12

**person's** 75:16

**personal** 5:24 6:3, 4,6,10,24,25 7:3, 14,18 12:18 13:2, 7,13,14,18 14:9 21:17 29:19 35:7, 9,16,17 44:3,24 45:7 51:20 54:7 65:7 69:11 101:15 128:6 136:3 139:10,21 140:3 148:2 159:3,7 162:7 167:2,20 168:5,15 169:6 172:21 173:22 174:10,14,16,20 175:1 179:11 188:25 193:8

**personnel** 105:4, 10,13,15

**pertained** 71:23 140:3

**pertaining** 71:20 82:14,15

**pertains** 172:17

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

**phases** 150:13

**physical** 110:12

**piece** 26:21 29:7

**place** 109:2

**plain** 156:17

**plaintiff** 4:3 18:3,9 45:14 46:9

**Plaintiff's** 56:6,11, 13

**plaintiffs** 46:2 75:22 76:2 136:13 211:19

**plaintiffs'** 92:3 95:15,18,20 99:2 100:20 175:10 177:19 182:22 184:17,18

**play** 121:3

**played** 15:18 125:5

**point** 17:7 38:4 41:8 46:21 53:4 86:11 94:11 98:13,15 105:19 129:11 133:17 134:8 165:25

**policies** 15:4,24, 25

**policy** 7:10,11

**poorly** 23:1

**pop** 73:13 74:24

**portion** 20:1 87:8 103:24 130:1 187:16

**position** 20:16 200:24

**positive** 132:10

**possibly** 85:6

**post-settlement** 10:24

**post-trial** 67:16 70:24

**potential** 43:19 199:3

**potentially** 73:23

**potentials** 52:12 54:23

**potty** 104:2

**practice** 5:14,19 9:5 10:5 27:12 28:12,21 34:18,22 35:2 69:12 90:3 96:15,23 97:3,7, 22 101:3 102:22 103:7 128:24 129:25 130:6 132:2,7,12,16,25 150:6 160:23 179:23 191:19

**practiced** 6:24

**practices** 9:2,17 183:16

**practicing** 44:22 51:19 62:10

**precise** 64:2

**precluded** 106:7

**preliminary** 11:15

**premise** 97:12 98:20

**premises** 129:7

**prep** 17:10

**preparation** 209:2

**prepare** 17:9

**prepared** 121:11 162:12

**preparing** 17:14

**present** 56:25

**presentation** 51:24

**presented** 50:25 146:8 147:1,19

**presenting** 51:2

**pretrial** 66:8

**pretty** 102:10 105:25 156:17 179:4 204:1

**prevailed** 103:15

**prevailing** 103:1

**previously** 139:1

**primarily** 5:17 7:1

**Prime** 33:10 43:19 45:15 53:15 54:12 55:1,5,10 56:8,15, 23 57:15 59:8,23 60:16,22 61:5 72:25 107:10 108:15 112:20 113:4 114:23 117:7 120:7 125:16 134:15 135:14 137:14,15, 25 139:24 140:1, 2,9 141:1,22 143:10,15 144:9 148:7 151:14 152:5 156:5 157:9 168:10 178:21 180:18 185:14 197:21 198:19 199:9 200:11

**Prime's** 95:16,23 109:21 139:8 158:16 199:17 201:24

**print** 91:2,4

**printer** 91:3,5

**prior** 13:10,11

101:22 136:23 137:13,22,24,25 138:3 139:19,22 153:15 173:14

**problem** 30:23 87:5,11,12 130:17 133:5 150:5 187:21

**problematic** 87:21,24

**problems** 16:19

**proceedings** 53:21

**process** 38:4 166:12,13 205:15

**procured** 200:12

**produce** 60:8

**produced** 17:5,11 24:20 55:19 64:10 90:13 141:16 206:9

**professional** 5:5 18:15 45:7 128:6, 18

**project** 84:12 85:16 86:6

**projects** 85:17 87:4,5

**prong** 49:10

**proportionality** 42:22 49:1

**prospect** 195:24, 25

**proven** 150:5

**provide** 18:11

**provided** 62:20 91:20 162:19 207:16 209:7 210:2

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

providing 8:25 15:22 32:5

public 165:7

publicizing 151:1 165:7,18

published 30:8,22

publisher 150:19

pull 30:1,5 47:10, 14 48:4 55:22 56:2 73:12 79:5 91:11 115:24 120:12,19 121:4 140:21 141:6 142:2,20 143:18 148:17 161:1 163:3,7,9 190:7 199:23

