IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| NEW PRIME, INC.,<br><br>        Prime,<br>v.<br><br>MCGRIFF INSURANCE SERVICES, INC., as successor in interest to REGIONS INSURANCE, INC.,<br><br>and<br><br>AMWINS BROKERAGE OF THE MIDWEST, LLC,<br><br>        Defendants. | Case No. 6:22-cv-03037-S-MDH |

**DEFENDANT AMWINS BROKERAGE OF THE MIDWEST, LLC'S SUGGESTIONS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Comes now AmWins Brokerage of the Midwest, LLC ("AmWins"), by and through its attorneys and pursuant to Rule 56.01 of the Federal Rules of Civil Procedure does hereby set forth to the Court its Suggestions in Support of its Motion for Summary Judgment.

# TABLE OF CONTENTS

Table of Contents…………………………………………………………………………………..i

Table of Authorities……………………………………………………………………………….ii

    I.      Background……………………………………………………………………..1

    II.     Statement of Uncontroverted Material Facts………………………………………2

    III.    Standard of Review……………………………………………………………..5

    IV.    Argument……………………………………………………………………….6

        A. AmWins Did Not Owe Prime a Duty to Advise………………………………6

            i. AmWins Did not Have an Extended Agency Agreement with Prime….7

            ii. AmWins Did Not have a Special Relationship with Prime…………….8

        B. AmWins Did not Owe Prime a Legal Duty to Explain the Terms of The Insurance Policies……………………………………………………………….10

        C. Boxwood's Advice as a Matter of Law is Not the Proximate Cause of Prime's Purported Damages……………………………………………………………..11

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Pages:**

*Born v. Medico Life Ins. Co.*, 428 N.W.2d 585, 589 (Minn. Ct. App. 1988)                                9

*Busey Truck Equip., Inc. v. Am. Family Mut. Ins. Co.*, 299 S.W.3d 735, 739
(Mo.App.2009)                                                                                            6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552–53,
91 L. Ed. 2d 265 (1986)                                                                                  5

*Emerson Elec. Co. v. Marsh & McLennan Companies*, 362 S.W.3d 7, 12–13 (Mo. 2012)                      6,7,8

*Farmers Ins. Co., Inc. v. McCarthy*, 871 S.W.2d 82, 85–87 (Mo.App.1994)                                 7,9

*I Square Management, LLC v. McGriff Insurance Services, Inc.*, 52 F.4th 1028, 1033
(8th Cir. 2022)                                                                                          9

*Jenkad Enters., Inc. v. Transp. Ins. Co.*, 18 S.W.3d 34, 38 (Mo.App. 2000)                             10

*Jones v. Kennedy*, 108 S.W.3d 203, 208 (Mo.App.2003                                                     6

*Kap–Pel Fabrics, Inc. v. R.B. Jones & Sons, Inc.*, 402 S.W.2d 49, 53 (Mo.App.1966)                    6,10

*Manzella v. Gilbert–Magill Co.*, 965 S.W.2d 221, 226–27 (Mo.App.1998)                                 6,7,8

*Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo. banc 1993)                                      6

*McCormack Baron Management Services, Inc. v. American Guarantee & Liability Ins. Co.*,                 11
989 S.W.2d 168, 170 (Mo.banc 1999)

*National Farmers Union Standard Ins. Co. v. Souris River Telephone Mut. Aid Co-op*, 75 F.3d
1268, 1273 (8th Cir. 1996)                                                                               9

*Parr v. Breeden*, 489 S.W.3d 774, 778 (Mo. banc 2016)                                                   6

*Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 392                                 11
(Mo.App. E.D. 2007)

*State Auto Property & Casualty Insurance Company v. Boardwalk Apartments*, L.C.,                       10
572 F.3d 511, 515 (8th Cir. 2009)

*Wilmering v. Lexington Insurance Company*, 678 S.W.2d 865, 872 (Mo.App. E.D. 1984)   10