pulled 47:16 91:14

pulling 30:17 69:15

punitive 41:2 74:10 176:19 199:4

punitives 49:15

purpose 31:3 37:3 209:23

purposes 26:1

pursued 67:24

pursuing 98:17

put 47:13 50:23 60:24 79:11,15 86:4 88:17 169:9 174:2,3 195:4

putting 64:4

**Q**

qualifications 159:25

qualifier 64:4

qualifying 40:5 119:25

quality 50:20 97:6, 7 136:22 173:19 178:17 183:24

quantified 103:11

quantify 85:20 87:13 99:15 103:10,18

quantifying 84:11 103:17

quantitative 77:3

question 13:9 22:24 23:10,15 24:11 33:23,24 34:1,5 36:8,9,19, 20,22 37:15,18,21 38:3 45:5 48:2,16 52:24 53:9,12,14 54:20 55:3,7 62:8 73:2 76:18,21 78:4 80:16 81:19 85:10 88:5 90:20 92:12,15 95:25 106:3 107:7 109:9 111:1,12,15,16 112:11,13 114:5 127:21,24 128:14 129:13 131:4,8, 10,12,15,16 132:14 133:17 134:14 135:2,7,8 136:3 145:12,18 163:4,6,7 164:12, 13 165:20 168:14 170:18 175:7 176:2 178:15 180:8 183:17 184:22,23 186:10, 13,16 189:15,21, 22,24 190:19,25 191:1,3,17 192:3 194:5,9 199:9 201:22 203:21 205:10,13,18

206:17,18,21 207:7,13 209:19 210:8,9,10

questions 15:8,9 37:3,4,5,7,9 53:6 77:13 88:5,23 109:14 110:23,24 111:3 169:12 187:11 189:11 191:15 205:2,9 206:15,16 207:6, 17,21,22 208:9 209:22,23 210:4, 6,21,25 211:3,5

quote 182:20

**R**

rafted 149:1

rafting 149:1

raise 89:3

raised 66:8

range 12:7 49:13 112:8

ranges 49:13

rate 12:11 21:24 22:22 23:3,18 24:25 28:17 31:12 33:2,5 34:7 35:10, 16,17 42:5,6 101:13 112:7,14, 16 114:2,5,10,18 115:1 124:7 130:7,20 176:23 188:25

rates 20:19 21:2,6, 7,9,12,13,14,15, 21,25 22:7,16 23:23,24 24:9,14 25:2,12,14 26:4, 15,20,21 27:22 28:11,21,23 29:1, 3,5,6,10,18,24

30:11,21,23 31:4, 5,10,13,15,18 32:2,5,6,11,12,15, 22 34:8,18,22 35:23 36:17 37:1 43:5,8,10 50:12 112:19 121:18 123:21 124:15 129:15,17,19 130:3 135:23 136:1,2

ratio 95:24 96:15, 21 99:4 102:25 103:8

re-review 209:2

reach 100:11,15 140:10 146:7 152:3

reached 51:8 152:21 153:11 155:23

reaching 207:8

read 15:6 19:18 20:2,3,16 22:9 24:2 25:10 29:16 38:21 40:13 45:19 46:3 47:8 49:17, 19 50:17 51:12 52:14 53:2 54:19 57:19,20 62:2,16 64:9 66:13 72:1,3 74:20 78:21 103:3,4 107:21 127:25 135:7 153:8 154:18 158:3,4 159:14 160:6 178:6 179:18,19,25 182:12 194:23 197:3 198:7 199:25 200:4

reading 49:18 159:14 201:20 211:9,10

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

**ready** 47:23 91:13 106:23 181:17

**real** 139:15 158:16,22 167:6

**reality** 46:15

**rear** 109:23

**rear-end** 40:21 108:25 109:12 111:6,21

**reasked** 24:11

**reason** 26:13 82:2 85:20 86:5 87:21, 24 88:6 96:13 97:1 98:2 124:4,7 152:14 163:5,24 164:1,5,14 165:13 178:16 194:17

**reasonable** 9:11, 18,25 10:3 11:9, 14,20,21,25 12:11 13:19,20 22:7,8, 17,18,22 35:23 50:12 58:18 61:17 83:5,11 84:8 85:8, 17 86:16 113:19 114:3,8,9,11 116:8 117:3,11 118:11 119:1,6 120:1,3 125:17,24 128:25 130:10,16 132:9 133:9,10, 18,20 134:4 135:13,22 145:14 146:9,10 147:20 151:18 185:21,25 186:13 192:7 193:20,25 194:20 195:25 196:16 201:15 209:9