*Zeff Dist. Co. v. Aetna Cas. & Surety Co.*, 389 S.W.2d 789 (Mo. 1965)   8

**<u>Rules</u>:**

Fed. Rule 56(c)   5

**<u>Secondary Sources</u>**

13 John A. Appleman & Jean Appelman, Insurance Law and Practice,   11
section 4684 (rev.vol.1976)

**BACKGROUND**

Plaintiff New Prime, Inc. ("Prime") has filed a three-count First Amended Complaint against McGriff Insurance Services, Inc. as successor in interest to Regions Insurance, Inc. ("Regions") and AmWins as follows: Negligence (Count I), Negligence – Special Relationship (Count II), and Breach of Fiduciary Duty (Count III). Each of the three counts are supported by the following allegations of negligence:

(a) Failing to analyze and assess Prime's existing coverages;

(b) Failing to explain the options for coverage of known risks of Prime, including the risk of trucking accidents;

(c) Failing to explain the coverage Defendants obtained, including how the policies in the complex insurance stack work together in the event of an occurrence;

(d) Failing to identify the gap in coverage created by the way the policies placed by Defendants worked together and with Prime's existing coverage;

(e) Failing to prevent the coverage gap;

(f) Failing to identify the change in Defense Obligations under the 2015 Lexington Policy;

(g) Failing to understand the change in the defense Obligations under the 2015 Lexington Policy; and

(h) Counseling Prime to continue to incur and pay to defend the Herrera Suit even after Prime had satisfied its obligations under the SIR and ACD.

However, the problem with seven of the eight stated bases of negligence, is that they are premised on the assumption of a legal duty to advise in some form or fashion. Such a duty does not exist in this case. Moreover, the final allegation of negligence occurred *after* Prime's purported

1

damages had already been incurred and cannot legally be the proximate cause of Plaintiff's said damages. Accordingly, AmWins' Motion for Summary Judgment ensues.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1. Prime is a multi-billion-dollar company providing refrigerated, flatbed, tanker, and intermodal trucking services throughout North America. See Exhibit A, First Amended Complaint ("FAC"), ¶ 1; see Exhibit B, Hoedl Deposition (03/27/23), 22:22-23:1.

2. Regions is a retail insurance broker. See id., ¶ 2.

3. AmWins is a wholesale insurance broker. See id., ¶ 3. See Exhibit H, Brejcha Affidavit.

4. Prime, like most large companies, had a number of primary policies, excess policies, umbrella policies, and self-insured retentions ("SIR") for various risks. *See id.,* ¶ 8.

5. Ultimately, Prime's CFO, Dean Hoedl, was responsible for the "decision on which insurance policy to go with or not go with." *See id.,* 7:25-8:4; 109:1-9.

6. Mr. Hoedl expected the auto excess and umbrella program to simply be renewed with the exception of potential changes to rates and deductibles. See id. 126:7-18.

7. Prime's philosophy with respect to insurance was to have competitive brokering in order to get the best price from its brokers and with its own risk manager reading the policies, understanding defense costs obligations and understanding when each layer of insurance was triggered. See id. 16:5 to 17:18, 21:8 to 22:3, 46:23 to 47:14, 52:18 to 52:22, 53:18 to 55:11, 56:10 to 56:21, 59:10 to 62:2, 128:24 to 129:24, 130:23 to 132:5.

8. AmWins did not enter into an agreement with Prime to assess Prime's existing coverages or to advise it of any potential shortcomings or deficiencies of its previous insurance program, to assess Prime's risk management department or trucking accident risks, to advise Prime

2

of any potential exposures, nor to explain to Prime the terms of the policies it was purchasing. See Exhibit H, Brejcha Affidavit.

9. Prime did not pay AmWins any extra consideration to perform these alleged services. Rather, AmWins was solely paid by commission off the insurance premiums. See id.

10. Regions and AmWins procured Prime's excess and umbrella policies for Prime's trucking beginning in 2013 and continued to procure such policies beyond December 2015. See Exhibit A, FAC, ¶ 24.

11. Another insurance broker, Cottingham & Butler, procured trucking policies from RLI Insurance Company (the "RLI Policy") that sat below Prime's excess and umbrella policies during time periods relevant to this action. See id., ¶ 27; see Exhibit D, Owen Deposition (03/28/23), 39:12-15.

12. The RLI Policy provided a $2,000,000 per occurrence limit that sat above a $3,000,000 SIR, and it also included an annual $2,500,000 aggregate corridor deductible ("ACD"). See Exhibit A, FAC, ¶¶ 28-30

13. AmWins, as the wholesale insurance broker, worked for Regions to procure the insurance requested of it. See Exhibit H, Brejcha Affidavit.