**reasonableness** 9:1,9,14 12:7 18:1,6,7,24 19:5 26:12 84:6 105:3 113:23 114:5

118:22 119:24 132:15,19 136:6 146:13 149:17 184:9 188:21 195:21 196:25 208:16,17

**reasons** 97:15 98:1 112:6,9 113:17 116:7 130:16 182:5

**recall** 7:13,22,23 8:2,3,6 13:4 17:5 23:22 24:21 25:13 40:4 41:7,9 42:14 44:7,18 45:10 51:22 52:1 54:9 55:11 62:13 68:8, 11 71:14 114:20 117:4 123:22 137:3,8,10 138:19 147:14 152:14 162:5,10 164:25 165:24,25 173:11 177:22 178:6 179:2 180:7 187:8,12,13,14,19 188:1,11 198:12 205:6 208:14

**received** 26:5 141:17 155:13 187:17,18

**receiving** 197:17

**recent** 45:25 154:16 158:1

**recess** 61:13 104:12 131:23 157:17 202:15

**recollection** 44:5 107:20 158:21 177:7

**recommendations** 155:6,24

**recommended**

156:20

**record** 4:13 57:13, 14 61:11,14 80:12 104:11,13 131:22, 24 138:4 139:19 140:2 157:16,18 161:6 194:9 202:14,16 206:25 211:7

**recover** 10:17 66:21,25 76:4

**recoverable** 10:20,23 75:6 78:9

**recovered** 66:12

**recovery** 10:15

**red** 89:4

**reduced** 78:10,12

**refer** 39:3

**referenced** 25:2 145:3

**references** 63:15, 19

**reflect** 175:24,25 183:2 191:13

**reflected** 73:23 130:9

**reflection** 170:16 178:13

**reflects** 27:6 80:3

**Regions** 15:17

**regulations** 62:23 63:17 65:1 101:20,23

**reimbursed** 196:1, 7 199:10 200:11 201:2,9

**reimbursement** 194:22 199:13,21

**relate** 101:21

**related** 8:23 9:2,3 83:15 84:21 105:13 114:18 139:14

**relates** 101:16 127:18 167:19

**relationship** 136:23 137:13,25 138:1,3,5 139:19 144:24 159:20 160:18 161:12 173:14

**relevance** 203:23

**relevant** 18:20 20:24 42:9,10 43:1,11,13 45:18 46:13 58:2,8 92:22 93:1 96:2, 11 97:9 113:22 118:21 119:23 132:14,18 146:2 147:17 151:16 153:25 156:1,2,4 176:11 189:7 195:20 196:3,4 201:7,9 202:21 203:1,6,25 204:12 206:23 209:24

**reliable** 31:17

**relied** 26:3 45:15 59:14,20 141:12 183:23 203:9,14, 19 204:4,19,25 205:6,7,9,17,24 207:8,17,22 209:25

**relies** 184:9

**rely** 14:4,7 40:9 45:12 134:15 141:14,15 184:7 202:2 204:2,3,22 205:3

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F

Case 6:22-cv-03037-MDH   Document 107-2   Filed 11/10/23   Page 76 of 83   LEXITAS

**relying** 45:17 50:11 175:23 176:3,5 184:2

**remember** 13:12 57:18 70:21,23 79:3 162:18,23

**removed** 72:17

**render** 208:11

**rendering** 11:11 25:24 26:6

**repeatedly** 80:8

**repetitive** 193:9

**rephrase** 189:22

**report** 16:9,12,25 17:25 18:22 19:20 21:11,23 22:2,3, 14 23:17,23 24:5, 15,16 25:3,5,8,11, 19,22 26:1,2,6,8, 14,20,21,23 27:8, 10,11,14,22 28:6, 9,15,23 29:9,11, 13,14,16 30:3,8, 16,22 31:8 39:16, 19,22 40:3,11,12 45:20 47:17 50:17 51:16 61:21 66:5 90:6 118:3,6 120:15,23 123:6, 8,18 134:18 135:10,12 145:4 154:2,3,4 155:12, 19 156:24 157:21 160:8,13 161:25 165:11 178:14 182:10,11,13,19, 24 196:21 198:10 200:19 201:21 204:6 205:3,8,11 207:9,23,24,25 208:18 209:3,4