14. A policy from Lexington Insurance Company was procured with a May 1, 2014, to May 1, 2015, policy period that provided a $5,000,000 limit excess of the RLI Policy ("2014 Lexington Policy"). See Exhibit A, FAC, ¶¶ 37-39.

15. At the very end of the renewal process for the 2015 policy year, Prime requested Regions and AmWins to include coverage for a daycare facility changing the policy to a general liability form, and Lexington reluctantly agreed. See Exhibit G, Brejcha Deposition (02/11/23), 125:1-127:18.

3

Case 6:22-cv-03037-MDH   Document 109   Filed 11/10/23   Page 7 of 17

16. A policy from Lexington Insurance Company was procured with a May 1, 2015, to May 1, 2016, policy period that provided a $5,000,000 limit excess of the RLI Policy ("2015 Lexington Policy"). Exhibit A, FAC, ¶¶ 43-44.

17. An umbrella policy from National Union Fire Insurance Company of Pittsburgh, PA was procured with a May 1, 2014, to May 1, 2015, policy period that provided a $25,000,000 limit that sat above the 2014 Lexington Policy ("2014 National Union Policy"). See id., ¶¶ 49, 51.

18. An umbrella policy from National Union Fire Insurance Company of Pittsburgh, PA was procured with a May 1, 2015, to May 1, 2016, policy period that provided a $25,000,000 limit that sat above the 2015 Lexington Policy ("2015 National Union Policy") (collectively both the 2014 and 2015 National Union Policies are referred to as the "National Union Policy"). See id., ¶¶ 50-51.

19. In or around February 2015, just months before placing the 2015 policies, Prime's Risk Manager fired Regions and AmWins. See Exhibit B, Hoedl Deposition (03/27/23), 147:21-24, See Exhibit E, Hoedl Deposition Exhibit 19, Email from Mr. Welbourn to Ms. Mertz, Mr. Hoedl, and Steve Crawford, dated February 18, 2015.

20. Approximately one month later and just six weeks before the policies renewed on May 1, 2015, Prime's Risk Manager reversed course, and she asked Regions and AmWins to renew the 2015 Lexington Policy and the 2015 National Union Policy. See Exhibit F, Email from Ms. Mertz to Mr. Welbourn and Mr. Larocca, March 18, 2015.

21. Prime was sued in New Mexico for negligence arising from a double fatality auto accident that occurred in December 2015 (the "Herrera Suit"). See Exhibit A, FAC, ¶¶ 1, 69.

22. Prime alleges it spent more than $9,900,000 defending the Herrera Suit, up until September 2017, when Lexington finally assumed the defense and after Prime had already incurred its claimed damages in this lawsuit. See id., ¶¶ 56-64, 72, 79-80, 82, 83, 86-88.

23. It was not until after Prime had sustained its purported damages in this case when Pierre Dugan, a claims consultant from the Boxwood Group ("Boxwood") who came into assist Prime at the request of AmWins, recommended that Prime pay its previously incurred expenses and seek reimbursement from Lexington, as there was no other choice at that point. See Exhibit I, Bordenave Deposition (10/06/23), 182:4-183:5; see Exhibit J, Dugan Deposition (08/18/23), 5:13-7:6, 32:5-35:24).

## **STANDARD OF REVIEW**

Under Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552–53, 91 L. Ed. 2d 265 (1986).

"The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. A party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Id*. at 323. So long as whatever is before the Court demonstrates that the standard for summary judgment

as set forth in Rule 56.01(c) has been satisfied, summary judgment should be granted. *Id.* The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Id.* at 324-34.

## ARGUMENT

### I. AmWins Did Not Owe Prime a Duty to Advise

"In any action for negligence, the Prime must establish that (1) the defendant had a duty to the plaintiff; (2) the defendant failed to perform that duty; and (3) the defendant's breach was the proximate cause of the plaintiff's injury." *Parr v. Breeden*, 489 S.W.3d 774, 778 (Mo. banc 2016) citing *Martin v. City of Washington*, 848 S.W.2d 487, 493 (Mo. banc 1993).