**reporter** 4:7,16 37:23 38:10 103:4

211:13,16

**reports** 18:21 27:2 30:20 51:12,13 63:5,7,8,10

**represent** 6:20 108:14 148:1 152:5

**representation** 111:9 115:4,23 116:1,2 140:22

**represented** 147:25

**representing** 5:20 20:10 70:22 113:4

**reputation** 145:2 161:21 172:8

**requests** 178:21 179:10,16 180:5, 14 181:9 182:7,21 211:17

**required** 37:4 104:21 113:21 114:16 117:15 118:8 119:4,21 120:4 132:5,13,17 161:20 168:9

**requirements** 63:2

**requiring** 101:12

**research** 41:17,18 42:16,18,21,25 43:10 48:25 49:4 50:22 64:22 106:8 144:5,6 146:4 162:2 172:10

**researched** 65:3,7

**RESERVED** 4:9

**resolution** 11:5

**resources** 154:15 158:1 161:20 173:17

**respect** 15:1 40:8 45:13 63:22 64:13 66:5 135:23,25 139:9 172:15 178:4

**respectable** 176:7

**respected** 175:25 176:1

**respectful** 38:1

**respects** 8:18

**respond** 189:18

**responded** 130:19

**respondents** 36:3

**response** 28:7 52:25 57:3 207:17,22 210:6

**Responses** 56:6, 11,13

**responsibilities** 164:21

**responsibility** 205:16

**rest** 178:15

**resulted** 105:24

**resulting** 40:22

**results** 49:13 50:6 73:16,22,25 187:22 204:10

**retain** 11:16 18:4 22:17 105:7 114:8 197:2

**retained** 10:1,6, 10,12 15:3 44:10, 18,23 86:25 105:17 108:18 113:4

**retaining** 45:16 73:20 116:17,25

**retention** 114:17

125:18

**retread** 129:22

**return** 51:6

**returned** 40:20,25

**reversed** 68:6,15 70:2

**review** 13:17 43:2, 4,5 44:19 55:9,20, 21 86:11,12,13,15 103:7 115:20 162:20 164:19 187:6 188:7 191:21,23 200:7

**reviewed** 12:17 26:17 41:14,15 50:24 55:17 78:24 83:7 88:12 91:22 102:20 115:15 118:10 138:12 155:16 162:22 187:14,15,18 189:17,24 190:8 192:5