A broker, as an agent of the insured, is a fiduciary with respect to the matters within the scope of its agency. *Emerson Elec. Co. v. Marsh & McLennan Companies*, 362 S.W.3d 7, 12–13 (Mo. 2012). The scope of the agency normally is limited to procuring the insurance requested by the insured. *Id.* at 13; citing *Busey Truck Equip., Inc. v. Am. Family Mut. Ins. Co.*, 299 S.W.3d 735, 739 (Mo.App.2009); *Kap–Pel Fabrics, Inc. v. R.B. Jones & Sons, Inc.*, 402 S.W.2d 49, 53 (Mo.App.1966). If a broker is asked to procure specific insurance but fails to do so or fails to inform the insured that the delivered policy is not the one actually requested so that the insured can make a knowledgeable decision whether to accept the policy or pursue other insurance, the broker has breached its fiduciary duty to exercise reasonable care, skill and diligence in procuring insurance. *Id.*

But brokers do not have a duty to advise the insured on its insurance needs or on the availability of particular coverage, unless the broker specifically agrees to do so. *Id.* citing *Jones v. Kennedy*, 108 S.W.3d 203, 208 (Mo.App.2003); *Manzella v. Gilbert–Magill Co.*, 965 S.W.2d

221, 226–27 (Mo.App.1998); *Farmers Ins. Co., Inc. v. McCarthy*, 871 S.W.2d 82, 85–87 (Mo.App.1994).

To instill such a duty upon a broker would thus remove any burden from the insured to take care of its own financial needs. *Manzella v. Gilbert-Magill Co*., 965 S.W.2d 221, 226 (Mo.App. W.D. 1998). It would effectively transform insurance brokers into financial counselors and guardians. *Id*. Rather, it should be the insured informing the broker of what coverage is necessary because the insured knows its assets and abilities to pay better than an insurance broker. *Id*. It is up to the insured to take care of its own financial needs and expectations before entering the marketplace to procure insurance coverage. *Id*. In order to advise as to the appropriate insurance, a broker would have to conduct an exhaustive analysis of the insured's financial position and business. *Id*. at 227. These are factors that an insured is much better left to determine. *Id*.

Moreover, brokers should not be held liable for failing to inform insureds of every available insurance option. *Id*. at 226. Insureds "should not be allowed to circumvent the intellectual gamble of a decision to purchase insurance by claiming that they would have purchased certain coverage if offered." *Id*.

To impose a duty to advise on a broker would open the floodgates to suits against brokers for failing to advise or inform insureds about an infinite number of possibilities. *Id*. at 227. The duty of a broker would become nearly unlimited. *Id*.

With all of that said, Missouri has acknowledged the possibility of an expanded or heightened duty of care if there is in fact an extended agency agreement in play between the broker and the insured or if there is a special relationship existing between the broker and the insured. See *Emerson*, 362 S.W.3d at 19-20; see *Manzella*, 965 S.W.2d at 227.

### A. AmWins Did Not Have an Extended Agency Agreement with Prime

One of the ways an insurance broker might owe a greater duty to advise its customer is through an expanded agency agreement. *Manzella*, at 227-28. Such an agency agreement exists when the broker holds himself out as an insurance specialist, consultant or counselor to the insured *and* is receiving compensation for such consultation and advice *apart* from premiums paid by the insured. *Id*. at 228.

Here, no such agreement existed between Prime and AmWins. AmWins is a wholesale insurance broker that worked for Regions. See Statement of Uncontroverted Material Fact ("SOF") ¶¶ 3, 13. Its job was to procure the insurance requested of it by Regions. See SOF ¶13. AmWins never entered into an agreement with Prime to assess Prime's existing coverages or to advise it of any potential shortcomings or deficiencies of its previous insurance program. See SOF ¶8. It never entered into an agreement with Prime to assess Prime's risk management department or trucking accident risks. See id. It never entered into an agreement with Prime to advise it of any potential gaps or exposures. See id. It never entered into an agreement with Prime to explain to Prime the terms of the policies it was purchasing. See Id. Moreover, AmWins received no extra consideration beyond what it received from commission off of the insurance premiums. See SOF ¶9. Simply put, it had no extended agreement for consideration to advise Prime of its insurance needs or exposures. As such, no such legal duty exists under this exception.