**reviewing** 11:7 44:24 45:8 187:12 196:19,23 198:2,6 201:14,25

**Reza** 149:5,8 150:4,13

**rhythm** 63:14

**Richard** 115:2 124:12

**Richards** 45:23 178:22 180:5,12, 20 181:1,4 182:21

**Richards'** 183:24

**Rising** 150:18

**risk** 38:18,24 49:22 50:9

**Rismani** 149:5,8 150:4

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

LEXITAS

**role** 15:17 86:10

**room** 181:18

**Roper** 25:1 26:3 27:10 28:9 29:10 31:7 129:12 162:12 163:10 164:3 175:21,23 176:5 189:2

**Roper's** 26:14 29:17 162:23 163:13 164:20 168:8 185:10 209:4

**roughly** 7:2

**routinely** 140:9

**rule** 19:3,14 20:2 28:10,11

**rules** 18:15,18,21 19:3,15 20:2 38:5, 7 62:23 65:1 87:3 101:20,23

**ruling** 94:4 178:4

**S**

**safety** 62:15 201:13

**Sam** 170:2

**San** 5:7,15

**save** 163:14

**school** 5:6

**screen** 30:18 32:14,18 47:13,18 73:13 74:25 79:11,15 88:17 122:1,4,5,21 123:4 163:19

**scroll** 75:9 121:21, 22 143:5

**scrolling** 123:8

**seasoned** 150:6

**securities** 167:3, 16

**security** 166:4

**seek** 76:3 209:8,9

**seeking** 10:15 11:3 209:18

**select** 152:14

**selected** 150:18 161:18,22

**selecting** 43:17

**Selection** 18:23

**send** 125:4 129:1 149:23 150:1 211:12,20

**senior** 149:20

**sense** 28:1 30:25 142:17 192:1

**sentence** 154:6 160:14 179:18 183:7

**separate** 53:21,24 58:23 59:1 75:24 76:9,10 77:23,25 78:1,2

**September** 4:14 94:25

**series** 125:25

**services** 19:17 21:4 26:25 29:2

**set** 18:14 49:15 87:3 114:25 129:6 176:12 204:5 207:9

**sets** 19:15 27:11 152:21

**setting** 19:3 107:8, 11

**settle** 46:25 52:21 99:23 100:4 209:1

**settlement** 11:4 42:23 46:1,6,9,12, 14 99:22 100:13 150:12 180:6 182:7,22

**settlements** 42:13,17 45:25 49:6,7

**settles** 49:2 100:9

**settling** 166:13

**seven-month** 107:14,15

**sexting** 175:17 176:13

**shareholder** 149:20 150:5

**sheet** 90:13,17 99:6 107:5 170:13

**short** 136:15

**shorthand** 4:5,6

**show** 74:4 79:9 80:13 122:4 125:20,23,25

**showed** 49:13 89:16 193:3

**showing** 122:5

**side** 9:5 136:13 181:18 185:12 205:20

**side's** 96:2

**sides** 46:21 90:8

**sign** 116:8 169:10 170:7

**signage** 111:4

**signature** 4:8

**signed** 125:18

**significance** 24:24 25:23,25 27:19

**significantly** 21:15

**signing** 211:10

**signs** 109:14

**similar** 18:17 19:16 21:3 43:8 154:17 158:2

**simple** 88:5 108:24 109:10 110:18 134:15 168:5 203:21

**simply** 72:19 86:6

**single** 150:23

**sir** 15:13 19:14 21:7,23 23:12 25:21 26:6 27:8 31:24 36:8 38:6, 12 39:9 41:16,24 42:15 48:12 53:13 54:6 55:1,21 57:25 58:11 72:21 76:8 78:21 79:7, 15 80:4 81:9,25 82:7,17 85:1 87:10,20 88:2,12, 22 91:7 92:11 94:6 95:21,22 96:13,19 99:23 102:4,16 107:5 111:5 113:25 114:22 115:18 117:1 118:17 120:18,20 122:2 128:18 129:16 134:14,21 135:5 137:12 141:5 142:14 143:8 146:12 147:4 153:5 155:12 161:16,19,25 162:2,19 163:3 164:6,19 165:19

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F

Case 6:22-cv-03037-MDH    Document 107-2    Filed 11/10/23    Page 78 of 83

168:2,23 171:3,10
174:12 175:14
176:12 177:19
180:20 182:3
184:6,11 186:3
188:10 189:17
190:7 191:17,22
192:25 193:3,15
194:8,17 197:5
199:1 200:9
201:20 202:18,24
203:21 204:20
206:11

**sit** 7:21,25 14:4
17:6 44:4,9,10,21
64:12 99:3 113:25
161:4 173:10

**sitting** 116:16
206:8

**situation** 149:16
156:11,12,18

**situations** 5:21
20:12

**six-** 107:15

**size** 105:24

**skill** 161:20 172:7
173:16

**sleep** 62:5,20
63:2,17 64:13,16,
18,21,22 65:4,9,
16,19 66:2
101:14,21 175:16
176:14

**slip** 6:17

**slipped** 6:19

**small** 6:5

**solver** 150:6

**somebody's** 77:2

**sophisticated**
196:21 201:24

**sort** 5:14 9:4 49:16

63:1 65:25 111:6
113:2 127:14
145:15 159:25
170:10 184:16

**sought** 11:19

**sounds** 157:3

**source** 29:23,24
59:21 179:14

**South** 139:15

**speaker** 181:11

**speaking** 13:25
46:16 66:24 67:2
78:5

**specialize** 106:5

**specialized**
174:20,23

**specializing**
173:22

**specialties** 146:17

**specialty** 147:17

**specific** 7:18
14:10 23:24 24:14
26:20 28:11,12
31:5,12 32:12
45:6 87:23 88:9
101:22 119:11
126:8 142:19
167:19 187:15
188:2 190:4,16,
17,23 194:1
205:2,10 206:15
207:7,16,17,22
209:22

**specifically** 9:10
15:17 22:2 23:23
39:3 41:5,16
44:24 45:1 51:11
66:7 68:12,20
105:11 114:24
132:4 157:21
172:17 179:9
187:9,13,19

196:20

**specifics** 62:25
162:23 178:7

**speculation** 133:7

**speech** 183:19

**speeches** 36:13
37:8

**spend** 84:1 86:19
195:3,15 196:9

**spending** 195:1,6,
13

**spent** 17:13 49:24
55:2,5 57:15
78:18 79:1 81:2,
16 83:11 84:11,21
85:5,15,17,18
87:23 88:9 162:15
188:6 191:5,14
192:11 199:7