**B. AmWins Did Not Have a Special Relationship with Prime**

Missouri courts have indicated that a long-term relationship between a broker and an insured during which the insured comes to rely on the broker for specific undertakings may give rise to a special relationship. *Emerson*, 362 S.W.3d at 20; *Zeff Dist. Co. v. Aetna Cas. & Surety Co*., 389 S.W.2d 789 (Mo. 1965). However, the duty to advise depends on the relationship of the parties, specific requests made by the insured and the professional judgment of the broker.

8

*National Farmers Union Standard Ins. Co. v. Souris River Telephone Mut. Aid Co-op*, 75 F.3d 1268, 1273 (8th Cir. 1996) citing *Born v. Medico Life Ins. Co*., 428 N.W.2d 585, 589 (Minn. Ct. App. 1988).

It is not unusual for a broker interested in obtaining new business to promote its expertise to a potential client who then relies on those promotions to make insurance decisions. *I Square Management, LLC v. McGriff Insurance Services, Inc*., 52 F.4th 1028, 1033 (8th Cir. 2022) (interpreting Arkansas case law). This alone does not create a special relationship. *Id*. Circumstances surrounding the commencement of the parties' relationship are insufficient to demonstrate a special relationship. *Id*. Rather, a special relationship exists when there is a long established and ongoing relationship of entrustment over a period of time between the broker and the insured. *Id*.

Here, no such relationship existed between AmWins and Prime. AmWins was the wholesale broker, working for Regions, the retail broker. See SOF ¶¶2-3,13. It procured the insurance requested of it by Regions. See SOF ¶13. It had only worked as said wholesale broker for a period of two years up through the placement of the 2015 coverages. See SOF ¶¶10, 13-20. During that time, the expectation was to renew the auto liability program already in place with the addition of adding a general liability component to the Lexington policy to include a daycare facility. See SOF ¶¶6, 15. The environment was not one of a trusted advisor-advisee relationship but rather an atmosphere driven by competitive pricing and a risk manager who fired Regions and AmWins for a brief period of time shortly before the 2015 renewal. See SOF ¶¶7, 19-20. AmWins did not undertake to examine Prime's previous insurance program for shortcomings or deficiencies or to assess Prime's Risk Manager's role and responsibilities. See SOF ¶8. AmWins did not undertake to tell Prime's Risk Manager on how to carry out her job. Instead, Prime expected its

9

own risk manager to serve in the role of the advisor having the requisite knowledge of its insurance program and policies that were ordered and procured. See SOF ¶7. Accordingly, the duty to advise did not arise due to any special relationship between Prime and AmWins.

## II. AmWins Did Not Owe Prime a Legal Duty to Explain the Terms of The Insurance Policies

Separate and apart from the allegations of what Prime should have gotten, Prime alleges that AmWins was negligent in advising it of the policies procured. In other words, Prime asserts that AmWins should have explained the terms and conditions of the 2015 policies. However, no such duty exists.

In Missouri, an insured has a duty to promptly examine its policy. *State Auto Property & Casualty Insurance Company v. Boardwalk Apartments*, L.C., 572 F.3d 511, 515 (8th Cir. 2009) citing *Jenkad Enters., Inc. v. Transp. Ins. Co.*, 18 S.W.3d 34, 38 (Mo.App. 2000) and *Secura Ins. v. Saunders*, 227 F.3d 1077, 1081 (8th Cir.2000). An insurance broker does not have a duty to explain the policy to an insured. *Wilmering v. Lexington Insurance Company*, 678 S.W.2d 865, 872 (Mo.App. E.D. 1984). This is particularly true when no request for such advice was made. *Id*. The insured has an obligation to advise itself of its purchase and while that obligation is less exacting as to the insured's broker that "does not mean that an insured can close his eyes and go on forever and act as an incompetent ward with the broker as his guaranteeing guardian." *Id*. citing *Kap-pel Fabrics, Inc. v. R.B. Jones & Sons, Inc*., 402 S.W.2d 49 (Mo.App. 1966).