**spoke** 60:16 174:8

**spoken** 60:12

**spot** 96:24

**spouse** 71:10

**spreadsheet**
162:12,17,24
163:10

**squashed** 109:13

**St** 4:1

**staffing** 128:21

**standard** 4:15
179:4,11,16
191:19

**standpoint** 31:5
114:7

**Star** 150:18

**Stars** 151:5

**start** 5:4,10 16:9
37:21 38:15 48:5
80:24 81:12

133:12 204:7

**started** 8:7,15
13:5 170:20
203:22

**starting** 5:9 48:2
49:1 81:11 94:15,
22 95:6 137:13

**state** 4:23 32:22,
23 75:5 105:21
141:22 142:8,11
148:20 151:12
196:18

**stated** 18:11 33:2
38:22 83:4 102:10
108:23 113:5
120:6

**statement** 16:2
159:6 183:24
200:15,16 202:24

**states** 18:16 28:19
29:20 65:4 106:12
142:14

**statewide** 141:1,2,
23 142:4

**stayed** 5:8

**Steve** 47:8,20 52:1
60:7 133:18
138:4,8,14,21
139:5 153:11,18
155:3,4,13,17
158:23 159:20,22
160:1 199:25

**Steve's** 159:18

**stipulate** 169:3

**STIPULATED** 4:2

**stop** 135:3 169:3
177:19

**straight** 117:24
118:1 201:21

**straightforward**
108:25 109:3,7,8

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #016F.
LEXITAS

110:1,4,7,9,16

**strategy** 150:15

**strike** 33:23,24 34:1 88:3 111:15, 16 168:11

**strong** 196:25

**structure** 18:21

**stuck** 191:10

**stuff** 53:3 73:11 104:16 139:15 207:16

**subject** 57:9 210:11

**subjective** 48:10, 11,14,18,23

**subset** 49:10

**substance** 137:17

**substantial** 68:5 180:4,17 199:2

**substantive** 13:11 63:21 64:5,18 93:13 94:7

**substantively** 78:4 93:11 94:7 177:12,13 178:10 192:19

**subtracts** 7:8

**success** 98:17

**successful** 66:10 102:25 154:16 158:1

**sudden** 58:20

**suddenly** 47:17

**suffering** 71:20, 23,25 72:17 93:21 95:9 99:12 100:1

**suggest** 98:19

**suggestive** 98:17

**suing** 66:21

**summarized** 165:13

**summary** 66:9,11 71:5,15,19 72:11 76:5 77:15 89:7,8, 15 93:20,22 95:8 96:5 99:10,13 103:12 168:8 177:17,21 178:1 192:23 193:1

**super** 150:19,23

**supplemental** 26:5

**supplied** 146:14

**support** 204:12

**supports** 185:11

**suppose** 100:22

**supposed** 155:7

**surprised** 193:4

**suspect** 43:7 97:6 153:22 165:10 174:15

**sways** 52:20

**swear** 4:16

**sworn** 4:19

---

**T**

**tabulated** 78:23 81:16

**tactics** 185:8

**taking** 53:8 61:2,4 66:2 126:10,13, 16,20,21 127:7 154:14 157:24 160:25 166:12 186:18

**talk** 7:9 27:4 49:9 64:1 66:7 71:4

90:3 101:5 118:14 136:5 137:19 139:18 140:7 172:7 175:5 189:9 204:15

**talked** 60:2 116:14,15 117:12, 14 132:1,2,3,12 136:23 137:15,17 156:17,18 159:22 160:2 173:15,16, 17 204:18

**talking** 29:7 36:6 37:24 46:17 61:2 68:16 80:15 81:4, 6 93:11,12 96:5,7 110:16,17 121:1 126:24 128:1 134:5 145:4 152:23 158:22 163:18 164:8 167:24 175:6 185:7 187:23 203:12,13,15 204:8,9

**talks** 25:11 28:6 157:21 160:21 182:24

**TAM** 150:4

**tangential** 13:14

**task** 85:5 87:23 88:9 190:4,24 192:11

**tasks** 190:17 191:6

**telling** 72:18 97:1, 20,25 117:6 205:5

**tells** 166:21

**ten** 12:22,23 13:24 14:2,21,22

**tend** 18:20 24:10

**tendency** 192:15

195:2

**term** 166:8

**terminated** 137:6

**terminology** 171:5

**terms** 7:11 9:17 12:19 29:17 43:8 45:15 72:22 75:5 106:4 128:6 129:13 145:25 168:3 172:16 187:22 198:17 199:6,7

**testified** 4:20 52:2 54:13 101:17 138:14 139:11 153:6 165:20 172:13 205:24 208:13,15 210:11

**testifies** 202:5

**testify** 11:17 183:9 188:5 205:25

**testimony** 25:21 39:23 53:15 54:18 94:19 101:11 114:1 138:9,11 152:2 154:21 155:14 157:12 158:12 160:20 161:1,7 172:10 194:6,14 197:19 198:18 200:1,4

**texting** 175:17 176:13

**thick** 24:21

**thing** 25:14 28:4 59:19 74:18 100:6,10 124:2 125:1,2 132:22 138:8,12 165:16 205:20

**things** 5:22 8:10, 19 12:1 39:21

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.