The job of the broker is to bring the insurance company and the insured together in a contract of insurance. *Wilmering*, 678 S.W.2d at 872. The contract is in writing, and by Prime's own admission, it expected its Risk Manager to read and ensure she understood it. See SOF ¶7. Any issues it encountered after reading said policy could have been but were not addressed until

10

after Prime allegedly paid close to $10 million in defense costs during the Herrera lawsuit two years later. See SOF ¶¶16,18, 22-23. Because AmWins had no separate duty imposed upon it to explain the terms of the policy, Prime's claims fail as a matter of law.

### III. Boxwood's Advice as a Matter of Law is Not the Proximate Cause of Prime's Purported Damages

Prime claims that AmWins, through the Boxwood Group counseled Prime to continue to incur and pay to defend the Herrera Suit even after Prime had satisfied its obligations under the SIR and ACD. The advice Prime refers to came only after Lexington had refused to defend Prime and Prime incurred its purported damages.

As Prime alleges, Lexington's 2015 policy provided a duty to defend. The duty to defend is broader than the duty to indemnify. *McCormack Baron Management Services, Inc. v. American Guarantee & Liability Ins. Co.*, 989 S.W.2d 168, 170 (Mo.banc 1999). "To suggest that the insured must prove the insurer's obligation to pay before the insurer is required to provide a defense would make [the duty to defend] provision a hollow promise...." *Id*. citing 13 John A. Appleman & Jean Appelman, Insurance Law and Practice, section 4684 (rev.vol.1976). The duty to defend arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case. *Id*. "The duty to defend is determined by comparing the language of the insurance policy with the allegations in the complaint. If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." *Id*. "To extricate itself from a duty to defend the insured, the insurance company must prove that there is no possibility of coverage." *Stark Liquidation Co. v. Florists' Mut. Ins. Co.*, 243 S.W.3d 385, 392 (Mo.App. E.D. 2007). When an insurer refuses to defend, the insured is "free to go its own way," and the

11

insurer is obligated to reimburse the insured for expenses incurred in defending the claim. *Id*. at 399.

Here, Mr. Dugan was not brought in until after Lexington had breached its duty to defend. See SOF ¶¶22-23. At that point in time, Prime was "free to go its own way" and seek reimbursement from Lexington for the defense costs incurred. Mr. Dugan's advice was not erroneous but was consistent with Missouri law. Further, his advice was not provided until after Prime's damages had been incurred. See id. Accordingly, and as a matter of law, Mr. Dugan's advice, could not have been the proximate cause of Prime's purported damages. Accordingly, Prime's final allegation of negligence against AmWins fails as a matter of law.

## **CONCLUSION**

In general, Missouri does not recognize a legal duty on the part of insurance brokers to advise them of their insurance needs. While there are a few limited exceptions in extraordinary cases, those exceptions do not apply here. AmWins did not have an extended agency agreement with Prime nor did it have a special relationship triggering such a duty to advise. Prime is a sophisticated insured that had its own Risk Manager fulfilling the role of its insurance advisor. Regardless of whether or not the Risk Manager properly carried out her role, the expectation was on her to read the policies, understand the policies and to act accordingly. Any damages incurred by Prime were not as a result of a false sense of reliance on AmWins, a wholesale broker working for the retail broker. Further, any damages incurred were not due to a claims consultant providing support to Prime after it sustained its self-inflicted wound. The damages incurred by Prime were caused by its own failures, and attempting to create a legal duty where one does not exist to place blame on outsiders, including AmWins, should not stand.

12

Case 6:22-cv-03037-MDH   Document 109   Filed 11/10/23   Page 16 of 17

Accordingly, AmWins respectfully requests this Court grant its Motion for Summary Judgment and for such other and further relief as this Court deems just and proper.

HEPLERBROOM LLC

By: */s/ Meg L. Fowler*
Meg L. Fowler No. 53776
Emily D. Roman No. 69307
701 Market Street, Suite 1400
St. Louis, MO 63101
314-241-6160
314-241-6116 Fax
MLF@heplerbroom.com
ER1@heplerbroom.com
*Attorney for AmWINS Brokerage of the Midwest, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 10, 2023, the foregoing was filed electronically with the Clerk of Court, therefore to be served electronically by operation of the Court's electronic filing system upon all counsel of record.

*/s/ Meg L. Fowler*