LEXITAS

49:16 50:10,13 59:18 61:1 63:22 64:6 73:15 77:23 100:5 112:2 113:24 125:10 129:13 147:6 149:24 151:22 175:12 176:16 178:16 180:7 184:7,16 185:4 186:18 190:16 203:5,22

**thinks** 48:19,22

**thought** 34:25 44:16 58:13 89:6 118:5 135:6 156:21 164:8 198:19 199:21 200:3 204:1,20

**thousand** 116:9 193:18

**three-week** 123:22

**ties** 201:12

**tight** 105:20 106:21,22 107:19

**time** 4:14,15 5:2 6:23 8:24 9:23 10:6,9 17:1,10,20 37:24 43:6 58:16 79:21 80:25 81:1, 14 83:11,14,25 84:11,14,18,21 85:5,15,17,18 86:18,21 87:23 88:9 89:19 98:8 104:21 105:4,11, 13,15 106:1,6 107:15,16,19,23 115:17 118:9 119:4 121:22 126:4 130:14 132:20 133:11,17 136:16,17 157:5 158:19 162:15

177:8 185:16 188:6 190:4,23 191:5,8,9,14 192:10 200:12 204:9 205:5

**timed** 189:25

**timeframe** 105:20 106:21,22,24

**timekeepers** 162:4,7,10 173:5, 6,7

**timekeepers'** 165:22

**times** 30:17,20 33:9 34:6 124:12, 15 202:19

**tiny** 50:18

**tires** 145:15 146:2

**title** 35:1 56:16

**today** 7:16,19,21, 25 14:4,6 17:6,11 27:20 37:3 44:4, 10,21 64:12 83:10,13,20 99:3 113:25 141:13 203:10 204:18 208:6,7,9,13 210:2,5

**today's** 4:14 186:2

**told** 41:7 59:2,19 60:4,20 87:19 117:2 152:3 186:19 189:11 203:24 204:24 205:1,7

**top** 33:9 34:21 101:13 112:8 162:13 163:21 168:20 169:21 170:2 193:19

**topics** 167:10

**total** 57:6 83:16 85:15 191:12

**totaled** 84:20

**touch** 46:14

**TPX** 211:20,21

**track** 17:16 139:19 140:2 158:19

**traffic** 108:24 109:11 110:18

**train** 8:19 135:6

**training** 62:19,23

**trainings** 63:17

**transaction** 158:17

**transactional** 5:16 166:5,22 167:17, 22

**transcribed** 4:7

**transcript** 211:16

**transnational** 167:22

**transportation** 150:8 168:21 169:7

**Treece** 149:20

**tremendous** 127:4

**trends** 26:24 28:7 30:3,8 43:2,5

**trial** 6:4,12 10:23 11:5 51:21 53:24 67:15 68:6,15 69:2,9,12 70:14 105:19 106:18,23 107:8,11,21 108:2,6 125:5,25 136:16,17 150:13 173:4 209:1,2

**trigger** 208:10

**truck** 40:22 68:3 109:22 110:25 112:1

**trucking** 7:22 14:13 23:7 41:2 42:12,16,19 43:3, 5,7,10,23,25 44:6, 12,20,25 45:2,8, 25 57:16 65:12,16 66:1 70:5,20 101:16,21 106:6 111:20 127:2,5 128:7,19,22,23 129:4 138:15 139:1 140:10,13 143:13 146:17,23, 25 147:12,23,25 148:1 150:7 151:9 153:1 162:4 167:2 172:17,20,24 183:16 184:18 185:15,17 188:15 191:20

**trucks** 109:13 175:4,6

**true** 23:18 35:7 39:9,11 45:9 46:6, 19,23 47:1 49:3 50:12 52:22 59:9 62:5 64:7 67:3,4 69:12 70:5 71:25 86:16 87:23 88:9, 11,14,15,25 89:1, 4,25 90:10 91:16, 23 92:1,4,12,17 93:21 97:4 98:10 99:19 101:16 102:11,13,17 103:2,9,16 108:15 112:17 113:20 114:13 115:12 116:12 118:12,21 124:8 128:19,20, 22 129:5 139:21 140:5 144:10 145:13 152:6,22

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F

155:14 160:10 165:23 172:12,18 174:10 188:8,16, 25 189:14 190:1, 5,10,17 192:7,11, 15,21 193:8,13 194:3 195:3,16 196:6,10 200:1,5 201:3,15

**trust** 144:25

**truth** 186:21

**turned** 16:18

**turning** 109:15 136:13

**two-fold** 200:25

**two-minute** 197:8

**type** 84:23

**types** 5:18 35:20 65:20 67:7 101:25 102:3 113:6 184:7 188:15

**typewriting** 4:8

**typical** 20:8 185:19

**typically** 9:14 10:11 11:14 18:16 20:4,8 21:16 46:17,24 48:7 108:2 115:6,7

## U

**uh-huh** 20:7 35:1 90:9 95:4 158:9 162:1 169:18 170:3

**ultimate** 49:6 132:15 157:2,3

**ultimately** 11:12 43:18 75:21 108:10 144:17,21 152:15 154:14

156:14,22,24 157:24 159:18 160:15 180:17 196:8,24

**underlying** 38:18, 24 49:23 50:9 186:22 188:9

**understand** 10:7,8 13:8 20:17 27:23 28:24 29:10 37:12 39:22 47:7 48:16 57:12 66:16 69:19,20,25 78:3 81:22 86:10 109:9,11 110:3 114:22 115:3 120:10 127:9,11, 21,24 129:15 137:22 138:13,16 139:11,16 141:2 143:16 145:17 153:6,10 154:20 155:4,9 158:15 167:13 183:5 189:15,20 192:2 193:15 200:10,13

**understanding** 14:8 27:1 29:23 31:3 38:22 64:15 68:14,22 69:7 71:8 76:23 94:2 101:22 112:6,22 123:16 137:24 144:16 152:2,10 156:7,8,10 159:17 161:10,17 175:15 185:9 198:21,25 199:3

**understood** 34:14 66:22 69:24 70:18 71:22 140:8 165:9

**undertaken** 105:1 117:10

**unfair** 167:4

**unique** 67:6,8

**United** 65:4

**unopposed** 94:18 95:1

**unquote** 182:20

**unreasonable** 12:3 58:22,25 85:19 185:14

**unusual** 89:9,13, 14

**upper** 46:2 182:8, 22,23

**UPS** 143:9

**utilize** 7:14

## V

**valid** 36:24 84:22

**vehicle** 62:11 65:8 109:23 113:10

**vehicles** 110:13

**venue** 46:1

**verbatim** 61:1

**verdict** 40:20,24 41:1 42:22 47:4 52:11 54:22 68:15 70:2

**verdicts** 38:25 39:4,11 40:1 42:12,17,20 45:25 50:1 51:7 59:9,11

**versus** 23:24 42:23 49:2,5 59:2 77:1 80:21

**vetted** 146:16 160:2

**video** 51:25

**view** 58:17 101:2 107:19 136:20

**viewed** 58:16,17

**volume** 117:9,14

## W

**wait** 36:7 94:15 109:5 118:18 155:2 170:3 180:25 194:13

**walk** 5:4 17:23 22:3 26:18 181:18

**wanted** 26:25 29:22 133:1 197:25

**warm** 16:16

**waste** 161:6,8

**wasting** 126:4

**watched** 51:24

**ways** 20:2 97:21

**website** 141:9 143:1,2 147:5,7,9 149:5 164:4 165:6

**well-positioned** 133:3

**well-versed** 135:12

**Werner** 143:9

**Western** 144:2

**whatsoever** 39:25 162:3 193:7

**Whoa** 97:18

**win** 72:19 76:18 94:17 97:16,23 98:5,9 176:23

**win/loss** 95:24 96:15,21 99:4 102:25 103:8

**window** 107:15

**winning** 70:23

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #216F.
**LEXITAS**

72:13 73:5 75:20 77:14 99:21

**withdraw** 94:18 95:1 154:12 157:23

**withdrawing** 131:9,10,11

**withdrew** 108:19

**won** 71:15,18 72:7 73:2 86:7 93:14, 16,17,19,20 94:8, 10 96:4,10,22 97:13 98:25 99:9, 11,13,17 103:11 192:22 193:2

**wondering** 27:18

**word** 108:17 110:4

**words** 78:3 173:25 179:19

**work** 5:7,16 8:25 10:18 12:14 13:18,20 16:22 22:7,16 27:7 50:12 51:9 54:10 59:1,4,5,6 61:17 68:12,20 70:18,19 82:16,22 84:24 85:6,19 86:8,16 88:8 92:25 104:20,25 105:9, 10,12,25 106:4,9 107:25 108:3 110:2,5 113:21 114:16 117:9,15 118:8 119:3,10, 12,17,20 121:16 125:19 132:5 133:10 136:3 137:1,2 153:15 161:21,22 162:11 163:22 165:3 166:23 170:5 174:20,24 183:13 189:11 192:20

194:1 208:19,22

**worked** 62:11 136:10 144:20 157:4 158:23 172:18 173:7 174:23

**working** 14:5 23:7 67:11 105:5 106:7 112:20,25 142:10, 13,15,17 161:3 172:24

**works** 37:8

**world** 64:14 133:7

**Worst** 156:12

**worth** 61:5 76:17 89:19 187:10

**wrap** 101:10 194:10

**writing** 48:5 199:11

**wrong** 12:4 24:1 28:13 79:7 86:17 92:20 113:7 130:21,24,25 131:3,6,12 152:8 178:2 190:20

**wrongful** 7:25 14:17 67:3,11,17, 20,21 75:6 102:10,14,19,20

---

### Y

**years** 6:21,22 7:2, 6 25:15,16 30:12, 13 164:9 170:12, 17

**yellow** 91:1,16 92:3

**young** 66:17

---

### Z

**zillion** 52:19,21

**zoom** 122:7,19

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required. Nevada Registration #116F.
**LEXITAS**